```
 1                  UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NORTH CAROLINA
 2                        EASTERN DIVISION

 3

 4   UNITED STATES OF AMERICA,-   Docket No. 4:20-cr-115-FL-1
                              -
 5       Plaintiff,           -   New Bern, North Carolina
                              -   January 20, 2023
 6          v.                -   Sentencing
                              -
 7   PATRICK FEDAK,           -
                              -
 8       Defendant.           -
     -------------------------------

 9

10          PUBLIC TRANSCRIPT OF SENTENCING HEARING
           BEFORE THE HONORABLE LOUISE WOOD FLANAGAN
11                UNITED STATES DISTRICT JUDGE.

12             (PURSUANT TO STANDING ORDER 22-SO-1,
     PORTIONS OF ALL CHANGE OF PLEA AND SENTENCING
13   TRANSCRIPTS ARE RESTRICTED)

14
     APPEARANCES:
15
     For the Plaintiffs:  United States Attorneys' Office
16                        By:  Barbara D. Kocher
                          150 Fayetteville Street, Suite 2100
17                        Raleigh, NC 27601
                          (919) 856-4500
18
     For the Defendant:  Federal Public Defender
19                       By: Lauren Harrell Brennan
                         150 Fayetteville St., Suite 450
20                       Raleigh, NC 27611-5967
                         (919) 856-4236
21
     Court Reporter:      Tracy L. McGurk, RMR, CRR
22                        413 Middle St.
                          New Bern, NC 28560
23                        (419) 392-6626

24

25   Proceedings recorded by mechanical stenography,
     transcript produced by notereading.
```

```
1                        I N D E X

2

3    Examinations                                Page

4

5       PETER SALOMON, DIRECT EXAMINATION           6

6       BY MS. KOCHER:

7       PETER SALOMON, CROSS-EXAMINATION            40

8       BY MS. BRENNAN:

9

10      PETER SALOMON, REDIRECT EXAMINATION         54

11      BY MS. KOCHER:

12      PETER SALOMON, CROSS-EXAMINATION            59

13      BY MS. BRENNAN:

14

15                      E X H I B I T S

16   No.         Description                     Page

17

18   Whereupon Defendant's Exhibit 1 is admitted    61

19    into evidence

20   Whereupon Government's Exhibits 1 through       61

21    11 are admitted into evidence

22

23                          - - -

24

25
```

                         (Commenced at 10:43 a.m.)

                         THE COURT:  Counsel, I'm going to invite you

to correct my pronunciation of your client's surname.

Fedak?  Fedak?

                         MS. BRENNAN:  Fedak.

                         THE COURT:  Mr. Fedak, have you read the

presentence report?

                         THE DEFENDANT:  Yes, ma'am.

                         THE COURT:  Good.  Have you had enough time

to talk with your attorney to be ready today to be

sentenced?

                         THE DEFENDANT:  Yes, ma'am.

                         THE COURT:  All right.  Very good.  Thank

you.  You can be seated.

                         I was disappointed to learn that the

defendant didn't stay with his in-laws on December 26th,

but instead drove to Raleigh and stayed with Ms. Pruitt,

when the Court had a motion pending in front of it

whether or not he would have permission to visit Ms.

Pruitt over the New Year's, which I ultimately denied.

                         And the probation officer called your

mother-in-law and wanted to know how things went over

Christmas, and she indicated that third night you

weren't with them.

                         And the defendant lied to the probation

| | | |
|---|---|---|
| 00:01:30 | 1 | officer.   He said he was at his house. |
| 00:01:32 | 2 | Of course, we can figure out where he is |
| 00:01:34 | 3 | because he's still wearing the location monitoring, or |
| 00:01:37 | 4 | where he's not, and he was not at his house. |
| 00:01:40 | 5 | And that's when the defendant admitted going |
| 00:01:45 | 6 | to see Ms. Pruitt in Raleigh. |
| 00:01:50 | 7 | And apparently Mr. Fedak says he was a |
| 00:01:55 | 8 | little confused with the language that was used to give |
| 00:02:03 | 9 | you those three nights with your in-laws and your |
| 00:02:09 | 10 | children and your wife, or soon-to-be ex-wife. |
| 00:02:14 | 11 | Which kind of is similar to what kind of got |
| 00:02:20 | 12 | you in this position, which is reading things, thinking |
| 00:02:27 | 13 | about things, and justifying your actions in a way that |
| 00:02:35 | 14 | brings you what you want. |
| 00:02:41 | 15 | And you used taxpayers' resources to bring |
| 00:02:45 | 16 | you a lot of things of what you want or wanted, or what |
| 00:02:52 | 17 | people in the service wanted, that accrued back to you |
| 00:02:57 | 18 | in terms of your sense of esteem.  Supposedly this car |
| 00:03:07 | 19 | brought your father pleasure, so it looks like that was |
| 00:03:12 | 20 | some form of justification that you used to steal the |
| 00:03:16 | 21 | car. |
| 00:03:21 | 22 | So for a lot of reasons the probation office |
| 00:03:24 | 23 | doesn't think you've accepted responsibility. |
| 00:03:29 | 24 | And we all know about you burying the |
| 00:03:32 | 25 | weapons in the dirt, which is an obstruction |

00:03:40  1   enhancement.

00:03:43  2              There's a lot to unravel here.

00:03:46  3              There's a lot of nice letters that have been

00:03:50  4   sent of support.  And a lot of work has gone into

00:03:57  5   advancing the defendant's position at sentencing for a

00:04:01  6   time served sentence that manifests itself in about

00:04:07  7   three-quarters of an inch of paperwork filed by the

00:04:11  8   Federal Public Defender.  A very thoughtful memorandum,

00:04:20  9   these letters, psychological evaluation.

00:04:31  10             Well, Ms. Brennan, where do you think we

00:04:35  11  should begin to unravel, with the first goal being to

00:04:39  12  decide what the advice is of the sentencing guidelines?

00:04:42  13             MS. BRENNAN:  Your Honor, I drafted pretty

00:04:48  14  detailed objections.  And I really think from hearing

00:04:51  15  what the Court opened with you have a very good handle

00:04:53  16  on exactly where we are, what the nature of our

00:04:57  17  objections are.  I'd be happy to answer any questions

00:05:00  18  that the objections have given the Court.

00:05:04  19             THE COURT:  Okay.  I appreciate that.

00:05:12  20             I know I've got some questions, but why

00:05:14  21  don't we hear from Ms. Kocher.

00:05:15  22             MS. KOCHER:  Your Honor, in response to the

00:05:17  23  objections, the government would put on evidence through

00:05:19  24  testimony --

00:05:19  25             THE COURT:  All right.

| | |
|---|---|
| 00:05:21 | 1 |
| 00:05:25 | 2 |
| 00:05:31 | 3 |
| 00:05:32 | 4 |
| 00:05:36 | 5 |
| 00:05:44 | 6 |
| 00:05:48 | 7 |
| 00:05:50 | 8 |
| 00:06:07 | 9 |
| 00:06:07 | 10 |
| 00:06:09 | 11 |
| 00:06:09 | 12 |
| 00:06:10 | 13 |
| 00:06:10 | 14 |
| 00:06:11 | 15 |
| 00:06:11 | 16 |
| 00:06:15 | 17 |
| 00:06:16 | 18 |
| 00:06:18 | 19 |
| 00:06:21 | 20 |
| 00:06:22 | 21 |
| 00:06:22 | 22 |
| 00:06:25 | 23 |
| 00:06:30 | 24 |
| 00:06:31 | 25 |

1  MS. KOCHER:  -- and would call Special Agent
2  Peter Salomon with the Naval Criminal Investigative
3  Service.
4  THE COURT:  Please come forward.
5  THE CLERK:  You may go to the witness stand.
6  If you would please raise your right hand, state and
7  spell your name.
8  THE WITNESS:  Peter Solomon, P-e-t-e-r
9  S-a-l-o-m-o-n.
10  (Whereupon the witness was sworn by the
11  clerk.)
12  THE CLERK:  You may be seated.
13  - - -
14  PETER SALOMON, DIRECT EXAMINATION
15  BY MS. KOCHER:
16  Q.  Sir, you're a special agent with Naval Criminal
17  Investigative Service; is that correct?
18  A.  Yes.
19  Q.  Did you have a role in the investigation of
20  Defendant Fedak?
21  A.  Yes.
22  Q.  Did you have the opportunity to debrief Mr. Fedak
23  following a plea agreement here in this courtroom in
24  June of 2022?
25  A.  Yes.

00:06:31  1    Q.  I would like to focus on that interview

00:06:33  2  ultimately.  But if you would, first, just -- the Court

00:06:37  3  has expressed understanding of the case, but just very

00:06:40  4  briefly describe how and when it came to NCIS attention.

00:06:45  5    A.  The investigation was initiated in December of

00:06:49  6  2019 after Command noticed that Mr. Fedak had ordered

00:06:54  7  items through GSAXcess, which is a government service

00:06:58  8  website where people can acquire -- or government

00:07:01  9  agencies can acquire no-cost items for agency-to-agency

00:07:05  10  transfer.  During the course of that investigation we

00:07:07  11  uncovered that there were additional items ordered from

00:07:12  12  both North Carolina and California to include a vehicle,

00:07:17  13  iPhones, firearms, and things of that nature.

00:07:20  14    Q.  You mentioned California.  How does California

00:07:23  15  come into the picture?

00:07:24  16    A.  California comes in because that is the previous

00:07:27  17  duty station of Mr. Fedak prior to transferring to North

00:07:31  18  Carolina.

00:07:31  19    Q.  And so at the time of the investigation and going

00:07:35  20  forward he was stationed at Marine Corps Air Station

00:07:39  21  Cherry Point here locally?

00:07:40  22    A.  Yes.

00:07:42  23         MS. KOCHER:  If I may approach, Your Honor?

00:08:03  24         THE COURT:  Yes.

00:08:03  25  BY MS. KOCHER:

| | | |
|---|---|---|
| 00:08:04 | 1 | Q. I hand you what's been marked Government's |
| 00:08:06 | 2 | Exhibits 1, 2, and 11. |
| 00:08:08 | 3 | Turning your attention first to Government's |
| 00:08:10 | 4 | Exhibit 1, do you recognize that? |
| 00:08:12 | 5 | A. Yes. |
| 00:08:12 | 6 | Q. And what is that? |
| 00:08:13 | 7 | A. This is a letter that NCIS received for the |
| 00:08:17 | 8 | notice of representation for, at the time, Captain |
| 00:08:21 | 9 | Patrick Fedak. |
| 00:08:23 | 10 | Q. So this would be in regard to any military |
| 00:08:25 | 11 | investigation or proceeding against him? |
| 00:08:28 | 12 | A. Yes. |
| 00:08:28 | 13 | Q. So the letter basically says that he had retained |
| 00:08:32 | 14 | counsel for the purpose of that proceeding; is that |
| 00:08:35 | 15 | correct? |
| 00:08:35 | 16 | A. Yes. |
| 00:08:36 | 17 | Q. At the interview -- so now turning to the |
| 00:08:42 | 18 | debrief. Did Mr. Fedak discuss the titling of the |
| 00:08:48 | 19 | Mercedes vehicle that you referenced earlier as a |
| 00:08:51 | 20 | vehicle that he obtained through GSAXcess? |
| 00:08:54 | 21 | A. Yes. |
| 00:08:55 | 22 | Q. If you would look at what's been marked |
| 00:09:02 | 23 | Government's Exhibit 2. |
| 00:09:02 | 24 | Do you recognize that? |
| 00:09:05 | 25 | A. Yes. |

00:09:05  1    Q.   And what is that?

00:09:07  2    A.   This is records that we received from the

00:09:10  3    California Department of Motor Vehicles pertaining to

00:09:14  4    the titling of that vehicle and additional California

00:09:19  5    DMV records.

00:09:20  6    Q.   Just to remind the Court briefly, this involves a

00:09:25  7    GSAXcess requisition by Mr. Fedak for a Mercedes SUV?

00:09:30  8    A.   Yes.

00:09:32  9    Q.   How did the SUV end up on the GSAXcess website?

00:09:32  10   Do you know?

00:09:37  11   A.   The vehicle was seized as part of another federal

00:09:39  12   agency investigation and ultimately was held by that

00:09:43  13   agency before being placed on GSAXcess.

00:09:46  14   Q.   Do you have any reference as to the timeframe

00:09:51  15   that that agency or other federal agencies held that

00:09:53  16   vehicle before it was posted on GSAXcess?

00:09:56  17   A.   Yes.  I believe the timeframe was between 2009 to

00:09:59  18   2010 when the vehicle was seized, and it would have been

00:10:01  19   posted and acquired in the 2019 timeframe.

00:10:04  20   Q.   In, I'm sorry?

00:10:07  21   A.   The 2019 timeframe is when Mr. Fedak acquired it.

00:10:11  22   Q.   If I could turn your attention to the page that

00:10:13  23   is stamped number 884.  What is that document?

00:10:23  24   A.   This document is the Application For Duplicate Or

00:10:26  25   Transfer of Title.

00:10:29 1    Q.  And in the interview, the debrief with Mr. Fedak,

00:10:35 2  did you reference this particular document in your

00:10:38 3  inquiry of him in regard to the Mercedes?

00:10:40 4    A.  Yes.

00:10:41 5    Q.  And at the inquiry did you show him this

00:10:45 6  document?

00:10:46 7    A.  Yes.

00:10:49 8    Q.  What specifically was asked of him in regard to

00:10:52 9  this document?

00:10:52 10    A.  He was asked whether or not he signed this

00:10:55 11  document and whether or not he signed the name for

00:10:59 12  Antonio Gonzalez on the document.

00:11:03 13    Q.  Is Antonio Gonzalez, to your knowledge, a real

00:11:07 14  person?

00:11:07 15    A.  Yes.

00:11:07 16    Q.  Who was that?

00:11:08 17    A.  He was the individual who the vehicle was seized

00:11:10 18  from as part of the previous law enforcement

00:11:12 19  investigation.

00:11:14 20    Q.  Virtually ten years prior to this?

00:11:16 21    A.  Correct.

00:11:19 22    Q.  How did he answer those questions?

00:11:21 23    A.  He provided that he signed this document for the

00:11:24 24  Patrick Fedak.  He provided that he wrote in the name

00:11:27 25  Antonio Gonzalez, but he denied signing the name Antonio

00:11:32  1  Gonzalez on these forms.

00:11:34  2      Q.  Did he explain or know who had signed for Mr.

00:11:36  3  Antonio Gonzalez?

00:11:38  4      A.  He theorized that someone at the California DMV

00:11:41  5  had signed when he submitted it.

00:11:44  6      Q.  I noticed this page bears a notary public seal

00:11:48  7  here from the State of North Carolina.  Did you have

00:11:50  8  the opportunity to investigate that?

00:11:52  9      A.  Yes.

00:11:52  10      Q.  And what did you learn?

00:11:53  11      A.  The notary, Ms. Lisa Kuhl, she is a notary on

00:11:58  12  Marine Corps Air Station Cherry Point.  We were able to

00:12:00  13  review her notary log, and she notarized this document

00:12:04  14  on March 10 of 2020.

00:12:06  15      Q.  And she had the records to show that?

00:12:08  16      A.  Yes.

00:12:10  17      Q.  Did you give him the opportunity during the

00:12:13  18  debrief to correct his statement in regard to this title

00:12:17  19  application?

00:12:18  20      A.  Yes.  This was brought up again, and that's when

00:12:21  21  we pulled up on the computer the document and physically

00:12:24  22  showed it to him.

00:12:25  23      Q.  And did he maintain that he did not sign Antonio

00:12:28  24  Gonzalez's signature on that?

00:12:30  25      A.  Yes.

| | | |
|---|---|---|
| 00:12:31 | 1 | Q. If I can turn your attention to the page stamped |
| 00:12:37 | 2 | 892 in this same Government's Exhibit 2. |
| 00:12:41 | 3 | What is that document? |
| 00:12:45 | 4 | A. This document is the bill of sale. |
| 00:12:49 | 5 | Q. For what? |
| 00:12:52 | 6 | A. It is a bill of sale showing that the Mercedes in |
| 00:12:55 | 7 | question was sold by Antonio Gonzalez to Patrick Fedak |
| 00:13:01 | 8 | on November 14, 2019. |
| 00:13:04 | 9 | Q. And is that day relevant to the receipt of the |
| 00:13:08 | 10 | Mercedes? |
| 00:13:09 | 11 | A. Yes, it correlates to the GSA documents for the |
| 00:13:13 | 12 | acquisition of the vehicle. |
| 00:13:14 | 13 | Q. All right. And what else does this bill of sale |
| 00:13:17 | 14 | inform the California Department of Motor Vehicles? |
| 00:13:20 | 15 | A. It informs that the -- well, there's the names, |
| 00:13:27 | 16 | both Antonio Gonzalez and Patrick Fedak on it with |
| 00:13:31 | 17 | signatures. It's also from the seller certified under |
| 00:13:34 | 18 | penalty of perjury under the laws of California. |
| 00:13:37 | 19 | Q. And is there a sale amount on this document? |
| 00:13:40 | 20 | A. Yes. The sale amount shows $1,500. |
| 00:13:53 | 21 | Q. Did you have the opportunity to compare the facts |
| 00:13:55 | 22 | on this bill of sale to statements made by government |
| 00:13:59 | 23 | officials who were present when Mr. Fedak acquired the |
| 00:14:03 | 24 | Mercedes? |
| 00:14:05 | 25 | A. Yes. |

00:14:06  1    Q.  And what can you tell us about their statements
00:14:08  2  in regard to the facts on this bill of sale?
00:14:10  3    A.  The facts of this bill of sale were not accurate
00:14:15  4  per the law enforcement agency.
00:14:20  5    Q.  If I can have you turn now to page 894.
00:14:30  6        What is this document?
00:14:31  7    A.  This document is an application for temporary
00:14:34  8  smog exemption for a vehicle located out of state.
00:14:39  9    Q.  And you noted the last document, the bill of
00:14:41  10  sale, was signed by purportedly Mr. Gonzalez and Mr.
00:14:48  11  Fedak both under penalty of perjury.  Does this
00:14:51  12  document bear that same certification?
00:14:53  13    A.  Yes.
00:14:55  14    Q.  Just at about the third from the top of the page,
00:15:02  15  the street address for Mr. Fedak is listed.  And below
00:15:05  16  that appears to be some type of statement of facts.  Do
00:15:08  17  you see where I'm referencing?
00:15:09  18    A.  Yes.
00:15:10  19    Q.  What does it say there?
00:15:11  20    A.  It says that the vehicle is temporarily located
00:15:15  21  out of state because it was inoperable and they no
00:15:18  22  longer lived in California.
00:15:21  23        "I am currently active duty military, and this
00:15:24  24  vehicle was bought when I was stationed in California.
00:15:27  25  It will not be reregistered in California where we no

00:15:31  1   longer live in that state and currently have no plans to

00:15:34  2   return."

00:15:35  3       Q.  All right.  And just looking -- it is true that

00:15:37  4   he no longer lived in California at this time; is that

00:15:40  5   correct?

00:15:40  6       A.  Yes.

00:15:41  7       Q.  And that he was currently active duty military?

00:15:44  8       A.  Yes.

00:15:46  9       Q.  What about the assertion that the vehicle was

00:15:48  10  bought when he was stationed in California?  Did this

00:15:52  11  activity, this acquisition of this Mercedes, occur while

00:15:56  12  he was stationed in California?

00:15:57  13      A.  No.

00:15:57  14      Q.  How do you know that?

00:15:58  15      A.  Per the GSA records, the acquisition documents,

00:16:01  16  and the vehicle transfers.

00:16:02  17      Q.  And his military records?

00:16:04  18      A.  Yes.

00:16:05  19      Q.  Did he have a temporary duty station in

00:16:09  20  California during the time period that he acquired this

00:16:12  21  vehicle?

00:16:12  22      A.  Not that I'm aware of.

00:16:14  23      Q.  Do you know then if he took leave or was absent

00:16:20  24  from the military under other circumstances?

00:16:22  25      A.  Yes, he took leave from his command in order to

00:16:26  1    travel down to pick up the vehicle with his dad.

00:16:28  2        Q.  So annual leave?

00:16:30  3        A.  Yes.

00:16:32  4        Q.  And that was from Marine Corps Air Station Cherry

00:16:36  5    Point?

00:16:36  6        A.  Yes.

00:16:41  7        Q.  And did you happen to compare the signatures of

00:16:44  8    Mr. Fedak on the three pages we have looked at, page

00:16:48  9    882, page 884, 892, and 894?

00:16:55  10       A.  Yes.

00:16:56  11       Q.  And what did you perceive about Mr. Fedak's

00:16:58  12   signatures?

00:17:00  13            MS. BRENNAN:  I'd object, Your Honor, unless

00:17:02  14   he has some special training in handwriting analysis.

00:17:05  15   Your Honor, I don't believe he's qualified to testify as

00:17:08  16   an expert regarding signatures.

00:17:10  17            THE COURT:  Let's hear what his answer is.

00:17:13  18       A.  The signatures look similar.

00:17:18  19            THE COURT:  Okay.  I'll let you test that on

00:17:20  20   cross, of course.

00:17:24  21   BY MS. KOCHER:

00:17:26  22       Q.  And in regard to Mr. Gonzalez's signatures?

00:17:30  23       A.  The signatures shown for Mr. Gonzalez --

00:17:35  24            MS. BRENNAN:  Same objection, Your Honor.

00:17:36  25            THE COURT:  Overruled.

00:17:38   1    A.   -- appear similar as well.

00:17:40   2   BY MS. KOCHER:

00:17:40   3    Q.   Now, a page that we've not looked at, there is an

00:17:48   4   application for registration of a new vehicle in the

00:17:52   5   package.   And this is at page stamped 900.

00:17:55   6    A.   Yes.

00:17:56   7    Q.   Did you have the opportunity to look -- well,

00:17:59   8   first of all, what is this?

00:18:01   9    A.   This is the application for registration of a new

00:18:05   10   vehicle.

00:18:06   11    Q.   So what is it?

00:18:08   12    A.   It is the application for new vehicle when the

00:18:11   13   vehicle was initially purchased by Antonio Gonzalez in

00:18:16   14   2009.

00:18:17   15    Q.   Does this application purport to contain the

00:18:19   16   signature of Mr. Gonzalez?

00:18:21   17    A.   Yes.

00:18:22   18    Q.   And where is that signature located?

00:18:24   19    A.   That signature is located under applicant's

00:18:28   20   certification towards the middle of the page dated

00:18:31   21   4-11-2009.

00:18:33   22    Q.   It's at the very bottom of the page?

00:18:35   23    A.   It's also on the very bottom of the page,

00:18:38   24   correct.

00:18:38   25    Q.   And to your perception, not putting you forth as

00:18:42  1   an expert, but to your perception does that signature

00:18:45  2   appear to be similar in nature to the other two

00:18:49  3   signatures of Antonio Gonzalez presented in Government's

00:18:52  4   Exhibit 2?

00:18:52  5       A.   No.

00:19:05  6       Q.   Let's turn to the burial of the firearms.   At

00:19:10  7   this debrief did you have the opportunity to speak with

00:19:14  8   Mr. Fedak about the burial of the firearms?

00:19:18  9       A.   Yes.

00:19:18  10      Q.   And what did he tell you?

00:19:22  11      A.   He provided that he had buried the firearms

00:19:25  12  earlier and that he was going back to check on them

00:19:30  13  before turning them in as part of his post guilty plea

00:19:35  14  proffer.

00:19:35  15      Q.   Did he give you a timeframe for that earlier

00:19:38  16  burial that he informed you of?

00:19:40  17      A.   Yes.  He provided it would have been after he was

00:19:43  18  told he could no longer possess weapons by the Court.

00:19:47  19      Q.   And his initial appearance was on or about

00:19:50  20  December 9 of 2020; is that correct?

00:19:52  21      A.   Yes.

00:20:02  22      Q.   Did you have the opportunity to review the

00:20:07  23  evidence in regard to the burial of firearms that the

00:20:09  24  investigation had revealed?

00:20:10  25      A.   Yes.

| | | |
|---|---|---|
| 00:20:11 | 1 | Q.  And did you prepare a series of clips from the |
| 00:20:15 | 2 | various video and video footage that would be of |
| 00:20:20 | 3 | assistance to the Court in understanding the timeline of |
| 00:20:22 | 4 | events? |
| 00:20:23 | 5 | A.  Yes. |
| 00:20:26 | 6 | Q.  All right.  First, the plea of guilty and the |
| 00:20:31 | 7 | debrief that followed was itself following a superseding |
| 00:20:34 | 8 | indictment which charged Mr. Fedak with obstruction; is |
| 00:20:38 | 9 | that right? |
| 00:20:38 | 10 | A.  Yes. |
| 00:20:39 | 11 | Q.  As part of that investigation is it true you |
| 00:20:41 | 12 | received a tip which included a nine-minute video of Mr. |
| 00:20:46 | 13 | Fedak talking about having buried the firearms? |
| 00:20:49 | 14 | A.  Yes. |
| 00:20:49 | 15 | Q.  And in particular, is there a portion of that |
| 00:20:53 | 16 | video that speaks directly to the timeline as to when |
| 00:21:00 | 17 | these firearms would have been buried? |
| 00:21:05 | 18 | A.  Yes. |
| 00:21:19 | 19 | MS. KOCHER:  If I may have just a moment, |
| 00:21:21 | 20 | Your Honor. |
| 00:21:21 | 21 | MS. BRENNAN:  Your Honor, I would object to |
| 00:21:22 | 22 | this being introduced as evidence based on the marital |
| 00:21:27 | 23 | privilege. |
| 00:21:28 | 24 | THE COURT:  Based on what? |
| 00:21:29 | 25 | MS. BRENNAN:  Marital privilege.  This is a |

00:21:29   1   conversation that occurred between Mr. Fedak and his

00:21:33   2   wife that she recorded.

00:21:40   3                 MS. KOCHER:  I believe it came in without

00:21:42   4   objection.  It's already in the Court's record as

00:21:46   5   Exhibit 4 from the detention hearing, Your Honor.

00:21:48   6                 THE COURT:  Well, I don't think we're

00:21:51   7   circumscribed at a detention hearing or at a sentencing

00:21:56   8   hearing by such a contention.  Do you think

00:22:00   9   differently?

00:22:01  10                 MS. BRENNAN:  The Rules of Evidence do not

00:22:03  11   strictly apply.  However, I would note that this was at

00:22:07  12   a marital communication, and I feel like it should be

00:22:10  13   excluded as such.

00:22:14  14                 THE COURT:  Well, I'll tell you, I read a

00:22:16  15   whole lot of marital communications in presentence

00:22:20  16   reports.  I'm going to let this in.

00:22:31  17   BY MS. KOCHER:

00:22:31  18       Q.  From that video clip of that nine-minute video,

00:22:35  19   can you tell the Court what you heard and viewed?

00:22:39  20       A.  Yes.  Mr. Fedak told the witness that once he

00:22:45  21   realized the guns were located at the DBJ Corporation,

00:22:49  22   he moved them specifically so nothing would be at the

00:22:52  23   DBJ Corporation and tied to her family because her

00:22:56  24   family had nothing to do with the alleged misconduct.

00:23:03  25                 MS. KOCHER:  All right.  I'd like to play

00:23:07  1    that clip for the Court now.

00:23:20  2                    (Whereupon exhibit is attempted to be played

00:23:28  3    in open court; no audio.)

00:23:48  4    BY MS. KOCHER:

00:23:49  5        Q.   So as you described --

00:23:50  6                    THE COURT:   Are you going to play it?

00:23:52  7                    MS. KOCHER:   Your Honor --

00:23:56  8                    THE COURT:   We can get an IT person down.

00:23:59  9              Let's just be at ease while Ryan Willett is

00:24:05  10   invited to the courtroom by Ms. Castania.

00:24:16  11                   MS. KOCHER:   Thank you, Your Honor.

00:24:18  12                   THE COURT:   I would like it louder.

00:24:22  13                   MS. KOCHER:   My apologies.

00:24:25  14              This is Exhibit 3.

00:24:27  15                   (Whereupon exhibit is played in open court.)

00:26:02  16   BY MS. KOCHER:

00:26:02  17       Q.   Did you hear, Agent Salomon, any reference to

00:26:07  18   having buried the guns in December of '20?

00:26:09  19       A.   No.

00:26:10  20       Q.   Instead, what did you hear?

00:26:11  21       A.   I heard that the guns were buried around the time

00:26:16  22   of that video, within a few months, in order to insure

00:26:20  23   that -- or within a series of a few days, per what the

00:26:23  24   investigation showed, to avoid them being at DBJ.

00:26:27  25       Q.   What is DBJ?

00:26:28  1    A.   DBJ Corporation is the business owned by his

00:26:34  2  wife's family.

00:26:36  3    Q.   All right.  Now, in investigating the

00:26:39  4  obstruction conduct, you, yourself, went to DBJ; is that

00:26:46  5  correct?

00:26:46  6    A.   Yes.

00:26:46  7    Q.   And located a number of available video footages

00:26:52  8  from that company and from its areas and parking lot; is

00:26:58  9  that correct?

00:26:58  10    A.   Yes.

00:26:58  11    Q.   As with the previous video, did you put together

00:27:02  12  particular clips that would be of interest in assistance

00:27:05  13  to the Court in understanding the timeline of the events

00:27:08  14  on that day?

00:27:09  15    A.   Yes.

00:27:09  16    Q.   All right.  First I'm going to show you what has

00:27:14  17  been marked as Exhibit 4.

00:24:28  18            (Whereupon exhibit is played in open court.)

00:27:22  19            THE COURT:  So 4 is on that disk?  Multiple

00:27:27  20  clips are on the disk that you handed up?

00:27:31  21            MS. KOCHER:  That's correct, Your Honor.

00:27:32  22  BY MS. KOCHER:

00:27:32  23    Q.   If you would, Agent Salomon, just describe what

00:27:35  24  you're seeing here?

00:27:36  25    A.   The video depicts Mr. Fedak walking into the DBJ

00:27:40  1  Corporation area where he was working holding both a

00:27:43  2  pickax and a shovel walking towards the end of the

00:27:46  3  building to the side door and then exiting the door

00:27:50  4  towards the front of the business.  And the time is

00:27:54  5  approximately 11:54.

00:27:59  6      Q.  Do you know if that's in the morning or the

00:28:01  7  evening?

00:28:02  8      A.  That's in the morning of February 9 of 2022.

00:28:08  9      Q.  So it is at about 20 seconds in the clip when you

00:28:17 10  can see from the rear view of Mr. Fedak the clear view

00:28:21 11  of both a shovel and a pickax in his left hand?

00:28:24 12      A.  Yes.

00:28:24 13      Q.  Can you describe for the record the demeanor, if

00:28:29 14  you would, as he's carrying those items?

00:28:32 15      A.  He's holding them both in one hand and walking at

00:28:36 16  a normal pace out of the building.

00:28:40 17      Q.  All right.  The next clip you prepared,

00:28:45 18  Government's Exhibit 5, is outside of a DBJ trailer; is

00:29:00 19  that correct?

00:24:28 20          (Whereupon exhibit is played in open court.)

00:29:00 21      A.  The next video I believe is outside -- yes, this

00:29:03 22  is outside the trailer.  These may have gotten out of

00:29:08 23  order here.

00:29:09 24  BY MS. KOCHER:

00:29:09 25      Q.  They did.  Sorry.  Let's try this one.

00:29:12   1   Exhibit 5.

00:24:28   2                   (Whereupon exhibit is played in open court.)

00:29:13   3       A.   Correct.   So this is the front camera depicting

00:29:16   4   the area where when you walk out that door from the

00:29:18   5   workshop that faces the front of the building, the

00:29:21   6   Silver Ford truck is his vehicle.   He walks over to the

00:29:26   7   truck and puts both the pickax and the shovel in the bed

00:29:29   8   of the truck, closes the door.

00:29:31   9   BY MS. KOCHER:

00:29:31  10       Q.   And there were several spots in there where both

00:29:34  11   of those tools could be seen; is that correct?

00:29:36  12       A.   Yes.

00:29:38  13       Q.   Namely right there at about three seconds in?

00:29:41  14       A.   Yes.

00:29:42  15       Q.   And then again when he turns at the end of the

00:29:44  16   truck?

00:29:45  17       A.   Yes.

00:29:47  18       Q.   You can see the two handles as they go into the

00:29:50  19   bed of the truck.   And that was at about ten seconds in?

00:29:54  20       A.   Yes.

00:29:57  21       Q.   Moving on to Exhibit 6 then.

00:30:05  22            Hang on.

00:30:08  23            The disk does not have multiple copies, just for

00:30:13  24   the --

00:30:17  25            Is that the same one?

00:30:20  1    A.  Still the same video.

00:30:22  2    Q.  My apologies.

00:30:34  3    A.  It should be the initial one you had pulled up

00:30:37  4  out of the trailer.

00:30:38  5    Q.  I'm sorry?  I can't hear you.

00:30:40  6    A.  It should have been the initial video of the --

00:30:45  7  where the silver truck is parked by the trailer in the

00:30:48  8  back.

00:30:56  9         Not this one.

00:31:14  10         MS. KOCHER:  If I can have just a moment,

00:31:16  11  Your Honor, I need to clean up the database so I don't

00:31:19  12  continue to take your time.

00:31:21  13         THE COURT:  Take a moment.

00:32:19  14  BY MS. KOCHER:

00:32:20  15    Q.  All right.  Let's see if I'm back on track now.

00:32:43  16         What does this video show?

00:24:28  17         (Whereupon exhibit is played in open court.)

00:32:49  18    A.  Still the --

00:32:51  19  BY MS. KOCHER:

00:32:51  20    Q.  Still the wrong video?

00:32:58  21    A.  It should be, I believe, the one that's marked

00:33:01  22  Exhibit 4 in what you had just pulled up.  It may have

00:33:05  23  been mislabeled.  Either 4 or 7.  I believe it's the

00:33:11  24  one marked 4.

00:33:13  25         MS. KOCHER:  Your Honor, may I retrieve the

| | | |
|---|---|---|
| 00:33:17 | 1 | disk from the Court and just play from the disk?  I |
| 00:33:23 | 2 | apologize. |
| 00:34:08 | 3 | BY MS. KOCHER: |
| 00:34:09 | 4 | Q.  All right.   This is Government's Exhibit 6. |
| 00:24:28 | 5 | (Whereupon exhibit is played in open court.) |
| 00:24:28 | 6 | BY MS. KOCHER: |
| 00:34:10 | 7 | Q.  What is happening here? |
| 00:34:12 | 8 | A.  This is the time Mr. Fedak returns in the silver |
| 00:34:19 | 9 | truck; he is seen taking the pickax out of the bed and |
| 00:34:21 | 10 | placing it into the second trailer, which is the same |
| 00:34:24 | 11 | location where NCIS located a pickax when we went to DBJ |
| 00:34:28 | 12 | Corporation. |
| 00:34:29 | 13 | Q.  Now, in compiling these videos, did you look at |
| 00:34:36 | 14 | all the video footage? |
| 00:34:38 | 15 | A.  Yes. |
| 00:34:38 | 16 | Q.  And following his placement of this pickax in the |
| 00:34:41 | 17 | trailer, did you ever see the pickax again? |
| 00:34:43 | 18 | A.  I did not see the pickax again. |
| 00:34:46 | 19 | Q.  Did you come to see the pickax again some other |
| 00:34:49 | 20 | time? |
| 00:34:49 | 21 | A.  Yes, I saw it again when we went to DBJ, and it |
| 00:34:53 | 22 | was in that same location where it was placed in this |
| 00:34:55 | 23 | video. |
| 00:34:56 | 24 | Q.  Right inside the door? |
| 00:34:57 | 25 | A.  Yes. |

00:35:02　1　　Q.　And Government's Exhibit 7 is a clip that

00:35:05　2　demonstrates what?

00:24:28　3　　　　　　(Whereupon exhibit is played in open court.)

00:35:06　4　　A.　So there is Mr. Fedak walking out of that

00:35:09　5　furthermost trailer carrying unknown objects and placing

00:35:13　6　them in the bed of the silver truck.

00:35:16　7　BY MS. KOCHER:

00:35:16　8　　Q.　Now, Agent Salomon, to your viewing, what is his

00:35:22　9　posture and attitude toward this object he's carrying

00:35:27　10　compared to that when he was carrying the shovel and

00:35:30　11　pickax in his left hand earlier?

00:35:32　12　　A.　He appears to be handling the unknown object

00:35:35　13　carefully, kind of slanted to the side, before he places

00:35:39　14　the unknown object into the bed of the truck.

00:35:44　15　　Q.　All right.　Now, I note this does not appear to

00:35:46　16　be the same speed with which some of the other video

00:35:49　17　ran.　Can you explain that?

00:35:50　18　　A.　Correct.　Some of the videos I utilized the

00:35:55　19　Microsoft or the Windows feature to be able to slow down

00:35:57　20　videos so that things were easier to see for the Court,

00:36:01　21　not in real speed.

00:36:02　22　　Q.　Having reviewed the original video, did that

00:36:05　23　alter the video in any way other than just slowing it

00:36:08　24　down?

00:36:09　25　　A.　No.

00:36:11  1    Q.  I'm now playing what's marked as Government's

00:36:14  2    Exhibit 8.

00:24:28  3              (Whereupon exhibit is played in open court.)

00:24:28  4    BY MS. KOCHER:

00:36:14  5    Q.  What are we seeing?

00:36:15  6    A.  So the silver truck is moved back to the front.

00:36:18  7    The DBJ vehicle is now pulled around to the back of the

00:36:21  8    silver truck.  Mr. Fedak is reaching into the silver

00:36:25  9    truck and pulls unknown objects out of that truck and

00:36:27  10   places them into the front passenger's seat of the DBJ

00:36:32  11   vehicle.

00:36:47  12   Q.  What will we see him doing here momentarily?

00:36:51  13   A.  Taking some type of bag or trash bag or sack and

00:36:56  14   appears to place it for a number of seconds over

00:36:58  15   whatever was placed in the front seat.

00:37:09  16   Q.  Were you able to identify specifically the object

00:37:11  17   he is moving from the bed of that truck to the cab of

00:37:14  18   the DBJ truck?

00:37:16  19   A.  Not specifically.

00:37:20  20   Q.  Where in the timeline does this video fall?

00:37:22  21   Where is the pickax at this moment?

00:37:24  22   A.  The pickax in this moment, we had just watched it

00:37:27  23   placed in that second trailer.  And this is shortly

00:37:30  24   after that.

00:37:32  25   Q.  And where is the shovel, if you know?

00:37:34  1      A.  The shovel is still in the bed of the truck,

00:37:36  2  which he removes in the next video and places in the bed

00:37:40  3  of the DBJ truck.

00:37:43  4      Q.  Let's go on to Exhibit 9.

00:24:28  5          (Whereupon exhibit is played in open court.)

00:24:28  6  BY MS. KOCHER:

00:38:02  7      Q.  DBJ had a GPS on this truck; is that right?

00:38:05  8      A.  Yes.

00:38:05  9      Q.  Following that particular video, did you utilize

00:38:08  10  that GPS information to learn where the truck was driven

00:38:12  11  by Mr. Fedak?

00:38:13  12      A.  Yes.

00:38:13  13      Q.  Where did it go?

00:38:14  14      A.  Ultimately it drove to what we believe is the job

00:38:18  15  site, and then drove to the location off Vandalia Road

00:38:23  16  where the buried weapons were recovered.

00:38:25  17      Q.  You prepared one final clip that's reflecting Mr.

00:38:29  18  Fedak's return to DBJ; is that correct?

00:38:31  19      A.  Yes.

00:24:28  20          (Whereupon exhibit is played in open court.)

00:38:36  21      A.  In this video he pulls the shovel and some type

00:38:40  22  of bag out of the back of the truck bed.  And there was

00:38:46  23  no pickax seen in this video.

00:38:51  24          MS. KOCHER:  All right.  Thank you, Agent

00:38:53  25  Salomon.

00:39:02  1                    THE COURT:  Are you finished with him, Ms.

00:39:03  2      Kocher?

00:39:04  3                    MS. KOCHER:  No.

00:39:07  4                    THE COURT:  Okay.

00:39:09  5      BY MS. KOCHER:

00:39:10  6          Q.  Can you tell the Court the condition of the guns

00:39:11  7      that were recovered following the burial?

00:39:14  8          A.  Yes.  They had some slight rust on them but not

00:39:19  9      in horrible condition.

00:39:22  10         Q.  And do you have just personal experience with

00:39:26  11     your own weapons?

00:39:27  12         A.  Yes.

00:39:28  13         Q.  What have you experienced in regard to the

00:39:33  14     development of rust on guns?

00:39:35  15         A.  So it can happen just from -- if I carry my Sig,

00:39:39  16     which is a metal-based gun, inside the waistband against

00:39:43  17     my skin, the salt and stuff can cause a little bit of

00:39:47  18     rust on the external of that, which is why I regularly

00:39:51  19     clean that weapon to keep it from having any rust spots.

00:39:54  20         Q.  What would you have expected the condition of the

00:39:56  21     guns to be if they had been in the ground for four days,

00:39:59  22     say?

00:40:01  23         A.  Not overly rusted and still having a descent

00:40:04  24     amount -- maybe a little bit of rust here and there.

00:40:07  25     But if they were in there for a long time, they probably

00:40:09  1  would have had a large amount of rust.

00:40:14  2      Q.  So if Mr. Fedak buried the guns off of Vandalia

00:40:21  3  Road, as he said, in or around December of 2020, that

00:40:24  4  would have put them in the ground for more than a year;

00:40:27  5  is that right?

00:40:27  6      A.  Yes.

00:40:28  7      Q.  And you would have an expectation then that rust

00:40:31  8  would have developed?

00:40:32  9          MS. BRENNAN:  Objection, Your Honor.

00:40:34  10  Again, he's not an expert on rust development or

00:40:37  11  scientific analysis of how metals deteriorate over time.

00:40:41  12  He's really going beyond his scope.

00:40:44  13          THE COURT:  Okay.

00:40:46  14          MS. BRENNAN:  He's a fact witness, Your

00:40:47  15  Honor, not an expert.

00:40:49  16          THE COURT:  Sustained.

00:40:52  17  BY MS. KOCHER:

00:40:52  18      Q.  Was there any rust on the guns when you saw them?

00:40:54  19      A.  A very little amount.

00:41:06  20      Q.  In the debrief, Agent Salomon, did Mr. Fedak make

00:41:10  21  any statements in regard to activities in the year 2019?

00:41:17  22      A.  Yes.

00:41:18  23      Q.  And were any of those statements relevant to the

00:41:21  24  final disposition of the weapons?

00:41:24  25      A.  Yes.

00:41:26  1    Q.  And what did he say?

00:41:27  2    A.  So he provided that initially when he learned

00:41:32  3    about the investigation that he called another

00:41:34  4    individual, Sergeant Major Lucas McKinney, and asked for

00:41:40  5    weapons back from the North Carolina list, and that

00:41:43  6    Sergeant Major McKinney told him that that wasn't

00:41:46  7    possible.  And ultimately those weapons were not

00:41:51  8    recovered.

00:41:52  9    Q.  And if I can turn your attention back to Exhibit

00:41:55  10   1, when did the investigation begin?

00:41:58  11   A.  The investigation began in December of 2019.  We

00:42:02  12   received the notice of representation 16 December of

00:42:05  13   2019.

00:42:07  14   Q.  And Mr. Fedak told you that it was in 2019 that

00:42:10  15   he called Sergeant Major McKinney to request those guns

00:42:15  16   back?

00:42:15  17   A.  Yes.

00:42:18  18   Q.  If I can ask you now to look at Government's

00:42:20  19   Exhibit 11.  To assist in your testimony today, did you

00:42:26  20   prepare a chart detailing each of the 66 requisitioned

00:42:32  21   firearms, whether or not they were recovered, and other

00:42:36  22   pertinent details?

00:42:37  23   A.  Yes.

00:42:38  24   Q.  Is Exhibit 11 that chart?

00:42:40  25   A.  Yes.

00:42:40  1    Q.  Is it true that it will, in fact, help you recall

00:42:44  2    the details between the guns and the various things that

00:42:47  3    you've learned about each of those guns?

00:42:49  4    A.  Yes.

00:42:50  5    Q.  First, if you would, taking a look at column B in

00:42:56  6    particular, it appears that the entries in the rows

00:43:02  7    below, some have spaces between them, and some do not.

00:43:07  8    Can you explain that to the Court?

00:43:09  9    A.  Yes.  The spaces involve different transactions.

00:43:12  10   So the transfer orders themselves are tied to --

00:43:17  11   sometimes there were multiple transfer orders pertaining

00:43:20  12   to a transaction with multiple serial numbers.  So all

00:43:23  13   of those are grouped together.

00:43:25  14   Q.  I see.  So each segment under column B is a

00:43:28  15   particular transfer order?

00:43:30  16   A.  Yes.

00:43:30  17   Q.  Do you have any information as to whether those

00:43:32  18   transfer orders resulted in a single shipment, or is it

00:43:36  19   a shipment per transfer order?

00:43:38  20   A.  So some of them are broken up into multiple

00:43:41  21   shipments per transfer order.  But for the most part

00:43:44  22   it's one shipment per transfer order.

00:43:48  23   Q.  How did you come to know that?

00:43:49  24   A.  We came to that conclusion through researching

00:43:52  25   and speaking with agencies themselves and obtaining

00:43:54  1  shipping records, emails, voice mails, and things of

00:43:57  2  that nature.

00:43:58  3     Q.   You were able to talk with a number of agents who

00:44:01  4  were providing the items actually that had been

00:44:04  5  requisitioned?

00:44:05  6     A.   Yes.

00:44:06  7     Q.   I note column A is the state.   And it appears

00:44:10  8  California takes up most of the first page of

00:44:13  9  Government's Exhibit 11, and North Carolina a good

00:44:17 10  portion of page 2; is that correct?

00:44:19 11     A.   Yes.

00:44:19 12     Q.   All right.   Let's just go through the chart very

00:44:23 13  quickly at this point.   What, if anything, do the

00:44:27 14  shaded lines mean in the chart?

00:44:30 15     A.   The shaded lines are weapons that we recovered

00:44:34 16  during the course of this investigation.

00:44:36 17     Q.   All right.   Of the 66, do you know off the top

00:44:40 18  of your head how many were recovered?

00:44:42 19     A.   I believe it was 22, approximately.

00:44:46 20     Q.   And that's recovered by any means, whether they

00:44:49 21  were unburied or given to you some other way?

00:44:52 22     A.   Yes.

00:44:54 23     Q.   I see the transfer dates are here.   If I can

00:44:58 24  turn you to page 2, column M reflects statements that

00:45:09 25  Fedak made in regard to specific weapons; is that

| | | |
|---|---|---|
| 00:45:12 | 1 | correct? |
| 00:45:12 | 2 | A.  Yes. |
| 00:45:13 | 3 | Q.  What did Mr. Fedak say about the disposition of |
| 00:45:16 | 4 | most of the weapons found on page 2? |
| 00:45:19 | 5 | A.  Most of the weapons he said were -- he |
| 00:45:22 | 6 | transferred to Sergeant Major Lucas McKinney at Lucas |
| 00:45:26 | 7 | McKinney's request to order them. |
| 00:45:28 | 8 | Q.  And what date were those transfers made to Mr. |
| 00:45:32 | 9 | Fedak? |
| 00:45:34 | 10 | A.  On here, 11/13/2019, and then 11/19/2019, and |
| 00:45:44 | 11 | 11/25/2019. |
| 00:45:48 | 12 | Q.  And we just previously discussed his statement |
| 00:45:52 | 13 | that he attempted to call Mr. McKinney when he learned |
| 00:45:54 | 14 | of the investigation; is that right? |
| 00:45:55 | 15 | A.  Yes. |
| 00:45:56 | 16 | Q.  And that would have been within 30 days of Mr. |
| 00:46:09 | 17 | Fedak himself receiving those very weapons; is that |
| 00:46:12 | 18 | right? |
| 00:46:12 | 19 | A.  Yes. |
| 00:46:13 | 20 | I missed in here the November 6, 2019 weapons as |
| 00:46:17 | 21 | well. |
| 00:46:17 | 22 | Q.  All right.  Just moving across then the column |
| 00:46:23 | 23 | names, column J says "Listed in CLEOC."  What is that? |
| 00:46:31 | 24 | A.  So CLEOC is NCIS's law enforcement operations |
| 00:46:35 | 25 | system.  It ties to military bases run by PMO, the |

00:46:41  1   Provost Marshal Office, then Marine Corps CID has

00:46:45  2   access, and different parties have access based on their

00:46:48  3   role.

00:46:50  4        And the weapons listed in that column were

00:46:52  5   weapons that Mr. Fedak had listed as having registered

00:46:56  6   them on base as personally owned weapons.

00:46:59  7   Q.   All right.   I notice that at least it looks like

00:47:05  8   four of those have both a "Y" in that column that they

00:47:09  9   had been listed as a personal weapon of his, but then

00:47:13  10  also a "Y" under the column that says "buried;" is that

00:47:17  11  right?

00:47:17  12  A.   Yes.

00:47:17  13  Q.   Did he make any statements to you about which

00:47:20  14  guns he chose to bury?

00:47:21  15  A.   He stated that he buried the illegal weapons.

00:47:30  16  Q.   Turning to column L, it says "Transferred at

00:47:33  17  Gunther Guns."   What is that?

00:47:35  18  A.   So during the investigation I searched ATF

00:47:38  19  records, which resulted in identifying transactions made

00:47:43  20  by Mr. Fedak through a licensed FFL dealer in California

00:47:50  21  which was Gunther Guns.   And the serial numbers for

00:47:54  22  those weapons transferred were from the list of stolen

00:47:58  23  weapons.

00:48:00  24  Q.   And did you ask Mr. Fedak about that particular

00:48:03  25  series of transfers?

00:48:04  1    A.  Yes.

00:48:04  2    Q.  What did he say?

00:48:05  3    A.  He provided that he was asked by Michael Cornett

00:48:11  4    to act as the transferrer on behalf of Cornett's father

00:48:17  5    so that Cornett would be able to legally own them in

00:48:22  6    California and that he was not aware of where the

00:48:26  7    weapons were from, that they were from GSAXcess.

00:48:30  8    Q.  So Mr. Fedak told you that Michael Cornett -- and

00:48:38  9    Cornett had a role in the acquisition of these

00:48:40  10   particular weapons; is that right?

00:48:42  11   A.  Yes, in the weapons Michael Cornett from

00:48:45  12   California is listed as the requester, and Fedak is

00:48:48  13   listed as the approver.

00:48:50  14   Q.  Approver.   Okay.

00:48:52  15        So that Cornett came to Mr. Fedak, asked him to

00:48:56  16   pretend to be the owner of these guns, which Fedak did

00:48:59  17   not know were obtained from GSA?

00:49:02  18   A.  Yes.

00:49:03  19   Q.  And Mr. Fedak did go into Gunther Guns and

00:49:06  20   assisted Cornett with that transfer?

00:49:09  21   A.  Yes.

00:49:09  22   Q.  Now, would that have required the ATF Forms 4473

00:49:13  23   and all of that to be filled out as to each weapon?

00:49:16  24   A.  Yes.

00:49:16  25   Q.  And those are signed too under penalty of

00:49:20  1  perjury?

00:49:20  2      A.  Yes.

00:49:27  3      Q.  Did Mr. Fedak say whether or not Cornett gave him

00:49:29  4  anything as a result of this service he provided?

00:49:31  5      A.  Yes.   He provided he was given two guns as a

00:49:38  6  result.

00:49:38  7      Q.  Are those two guns on this chart?

00:49:39  8      A.  Yes.

00:49:40  9      Q.  Which two are they?

00:49:41  10      A.  They are the DST8544, the pistol.

00:49:56  11      Q.  Line 8?

00:49:56  12      A.  Correct.

00:49:58  13          Then the other one was the NGH206.

00:50:04  14      Q.  Line 35, that is?

00:50:06  15      A.  Yes.

00:50:07  16      Q.  And were those weapons that had been given by

00:50:11  17  Cornett to Mr. Fedak buried as well?

00:50:14  18      A.  Yes.

00:50:24  19      Q.  Overall did Mr. Fedak believe that he bore

00:50:29  20  responsibility for a number of these weapons from

00:50:32  21  California?

00:50:34  22      A.  No, he provided he did not know any other

00:50:38  23  information about the additional California weapons

00:50:42  24  because he was not involved in their procurement.

00:50:44  25      Q.  I'm sorry?

00:50:45  1    A.  He was not involved in their procurement.

00:50:47  2    Q.  All right.  Let me turn you to the lines

00:50:50  3  beginning at 37 at the bottom of the first page.  I see

00:50:54  4  in column N it reflects that "Fedak left voice mail."

00:50:58  5  Can you tell us about that?

00:50:59  6    A.  Yes.  So the weapons tied to the Gunther Guns

00:51:06  7  transaction were acquired from a Department of Treasury

00:51:09  8  Division known as SIGTARP having to do with asset relief

00:51:14  9  programs through the Treasury.  There's emails and

00:51:19  10  voice mails that we obtained from SIGTARP of Mr. Fedak

00:51:23  11  being in contact with SIGTARP coordinating the

00:51:27  12  acquisition, I believe, of 12 different weapon, some of

00:51:30  13  which were the ones that we recovered buried, and also

00:51:34  14  seized from Mr. Cornett.

00:51:44  15    Q.  Finally I note in column M at lines 15, 16, and

00:51:49  16  42 there are comments in that column M.  What is that?

00:52:00  17    A.  Column M.  There was a Smith & Wesson Model 1006

00:52:05  18  handgun that was anonymously turned in initially in

00:52:11  19  California.  And Mr. Fedak made a statement during the

00:52:15  20  interview that he did not give a Smith & Wesson 1006 to

00:52:19  21  anyone other than what had been recovered, and he didn't

00:52:22  22  have any other information on it because he was not

00:52:25  23  involved in the procurement.

00:52:27  24       And after that interview I was able to track down

00:52:30  25  who had that weapon, interviewed Mr. Daniel Navarro, who

00:52:38   1   provided that he received that weapon from Mr. Fedak,

00:52:42   2   and also provided he had another weapon in his

00:52:44   3   possession from Mr. Fedak that we seized, the serial

00:52:47   4   number of which matched the -- another one of these

00:52:51   5   weapons from this list.

00:52:54   6        Now going down to 16 and 42, these were weapons

00:53:02   7   that we recovered, and he had provided initially that he

00:53:05   8   had taken the weapons to his in-laws' house and hid them

00:53:10   9   in a crawl space before he ultimately reburied them.

00:53:14  10   Q.  All right.  And those statements about the crawl

00:53:16  11   space, that occurred at the debrief?

00:53:18  12   A.  Can you repeat that?

00:53:19  13   Q.  The statements in regard to his mother-in-law's

00:53:22  14   crawl space was at the debrief?  He told you that in the

00:53:25  15   debrief?

00:53:25  16   A.  Yes.

00:53:26  17   Q.  And that's contrary to his statements that he was

00:53:29  18   removing them from DBJ; is that correct?

00:53:32  19   A.  Yes.

00:53:34  20   Q.  Agent Salomon, the Notice of Representation at

00:53:40  21   Government's Exhibit 1 was dated December 16, 2019; is

00:53:45  22   that correct?

00:53:46  23   A.  Yes.

00:53:48  24   Q.  Sir, what was the date the notary signed Mr.

00:53:52  25   Fedak's signature on Government's Exhibit 2 at page --

```
00:53:58   1      A.   March 10, 2020.

00:54:00   2      Q.   I'm sorry?

00:54:01   3      A.   March 10, 2020, I believe.

00:54:03   4      Q.   March 10 of 2020?

00:54:05   5      A.   Yes.

00:54:07   6           MS. KOCHER:   No further questions, Your

00:54:10   7   Honor.

00:54:10   8           THE COURT:   Okay.

00:54:11   9           MS. BRENNAN:   May I have a few moments to

00:54:13  10   consult?   Thank you.

00:54:16  11           (Discussion had off the record between the

00:55:32  12   Defendant and defense counsel.)

00:55:32  13           THE COURT:   If you want, we can take an

00:55:35  14   early lunch break and come back at 12:45 for your cross.

00:55:42  15   I'll just throw that out.

00:55:49  16           MS. BRENNAN:   Your Honor, I'll defer to the

00:55:53  17   Court, but I think we can --

00:55:55  18           THE COURT:   You can keep on going?

00:55:56  19           MS. BRENNAN:   I believe so, Your Honor.

00:55:57  20           THE COURT:   Okay.

00:56:22  21                              - - -

00:56:22  22           PETER SALOMON, CROSS-EXAMINATION

00:56:23  23   BY MS. BRENNAN:

00:56:23  24      Q.   Good morning, Agent.

00:56:28  25      A.   Good morning.
```

00:56:34  1   Q.  I may jump around a little bit here, but I'm

00:56:37  2   going to try to walk through some of the things I have

00:56:39  3   questions about from your testimony, okay?

00:56:41  4   A.  Okay.

00:56:50  5   Q.  Let's start sort of from the end with the

00:56:54  6   firearms and the debrief from June of '22.  When you

00:56:59  7   were questioning him in this debrief, did you record the

00:57:02  8   debrief with anything other than note taking?

00:57:06  9   A.  No, it was not recorded.

00:57:09  10  Q.  So the testimony is from the best of your

00:57:11  11  recollection based off of notes that you took?  It's not

00:57:14  12  a verbatim transcript, correct?

00:57:16  13  A.  Both notes and another special agent who was

00:57:18  14  present, yes.

00:57:19  15  Q.  From notes, not from any type of recording

00:57:22  16  device, correct?

00:57:23  17  A.  Yes.

00:57:24  18  Q.  And when you asked him about the weapons in

00:57:27  19  California, the ones that were acquired while he was

00:57:30  20  stationed in California, your questions specifically

00:57:33  21  were in regards to where those weapons were located now

00:57:36  22  and if he had access or could tell you where any of the

00:57:40  23  weapons might be located, correct?

00:57:42  24  A.  Yes, there were questions about that.

00:57:45  25  Q.  And his response was that he wasn't sure where

00:57:50  1   any of the weapons were now, correct?

00:57:53  2       A.   He stated he did not know.

00:57:54  3       Q.   Correct.   And the weapons acquired in

00:57:59  4   California, according to the transfer dates, were

00:58:02  5   transferred in 2017, correct?

00:58:05  6       A.   I believe some were also 2018.

00:58:07  7       Q.   2017 to 2018?

00:58:09  8       A.   Yes.

00:58:10  9       Q.   So roughly five to six years ago?

00:58:12  10      A.   Yes.

00:58:13  11      Q.   And he has been stationed -- he was moved to

00:58:18  12  Marines Corps Air Station Cherry Point in roughly 2018;

00:58:23  13  is that correct?

00:58:23  14      A.   I believe so.

00:58:24  15      Q.   Excuse me, Quantico, then Cherry Point, correct?

00:58:26  16      A.   Yes.

00:58:27  17      Q.   And has not been -- was not restationed in

00:58:30  18  California after that, right?

00:58:31  19      A.   Correct.

00:58:32  20      Q.   And the weapons were, in fact, requested by

00:58:37  21  Cornett and only approved by Mr. Fedak; is that correct?

00:58:41  22      A.   Yes.

00:58:42  23      Q.   And so his statement that he wasn't sure where

00:58:49  24  those weapons were located now, you don't have any

00:58:52  25  evidence to the contrary that he actually knew where the

00:58:55   1   weapons are presently, correct?

00:58:57   2     A. He -- I'm a little confused by the wording. Can

00:59:01   3   you rephrase that?

00:59:02   4     Q. You don't have any evidence that he, in fact,

00:59:05   5   knew where the location of those weapons were in June of

00:59:08   6   '22, correct?

00:59:09   7     A. He stated that he did not have any knowledge of

00:59:14   8   them because he had not been involved in their

00:59:16   9   acquisition, which was proven not to be factual.

00:59:21   10     Q. He did not say that he had no involvement in

00:59:25   11   their acquisition, did he?

00:59:27   12     A. He stated he had not received any of the weapons

00:59:30   13   or participated in the additional weapons procurement

00:59:33   14   other than what had been seized.

00:59:40   15     Q. His statement was that he did not know where the

00:59:42   16   weapons were presently. He did not state that he had

00:59:46   17   no involvement in the acquisition of any of the weapons

00:59:50   18   in California, did he?

00:59:51   19     A. He provided at the start of the interview that

00:59:54   20   the list of weapons from California was incorrect per

00:59:58   21   the GSA records. He stated that was not an accurate

01:00:01   22   representation of the weapons acquired in California.

01:00:03   23     Q. But he never made a statement that he had no

01:00:06   24   involvement in the acquisition of those weapons,

01:00:08   25   correct?

01:00:09  1    A.  Not pertaining to the acquisition, but pertaining

01:00:11  2  to their transfer or knowledge of where they are or

01:00:15  3  where they went.

01:00:17  4    Q.  That's -- now, that is accurate.  He made a

01:00:20  5  statement that he had no knowledge of where they

01:00:22  6  presently were, correct?

01:00:24  7    A.  Yes.

01:00:25  8    Q.  And he -- but he did not deny that he had played

01:00:29  9  a role in the acquisition of those weapons, correct?

01:00:32  10    A.  Correct, except for the weapons that he said were

01:00:36  11  incorrect from the list from California at the start.

01:00:41  12  That's how he opened the interview, by telling us that.

01:01:02  13    Q.  This document, Government's Exhibit 11, that was

01:01:04  14  provided today, correct?

01:01:06  15    A.  Yes.

01:01:20  16    Q.  Let's talk a little bit about some of the -- some

01:01:27  17  of what you discussed in relation to the trailer or the

01:01:30  18  guns that were found behind the church on Vandalia Road.

01:01:40  19  I'm going to try to get the exhibits right.

01:01:43  20        You went through multiple videos, correct?

01:01:50  21    A.  I went through multiple hours of surveillance

01:01:54  22  footage from videos.

01:01:55  23    Q.  But they were all taken from different cameras,

01:01:58  24  right?

01:01:58  25    A.  Yes.  Some of the videos were from the same

01:02:01    1    camera.

01:02:01    2        Q.   But whenever we saw a different angle, it was

01:02:04    3    from -- or a different location was from a different

01:02:04    4    camera, correct?

01:02:05    5        A.   Yes.

01:02:05    6        Q.   Out of those videos that you watched, only one of

01:02:08    7    those had a time stamp, correct?

01:02:09    8        A.   No, they all had time stamps, but in this

01:02:13    9    presentation they didn't have time stamps because they

01:02:15   10    were cut from the original.

01:02:17   11        Q.   So the videos were altered in such a way that we

01:02:20   12    couldn't view the time stamps?

01:02:21   13        A.   Well, for some of the parts of the video, they

01:02:26   14    were zoomed in on for the purpose of the Court

01:02:28   15    presentation.   But the full video to include those

01:02:31   16    parts was part of discovery.

01:02:33   17        Q.   So the videos that I saw that are made exhibits

01:02:38   18    in this courtroom, there was only one that had a time

01:02:40   19    stamp, and that was the very first one that was

01:02:43   20    presented, correct?

01:02:44   21        A.   Correct.

01:02:46   22        Q.   Everything else would have been cut off?  The

01:02:49   23    time stamps were cut off from the exhibits that were

01:02:51   24    presented, correct?

01:02:52   25        A.   Yes, due to zooming.

01:02:54 1     Q.  There's no -- on the exhibits that were here,

01:02:57 2   there is no time stamp on those videos, correct?

01:03:00 3     A.  Yes.

01:03:01 4     Q.  And I believe you testified as to Exhibit 8 that

01:03:09 5   you could not identify what objects were being moved

01:03:12 6   from, I guess, Mr. Fedak's personal vehicle to the DBJ

01:03:20 7   truck, correct?

01:03:20 8     A.  Correct.

01:03:20 9     Q.  So you have no idea what those objects are?

01:03:23 10    A.  Correct.

01:03:23 11    Q.  They could be pipes, correct?

01:03:27 12    A.  We have an idea based on his statement.  He told

01:03:30 13  us initially that it was a pickax.

01:03:33 14    Q.  Do you have any idea, based on your viewing of

01:03:36 15  the video, what those objects are?

01:03:39 16    A.  I have an inclination, but I do not have

01:03:42 17  definitive evidence.

01:03:43 18    Q.  You watched the video.  Do you have any idea

01:03:45 19  what those objects are?  Yes or no?

01:03:47 20    A.  I have an idea, but I'm not definitive on that

01:03:50 21  idea.

01:03:50 22    Q.  Can you tell from watching the video exactly what

01:03:53 23  that is?

01:03:53 24    A.  No.

01:04:00 25              THE COURT:  Well, he answered your question

01:04:02  1    "Do you have an idea?" in the affirmative.  Do you want

01:04:05  2    to hear what his idea is?

01:04:08  3              MS. BRENNAN:  Your Honor, I believe I know

01:04:09  4    what his -- I know what his idea is.  My question was

01:04:14  5    more directed:  Can he see clearly from the video what

01:04:16  6    the objects are?  That's probably a better way to phrase

01:04:20  7    it.

01:04:21  8        A.  No.

01:04:22  9              THE COURT:  Okay.

01:04:23  10   BY MS. BRENNAN:

01:04:24  11       Q.  And you also analyzed the GPS data?

01:04:28  12       A.  Yes.

01:04:28  13       Q.  So from your analysis of the GPS data, he left

01:04:32  14   DBJ and went to a job site?

01:04:35  15       A.  I believe that's correct.

01:04:36  16       Q.  And then went to the location where the firearms

01:04:39  17   were recovered?

01:04:40  18       A.  Yes.

01:04:45  19       Q.  Do you know what he was doing at the job site?

01:04:47  20       A.  I do not.

01:04:48  21       Q.  And you don't know if the objects transferred

01:04:50  22   from his truck to the DBJ truck have anything to do with

01:04:53  23   the job site, correct?

01:04:55  24       A.  I don't.

01:05:18  25       Q.  And the video in question regarding the pickax,

01:05:23　1　when that subject came up in the debrief, I believe that

01:05:26　2　was in reference to the items that he was putting in the

01:05:29　3　back of his own personal vehicle, correct?

01:05:32　4　　A.　It was the items that he was taking out of his

01:05:34　5　personal vehicle and placing in the DBJ truck, because I

01:05:37　6　showed him the video on my phone during that interview

01:05:40　7　multiple times.

01:05:41　8　　Q.　I do recall watching the video, and I believe the

01:05:44　9　video that we saw was the video of him placing items in

01:05:47　10　the back of his truck.

01:05:48　11　　A.　That is incorrect.

01:06:18　12　　Q.　Backing up further into the original testimony,

01:06:23　13　you showed a video that was a film by his wife, correct?

01:06:29　14　　A.　Correct, that she had turned over to us.

01:06:31　15　　Q.　In their home, correct?

01:06:33　16　　A.　In their in-laws' house.

01:06:36　17　　Q.　Where they were living at the time?

01:06:39　18　　A.　Correct.

01:06:39　19　　Q.　And it was filmed without his knowledge?

01:06:43　20　　A.　I believe so.

01:06:44　21　　Q.　And it was filmed from her cell phone?

01:06:46　22　　A.　Yes.

01:06:51　23　　Q.　And do you know anything about the state of their

01:06:54　24　marriage at the time?

01:06:55　25　　A.　I knew they were having some type of marital

01:06:58  1  difficulties because she called NCIS to say that she

01:07:01  2  wanted to report information about her husband.

01:07:05  3      Q.  And so you don't know the substance of the

01:07:08  4  conversation that occurred prior to what you see on the

01:07:11  5  video, correct?

01:07:12  6      A.  No.

01:07:13  7      Q.  And you don't know the substance of the

01:07:14  8  conversation that occurred after -- it was a roughly

01:07:18  9  eight- to nine-minute full-length video, correct?

01:07:20  10     A.  Correct.

01:07:22  11     Q.  And to my knowledge there was no date that was

01:07:27  12  referenced on the video, that clip that we received,

01:07:31  13  even within the full eight- to nine-minute video,

01:07:34  14  correct?

01:07:35  15     A.  Correct.  There was no specific date.

01:07:37  16     Q.  So while you assume that he's referring to

01:07:40  17  burying the guns recent in time, you don't have any

01:07:44  18  actual knowledge that that is when he was referring to

01:07:47  19  burying the guns, correct?

01:07:48  20     A.  Not specifically from that video.

01:08:00  21     Q.  In regards to the vehicle that was transferred by

01:08:06  22  Mr. Fedak out of GSAXcess into his possession, there are

01:08:13  23  multiple signatures on those documents, correct?

01:08:16  24     A.  Correct.

01:08:17  25     Q.  And they were all documents that were filed with

01:08:19   1   the California Department of Motor Vehicles, correct?

01:08:22   2       A.   Yes.

01:08:22   3       Q.   And Mr. Fedak admitted to signing those

01:08:27   4   documents, correct?

01:08:28   5       A.   Yes.

01:08:30   6       Q.   He did not admit to signing the documents on

01:08:33   7   behalf of Mr. Gonzalez, correct?

01:08:36   8       A.   Correct.

01:08:36   9       Q.   And you don't have any evidence that is, in fact,

01:08:40  10   his signature -- you don't have any evidence that he

01:08:42  11   signed those documents for Mr. Gonzalez, correct?

01:08:46  12       A.   Yeah, nothing specific.

01:08:48  13       Q.   You have no idea who signed those on Mr.

01:08:51  14   Gonzalez's behalf, correct?

01:08:53  15       A.   Once again, I believe I have an idea, but I have

01:08:56  16   no affirmative evidence pertaining to that.

01:08:58  17       Q.   And you have no affirmative evidence whether that

01:09:00  18   signature was placed there before or after he submitted

01:09:04  19   those documents to the DMV, correct?

01:09:07  20       A.   Correct.

01:09:18  21       Q.   Were you present at his -- at Mr. Fedak's initial

01:09:21  22   appearance?

01:09:25  23       A.   For the obstruction or for the --

01:09:27  24       Q.   I apologize, for the original charge, for the

01:09:31  25   theft of government property -- the original charge back

01:09:34  1   in December of 2020.

01:09:38  2        A.   I believe I was.

01:09:40  3        Q.   And Mr. Fedak did, in fact, request appointed

01:09:43  4   counsel at that hearing, correct?

01:09:45  5        A.   Yes.

01:09:46  6        Q.   And Mr. Fedak was denied appointed counsel at

01:09:49  7   that hearing, correct?

01:09:51  8        A.   I believe so, yes.

01:09:52  9        Q.   It was found he didn't qualify, right?

01:09:54  10       A.   I believe so.

01:09:55  11       Q.   He had no attorney representing him beyond the

01:09:58  12  temporary appointment for that day, correct?

01:10:04  13       A.   Yes.

01:10:08  14            MS. BRENNAN:   May I have one moment, Your

01:10:11  15  Honor?

01:10:11  16            (Discussion had off the record between the

01:10:54  17  Defendant and defense counsel.)

01:10:54  18            MS. BRENNAN:   One more question, Your Honor.

01:10:57  19  BY MS. BRENNAN:

01:10:58  20       Q.   You have transfer numbers for all of these

01:11:01  21  weapons.   Do you have any confirmation that each and

01:11:05  22  every one of these weapons, the transfer was actually

01:11:08  23  completed?

01:11:10  24       A.   Not for every single item on here, but for a

01:11:14  25  majority.

01:11:15  1    Q.  But not for every weapon?  So there very well

01:11:18  2  could be some weapons on here that while they were

01:11:20  3  requested and assigned a transfer number, that transfer,

01:11:24  4  in fact, never occurred, correct?

01:11:25  5    A.  It is possible, I believe, for at least one

01:11:28  6  weapon there.

01:11:31  7    Q.  So for the other 65 you have confirmation they

01:11:37  8  were actually transferred?

01:11:38  9    A.  I'm not positive on the specifics of every

01:11:40  10  shipping label and every email that we have.

01:11:45  11    Q.  Because there were a number of items in this

01:11:47  12  case, in the grand scheme of the case, not just the

01:11:51  13  weapons but all of the items that were requested during

01:11:54  14  Mr. Fedak's tenure in the military, numerous ones of

01:11:57  15  those he requested and they were never received:  small

01:12:00  16  items, big items?  They're all assigned a transfer

01:12:04  17  number, but many times the transfer didn't occur,

01:12:06  18  correct?

01:12:07  19    A.  As part of the transfer paperwork, it will --

01:12:10  20  from what I saw in this investigation, they would have

01:12:12  21  an additional page addendum showing that this specific

01:12:16  22  transaction was denied.

01:12:17  23    Q.  Or there would be a specific page showing the

01:12:20  24  shipping confirmation, correct?

01:12:23  25    A.  The shipping documentation primarily received

01:12:26 1     from agencies points directly who shipped them, not from

01:12:32 2     GSA.   So there were, I believe, a few denials in there,

01:12:35 3     but I do not recall seeing specific shipping label

01:12:39 4     documents pertaining to the transfer orders in the same

01:12:42 5     document.

01:12:42 6     Q.   Can you tell the Court exactly how many firearms

01:12:45 7     you can with 100 percent certainty confirm were actually

01:12:50 8     transferred?

01:12:54 9     A.   Not at this time.   I would have to review all of

01:12:56 10     the data and go through all of those numbers to pinpoint

01:13:00 11     it together.

01:13:01 12         As it pertains specifically to SIGTARP for a

01:13:05 13     number of weapons, the emails, voice mails, and transfer

01:13:09 14     records, and shipping labels corroborate at least 12

01:13:12 15     handguns tied to the order numbers for that, not

01:13:16 16     counting the other weapons that were recovered.   For a

01:13:21 17     lot of the other weapons recovered there were additional

01:13:24 18     weapons on the same transfer order tied to the shipment

01:13:27 19     of weapons that we did recover to include additional

01:13:31 20     weapons that we did not recover from the same transfer

01:13:33 21     orders.

01:13:34 22     Q.   So in total right now, based off your knowledge

01:13:37 23     of the case and the verifications that you've done in

01:13:41 24     preparation for this hearing, how many weapons exactly

01:13:45 25     can you confirm were transferred?

01:13:52  1    A.  I can't provide a specific number at this time.

01:14:00  2              MS. BRENNAN:  No further questions, Your

01:14:02  3    Honor.

01:14:02  4              THE COURT:  Okay.

01:14:03  5              MS. KOCHER:  Thank you, Your Honor.

01:14:04  6                        - - -

01:14:04  7              PETER SALOMON, REDIRECT EXAMINATION

01:14:04  8    BY MS. KOCHER:

01:14:04  9    Q.  Agent Salomon, you said you had an idea of what

01:14:07  10   the unidentified item was.  Can you explain that idea,

01:14:10  11   what you believed it might have been and why?

01:14:13  12   A.  Yes.  So I believe the unidentified items were

01:14:17  13   possibly the shotgun lower receivers as well as a bag

01:14:22  14   containing a lot of the handgun parts that were

01:14:25  15   recovered from being buried.

01:14:27  16           My reasoning behind that is during the review of

01:14:29  17   the surveillance video, Mr. Fedak was seen going in and

01:14:33  18   out of the far trailer numerous times.  And that was

01:14:38  19   corroborated by his boss who, when we spoke to her, she

01:14:43  20   provided that she asked him:  Hey, what are you doing

01:14:46  21   there?  Because he was supposed to be working.

01:14:48  22           And he said:  None of your business, or something

01:14:50  23   along those lines.

01:14:52  24           Ultimately the items carried out of there that

01:14:55  25   went into the truck appeared to be the same items that

01:14:58  1    went into the DBJ truck.

01:15:01  2         And then also when NCIS searched that trailer we

01:15:03  3    found parts tied to the weapons that were recovered

01:15:10  4    buried off of Vandalia Road.  So those were in the same

01:15:14  5    location as he had been seen coming in and out of where

01:15:17  6    he had walked down carrying those items, placed them

01:15:20  7    into the truck, gone around side, parked out front, got

01:15:25  8    in the DBJ vehicle, and then proceeded to move those

01:15:29  9    same items to the passenger's side of the DBJ truck .

01:15:32  10   Q.  Can you remind the Court what the video depicted

01:15:35  11   Mr. Fedak doing once items were placed in the front seat

01:15:38  12   of the DBJ pickup truck?

01:15:39  13   A.  So he pulled out some type of, like -- whether it

01:15:44  14   be cloth or plastic, some type of bag-looking item and

01:15:50  15   was in there for a few seconds placing it over things in

01:15:54  16   the front seat.

01:16:01  17   Q.  You had testified on direct about body language

01:16:05  18   in terms of the video that we watched when he carried

01:16:09  19   the shovel and the pickax.  Was there any information

01:16:12  20   in that that informed your idea that what he was

01:16:15  21   carrying was different than tools as well?

01:16:18  22   A.  Yes.  He handled the items both coming out of

01:16:21  23   the DBJ trailer and placed them in the truck and take

01:16:25  24   them out of the truck and placed in the DBJ truck in a

01:16:28  25   different way than he handled the pickax and the shovel,

01:16:31 1 both seen as him placing the shovel into the bed of the

01:16:35 2 DBJ truck and walking through the DBJ area carrying the

01:16:38 3 pickax and the shovel and removing the pickax from the

01:16:42 4 vehicle.

01:16:43 5     Q.  You were asked, Agent Salomon, as to whether the

01:16:46 6 video, the nine-minute video in which he describes

01:16:50 7 having buried the weapons off of Vandalia contained the

01:16:53 8 specific time or date that he buried those items.  Do

01:16:59 9 you recall that question?

01:17:00 10     A.  Yes.

01:17:00 11     Q.  My recollection is that you said that the video

01:17:03 12 did not contain that specific information; is that

01:17:06 13 correct?

01:17:06 14     A.  I believe so.

01:17:07 15     Q.  Did you come upon more specific information

01:17:11 16 through interviews?

01:17:12 17     A.  Yes.

01:17:13 18     Q.  Tell us about that.

01:17:14 19     A.  So the interviews occurred -- ultimately we

01:17:18 20 interviewed the individual who took that video as well

01:17:21 21 as the DBJ employee and obtained the surveillance

01:17:29 22 footage that corroborated to the general date and time

01:17:32 23 of the timeframe we believed was inferenced in that

01:17:37 24 video and had been solidified by those interviews and

01:17:41 25 that data.

01:17:44  1    Q.  All right.  You were asked if you could, with

01:17:47  2  100 percent certainty, tell the Court how many guns were

01:17:51  3  transferred to Fedak.  My understanding was you said

01:17:55  4  you could not.

01:17:56  5    A.  Correct.

01:17:57  6    Q.  Can you with 100 percent certainty, Agent

01:18:00  7  Salomon, tell the Court that any of the guns which have

01:18:03  8  not been recovered were, in fact, transferred?

01:18:06  9    A.  Yes.

01:18:08  10    Q.  And can you give the Court an idea of how many

01:18:11  11  that you are able to confirm were transferred?

01:18:15  12    A.  So at a bare minimum there were two M16A2s; and

01:18:22  13  the additional SIGTARP weapons; and all of the North

01:18:27  14  Carolina list weapons; and then at least two Beretta M9s

01:18:36  15  that Mr. Fedak had stated he watched get demilitarized

01:18:40  16  as part of plaques and/or gifts; as well as the M14s on

01:18:46  17  the list, which he stated they were actually just wooden

01:18:50  18  stocks and not the full weapons themselves.

01:18:52  19    Q.  Would wooden stocks bear serial numbers?

01:18:55  20    A.  They may.

01:18:59  21          THE COURT:  So what's the total, the bare

01:19:01  22  minimum total of all of what you each just named?

01:19:05  23          THE WITNESS:  May I have a moment to add

01:19:06  24  these up?

01:19:06  25          THE COURT:  Yes.

01:20:14  1          THE WITNESS:  I believe 56, and that

01:20:17  2   includes the ones that are tied to same transfer orders

01:20:21  3   that were shipped, ultimately received, and/or had

01:20:24  4   weapons seized as part of that transfer.

01:20:28  5   BY MS. KOCHER:

01:20:28  6      Q.  Can you give us an example of that latter

01:20:30  7   statement of yours?

01:20:32  8      A.  Correct.  So I'll use the SIGTARP weapons as an

01:20:37  9   example.

01:20:37  10      Q.  If you could reference to the line numbers on

01:20:39  11   Exhibit 11.

01:20:40  12      A.  Yes.  So lines 33, 34, and 35 are three weapons

01:20:49  13   obtained from SIGTARP, and these weapons were part of a

01:20:56  14   shipment.  We have the emails pertaining to the overall

01:21:01  15   orders from SIGTARP.  Ultimately Mr. Fedak is

01:21:06  16   exchanging emails with the special agent who is

01:21:09  17   responsible for shipping the items out.

01:21:12  18          Initially they say:  Hey, there's going to be one

01:21:14  19   box with six handguns in it.

01:21:17  20          And then it's:  Hey, there's -- I put an order in

01:21:20  21   for six more.

01:21:21  22          Here's six additional.  There's going to be a

01:21:24  23   second box shipped as part of this, to include the

01:21:27  24   shipping labels having been sent out.

01:21:30  25          We know he received the boxes because we have

| | | |
|---|---|---|
| 01:21:32 | 1 | some of those weapons in evidence, to include weapons |
| 01:21:35 | 2 | that were buried on Vandalia Road, and transferred to |
| 01:21:40 | 3 | Gunther Guns. |
| 01:21:41 | 4 | Q.  I see.  Thank you. |
| 01:21:42 | 5 | And is that carried through then to your |
| 01:21:45 | 6 | testimony when there is a transfer control number in the |
| 01:21:50 | 7 | left column and, say -- just taking at the very top, |
| 01:21:54 | 8 | lines 3, 4, and 5, one of that was one shipment |
| 01:21:59 | 9 | presented there, and one of the guns of the three was |
| 01:22:04 | 10 | recovered.  So you're using that as proof that all |
| 01:22:10 | 11 | three of those guns were actually transferred? |
| 01:22:13 | 12 | A.  Are you referring to line 3 -- or 1 through 3? |
| 01:22:17 | 13 | Q.  Three through five, yes. |
| 01:22:20 | 14 | A.  Yes.  Correct.  And those M14s were what he |
| 01:22:24 | 15 | referenced as being only the stocks with that particular |
| 01:22:28 | 16 | shipment. |
| 01:22:30 | 17 | MS. KOCHER:  Understood. |
| 01:22:35 | 18 | No further questions, Your Honor. |
| 01:22:38 | 19 | MS. BRENNAN:  Just some brief recross. |
| 01:22:38 | 20 | - - - |
| 01:22:38 | 21 | PETER SALOMON, CROSS-EXAMINATION |
| 01:22:45 | 22 | BY MS. BRENNAN: |
| 01:22:45 | 23 | Q.  The trailer that you're referencing that the |
| 01:22:48 | 24 | objects came out of, you searched that trailer? |
| 01:22:50 | 25 | A.  Yes. |

01:22:50  1    Q.  Contained also in that trailer was numerous pipe

01:22:53  2   fittings, pipes, things that were utilized by DBJ for

01:22:58  3   job site work, correct?

01:22:59  4    A.  Yes.

01:23:08  5    Q.  So again, you do not know exactly what was

01:23:11  6   removed from that trailer?

01:23:13  7    A.  Correct.

01:23:27  8         MS. BRENNAN:  No further questions, Your

01:23:29  9   Honor.

01:23:29 10         THE COURT:  Okay.  Thank you very much.

01:23:34 11         THE WITNESS:  Thank you, ma'am.

01:23:34 12         THE COURT:  I'd like to take a lunch.  Is

01:23:40 13   anyone adverse to that?

01:23:41 14         MS. BRENNAN:  I'm not, Your Honor.  Can I

01:23:42 15   submit one exhibit we have?  Or I'm happy -- it relates

01:23:46 16   to this.

01:23:47 17         THE COURT:  Sure.  And what is this?

01:24:05 18         MS. BRENNAN:  Your Honor, this is a

01:24:06 19   polygraph we had done of Mr. Fedak, in fact, this past

01:24:11 20   fall/summer prior to entering into a plea agreement with

01:24:15 21   the government that resulted in the dismissal of the

01:24:19 22   obstruction charge.  We had him polygraphed in regards

01:24:22 23   to when the guns were initially buried.  And he was

01:24:26 24   found to be truthful, in fact, that he did bury the guns

01:24:31 25   in December, which aligns with the statement that he

01:24:34  1   buried them initially there, and then in February of

01:24:38  2   this past year went to see where they were located so

01:24:42  3   that he could, in fact, turn them over to law

01:24:45  4   enforcement.

01:24:45  5           THE COURT:  So we'll call this, because it

01:24:48  6   doesn't have a label, we'll call this Defendant's

01:24:51  7   Exhibit 1.

03:29:57  8           (Whereupon Defendant's Exhibit 1 is admitted

03:30:00  9   into evidence.)

01:24:51  10          MS. BRENNAN:  Thank you, Your Honor.

01:24:55  11          THE COURT:  Well, I'd like to see you all at

01:24:58  12  1:30.

01:24:59  13          Is that all right, Ms. Kocher?

01:25:00  14          MS. KOCHER:  It is, Your Honor.  If I could

01:25:02  15  go ahead and move to admit the 11 exhibits that were

01:25:05  16  referenced.

01:25:06  17          THE COURT:  Let them be received.

01:25:43  18          (Whereupon Government's Exhibits 1 through

03:29:59  19  11 are admitted into evidence.)

01:25:44  20          (Recess taken.)

01:25:50  21          THE COURT:  Ms. Kocher, is there any further

02:48:37  22  evidence to be offered?

02:48:39  23          MS. KOCHER:  No, Your Honor.

02:48:40  24          THE COURT:  Do you have any evidence?

02:48:42  25          MS. BRENNAN:  Nothing beyond what we

02:48:44  1  submitted to the Court prior to the recess.

02:48:49  2          THE COURT:  Well, I guess we'll start with

02:48:51  3  Ms. Kocher in argument.

02:48:52  4          MS. KOCHER:  Thank you, Your Honor.

02:48:54  5          As to the obstruction and acceptance of

02:48:59  6  responsibility, the record, we believe, shows that Mr.

02:49:06  7  Fedak has lied in many different ways and with many

02:49:12  8  different effects.

02:49:14  9          And, Your Honor, it reminds me of the

02:49:18 10  microscope guessing game that we used to play where they

02:49:20 11  would bring the microscope down so close to an object,

02:49:24 12  and you were supposed to guess what you saw.  And you

02:49:26 13  would see, for instance, a series of sand dunes, and

02:49:32 14  then a frothy surf hitting up against them.  And as

02:49:37 15  they pull the microscope back, it's actually the tip of

02:49:38 16  a sharpened pencil.  And the undulations of the dune

02:49:42 17  were the shaved area that had striations on it, then the

02:49:46 18  frothy surf was the scallop where the shaved area meets

02:49:52 19  the color of the pencil.

02:49:53 20          That is what Mr. Fedak has done throughout

02:49:57 21  this case from the beginning, is to point to a

02:50:00 22  particular fact and claim that it's wrong, so much and

02:50:04 23  so frequently that he's lost sight of what he's said in

02:50:08 24  the past so that even his lies are disagreeing with one

02:50:11 25  another.

02:50:12  1          Just very quickly; I know you were attentive

02:50:15  2     during that lengthy evidence presentation.  And it was

02:50:18  3     just samples, literally just three main points:  the

02:50:22  4     California titling of the Mercedes, the burial of the

02:50:25  5     weapons, and what has happened with those weapons.

02:50:28  6          There were -- you know, noting he had

02:50:29  7     counsel as early as 2019 in regard to this overarching

02:50:34  8     investigation with the statement that he called the

02:50:38  9     person that he told us in interview that he had given

02:50:41 10     all the guns to -- less than 30 days, Your Honor, that

02:50:44 11     would be -- asking for those guns back.  So he told us

02:50:46 12     in interview that it was December of '19 that he called

02:50:50 13     Sergeant Major McKinney to ask for the guns back.

02:50:53 14          The last time -- and you can look at the

02:50:56 15     last gun referenced in Chart 11 -- that he, Fedak,

02:51:03 16     received a gun that he then told us he gave to McKinney

02:51:06 17     was on November 25th of the same year, of 2019.  So

02:51:11 18     less than 30 days later.  And by that statement he was

02:51:14 19     prepared to turn the guns in.  And here we are almost

02:51:17 20     four years later now, over three years in any event, and

02:51:20 21     still don't have the guns back.

02:51:23 22          The Mercedes papers speak for themselves.

02:51:26 23     There is a specific bill of sale that Patrick Fedak

02:51:29 24     signed, no matter who signed Antonio Gonzalez's name,

02:51:34 25     that he paid Antonio Gonzalez $1,500.

02:51:38  1          The statement, for instance, in that same
02:51:39  2  package that he obtained that car while he was stationed
02:51:42  3  in California.
02:51:43  4          I could go on and on with these types of
02:51:45  5  examples, Your Honor.
02:51:46  6          The conflicting statements he made in regard
02:51:48  7  to burial.  That at first it -- they were at DBJ, and he
02:51:54  8  wanted to remove them from DBJ.  And in objections and
02:51:57  9  to the Court he says that he actually buried them back
02:52:00  10  in 2000.  Your Honor's been given a polygraph that
02:52:04  11  would show no deception -- by the way, not necessarily
02:52:06  12  truthfulness.  But polygraphs, of course, are not
02:52:11  13  admissible and it is of no -- particularly in light of
02:52:14  14  the other falsehoods that have been brought to the
02:52:18  15  Court's attention.
02:52:21  16          He specifically said during interview that
02:52:25  17  other than those guns that have been recovered -- either
02:52:27  18  from him, from his father, from the few out in
02:52:30  19  California that were recovered, and those that were
02:52:33  20  buried -- that he did not have involvement.  Not simply
02:52:36  21  that he didn't know where they were currently located.
02:52:39  22  That doesn't even make sense in the context of a debrief
02:52:42  23  following a plea, Your Honor.  He did not know; he
02:52:46  24  claimed he did not know.  He wasn't involved with them.
02:52:49  25  And he had handed over all the North Carolina guns, in

02:52:52 1   particular, that weren't recovered to that Sergeant

02:52:54 2   Major McKinney, who just refused to give them back less

02:52:58 3   than 30 days later.

02:52:59 4           There were voice mails, Your Honor.  The

02:53:01 5   fact that we recovered guns from the various shipments

02:53:04 6   and then not others in that same shipment does, again,

02:53:08 7   go to the falsehoods said to us, the denial of

02:53:14 8   responsibility in all of this.

02:53:15 9           Your Honor, I have not seen someone who has

02:53:20 10   made from whole cloth so many details about the case

02:53:26 11   that are -- I mean, even the videos.  It is there.

02:53:31 12   While you don't see the guns, that is true, it is

02:53:34 13   certainly not a shovel or a pickax.  The guns were not

02:53:38 14   in a condition such that they had been buried more than

02:53:43 15   a year.

02:53:43 16           I say all of this, Your Honor -- and you

02:53:45 17   haven't ruled.  Do you want me to go on then to my

02:53:49 18   sentencing position, or do you want to rule on the

02:53:50 19   objections and then --

02:53:52 20           THE COURT:  I think we ought to address the

02:53:56 21   objections first.

02:53:58 22           MS. KOCHER:  All right.  In that case, Your

02:54:00 23   Honor, I would stop there.

02:54:00 24           I just believe that by far more than a

02:54:05 25   preponderance the bulk of the evidence in the case

| | | |
|---|---|---|
| 02:54:08 | 1 | presented in the PSR and as you heard today indicate |
| 02:54:15 | 2 | obstruction. |
| 02:54:16 | 3 | And not forgetting too the violative conduct |
| 02:54:20 | 4 | while on release where he lied to the probation officer. |
| 02:54:24 | 5 | All of those considerations would support |
| 02:54:28 | 6 | the Court enhancing a sentence with the obstruction of |
| 02:54:34 | 7 | justice and taking away the acceptance of |
| 02:54:37 | 8 | responsibility. |
| 02:54:37 | 9 | THE COURT:  Okay. |
| 02:54:39 | 10 | MS. BRENNAN:  Thank you, Your Honor. |
| 02:54:41 | 11 | I think it's interesting that the government |
| 02:54:43 | 12 | indicates that Mr. Fedak made with whole cloth so many |
| 02:54:48 | 13 | details, because it sounds to me it's very similar to |
| 02:54:53 | 14 | what the agent was surmising from his view of the video. |
| 02:54:59 | 15 | He said directly on the stand he could not see the |
| 02:55:02 | 16 | items, but he surmises that it must have been a gun. |
| 02:55:07 | 17 | He told the Court he went to a job site before he went |
| 02:55:11 | 18 | to the location of where the firearms were apparently |
| 02:55:14 | 19 | buried.  If he was so concerned with concealing these |
| 02:55:17 | 20 | items, it makes no sense that he would go from picking |
| 02:55:21 | 21 | the items up to a job site and then to bury them. |
| 02:55:26 | 22 | So, Your Honor, I would submit that the |
| 02:55:29 | 23 | government's version of events for that simply doesn't |
| 02:55:32 | 24 | make sense. |
| 02:55:34 | 25 | I believe they are picking one or two |

02:55:36  1  details out here and there and choosing to use them and

02:55:41  2  bend them in ways that -- Mr. Fedak certainly is here to

02:55:45  3  accept responsibility and --

02:55:47  4           THE COURT:  Would you say going to the job

02:55:52  5  site sort of adds a cloak of authenticity to the need

02:55:56  6  for the tools or to just present him doing work as

02:56:02  7  usual?

02:56:04  8           MS. BRENNAN:  If you believe that they were

02:56:06  9  firearms.  But I would submit that there is no evidence

02:56:11 10  that what he took from that storage unit, which,

02:56:15 11  according to the government's testimony -- witness's

02:56:20 12  testimony, had items utilized by DBJ for work at job

02:56:25 13  sites, I would submit they have zero evidence that what

02:56:29 14  he took from there is actually firearms pieces.

02:56:32 15           And quite to the contrary, we did submit to

02:56:34 16  the Court a polygraph.  And although the government

02:56:38 17  would say that they're not admissible, Your Honor, I

02:56:43 18  would draw the Court's attention to page 4, Section K.

02:56:47 19           THE COURT:  Let me get that back in front of

02:56:48 20  me.  The clerk has -- I think you've got that, Marsha.

02:56:53 21  Do you have the exhibits from this morning?  Could I

02:57:01 22  have them?

02:57:02 23           All right.  So you said page --

02:57:05 24           MS. BRENNAN:  Well --

02:57:07 25           THE COURT:  What were you referring to?

02:57:09 1          MS. BRENNAN:  I was referring to the

02:57:10 2  government's comment that that was inadmissible, when

02:57:13 3  the very plea agreement that they offered to us actually

02:57:16 4  contains a paragraph that requires him to submit to a

02:57:21 5  polygraph examination; "the results of these

02:57:24 6  examinations will be admissible only at the defendant's

02:57:27 7  sentencing and any hearing as to whether there has been

02:57:31 8  a breach of this agreement."

02:57:33 9          And, Your Honor, I would submit we are

02:57:34 10 submitting this at sentencing to demonstrate that he did

02:57:37 11 not, in fact, breach the agreement in the way that the

02:57:40 12 government believes that he breached the agreement.

02:57:43 13          Your Honor, he was truthful.

02:57:45 14          Did he bury the firearms?  Yes.  There's

02:57:48 15 no argument there.  It was a regrettable mistake.

02:57:52 16          But he didn't bury them -- and frankly, it

02:57:56 17 doesn't make any sense.  Why would an individual who had

02:57:59 18 signed a plea agreement to cooperate, in part knowing

02:58:04 19 that part of that was to turn over the firearms, go bury

02:58:08 20 the firearms?  It frankly just doesn't make any sense.

02:58:12 21 I mean, he would have at that time -- was doing exactly

02:58:14 22 what he promised to do; he was confirming the location

02:58:18 23 of the firearms where he remembered burying them so that

02:58:21 24 he could turn them over in accordance with his plea

02:58:24 25 agreement.

02:58:24  1          So, Your Honor, it's difficult, I get, when

02:58:31  2  someone has been dishonest in one way to sort of parse

02:58:35  3  it out, other statements that he made.

02:58:41  4          Did he have any right to acquire that

02:58:46  5  vehicle?  He didn't.  And he did take steps to insure

02:58:50  6  that he could acquire it, take title to it, and dispose

02:58:53  7  of it, and sell it eventually.  And part of his

02:58:57  8  admission here in pleading guilty was admitting that

02:59:01  9  conduct.

02:59:02  10          But, Your Honor, that all happened prior to

02:59:05  11  him entering a plea agreement.  The government was well

02:59:08  12  aware of that conduct when they brought the charges.

02:59:11  13  So I don't believe that that conduct rises to the level

02:59:14  14  of obstruction; I do not believe that -- and certainly

02:59:19  15  not loss of acceptance.  And I don't believe his

02:59:22  16  actions with the firearms rise to the level of

02:59:25  17  obstruction or loss of acceptance.

02:59:27  18          I believe he is entitled to his three levels

02:59:30  19  for acceptance of responsibility.  I do not believe an

02:59:32  20  enhancement for obstruction of justice is appropriate.

02:59:35  21  Thank you.

02:59:47  22          THE COURT:  Did you want to respond, Ms.

02:59:49  23  Kocher?

02:59:49  24          MS. KOCHER:  Your Honor, only to the extent

02:59:53  25  that the Mercedes is mentioned to establish the

02:59:58  1   untruths, not that the pre-plea conduct itself is

03:00:04  2   obstructive or would show the acceptance of

03:00:08  3   responsibility.   Rather, those are putting in context,

03:00:11  4   in part, why we believe everything else that he's said

03:00:13  5   since then is untruthful, because that is what he's

03:00:17  6   done.   That would be the government's point.

03:00:21  7              THE COURT:  He told his wife that his

03:00:23  8   attorney told him to bury the firearms.

03:00:25  9              MS. KOCHER:  That's correct.

03:00:25  10             MS. BRENNAN:  He did, Your Honor.

03:00:31  11             THE COURT:  And that kind of got that

03:00:32  12  attorney in trouble for a while, didn't it?

03:00:35  13             MS. BRENNAN:  That attorney ultimately

03:00:37  14  withdrew from the case.   It did create a conflict.

03:00:40  15  That statement and the video that this Court saw was in

03:00:46  16  the midst of a very difficult period in their marriage

03:00:51  17  and separation.   They were in the middle of a fight.

03:00:54  18  His wife was understandably upset when things came to

03:00:58  19  the table.   That conversation actually happened the

03:01:02  20  evening after his wife and he had sat down with that

03:01:07  21  attorney, and his wife really learned the full breadth

03:01:11  22  of everything.   And she informed him that she was

03:01:15  23  leaving him, that he was going to need to leave; they

03:01:18  24  were separating.   And he said some things that night

03:01:21  25  that were dishonest to his wife, really because he was

03:01:26  1    in fear of what that meant for his marriage.

03:01:29  2              So, Your Honor, I understand.  Like I

03:01:35  3    said -- and I do understand what the government is

03:01:37  4    saying.  It's difficult to parse out.  But I can say

03:01:41  5    that we have offered evidence that he was, in fact,

03:01:43  6    truthful about when he buried the firearms.  And if

03:01:46  7    that's what they're relying upon for the basis of

03:01:49  8    obstruction or loss of acceptance of responsibility, I

03:01:52  9    don't think that's appropriate.

03:01:53  10             And I will also note that the plea agreement

03:01:56  11   that he signed did occur after the alleged conduct in

03:02:01  12   February of '22.

03:02:05  13             And so I do think he's entitled to

03:02:09  14   acceptance of responsibility for his role in the

03:02:10  15   offense.  And he is here today to accept responsibility

03:02:14  16   for that.

03:02:16  17             THE COURT:  The irony is:  That burying that

03:02:21  18   he did resulted in a whole new charge being brought

03:02:24  19   against him, and it undid the plea agreement that was in

03:02:29  20   effect before he went and buried the firearms, right?

03:02:33  21             MS. BRENNAN:  Well, actually, the initial

03:02:36  22   burying occurred well before the plea agreement.  The

03:02:39  23   actions and his comments about where the firearms were

03:02:42  24   and all that, that's what ultimately undid --

03:02:45  25             THE COURT:  It's a pattern.  This is a

03:02:48  1   pattern throughout the period of this man's life that's

03:02:52  2   in front of me for consideration.  He thinks a lie

03:02:59  3   achieves a good or better goal.

03:03:01  4            MS. BRENNAN:  I think --

03:03:03  5            THE COURT:  Saving his marriage, working

03:03:05  6   with his father, developing the esteem and reliance of

03:03:12  7   those in the military with him.   You know, saving his

03:03:17  8   skin in this case.  He gets rid of the guns.  That's a

03:03:23  9   better decision?  And throw his lawyer under the bus to

03:03:27  10  the wife because he's going to keep his relationship

03:03:30  11  with her, maybe, that way.   It's just boom, boom, boom,

03:03:33  12  boom.

03:03:33  13           And I know there are mental health issues.

03:03:35  14  And that's probably one of the best things you've got

03:03:38  15  going for you in terms of a variance.

03:03:43  16           MS. BRENNAN:  And I do think that what you

03:03:45  17  see during the sort of -- well, if you start in 2017,

03:03:49  18  and you take it all the way up to '22, really this

03:03:53  19  five-year period is a slow unravelling and compounding

03:03:58  20  and really somebody who is just -- has got himself in

03:04:03  21  over his head and is ill-equipped due to his mental

03:04:07  22  health issues to make the proper decisions and has

03:04:11  23  really compounded the situation at every step of the

03:04:14  24  way.

03:04:14  25           THE COURT:  And he does it as recently as a

03:04:16  1   couple weeks ago when he lies to his probation officer

03:04:19  2   about where he really is on the day of December 26th,

03:04:24  3   right?

03:04:25  4           MS. BRENNAN:  And he does.  So my

03:04:27  5   understanding of the chain of events there is he did

03:04:30  6   go -- he spent Christmas Eve, Christmas Day, and the day

03:04:34  7   after Christmas, the large part of the day, with his

03:04:37  8   family.  His children left Christmas the 26th, the

03:04:43  9   afternoon.

03:04:44  10          THE COURT:  You're enabling him.  It's

03:04:47  11  going to be another one of these excuses, a lie to

03:04:50  12  achieve something.  He couldn't see his children; they

03:04:56  13  were gone.  But he could go see Ms. Pruitt in Raleigh,

03:05:01  14  even though there's a pending motion you correctly made

03:05:04  15  for permission for him to see Ms. Pruitt, which

03:05:07  16  ultimately got denied.

03:05:08  17          MS. BRENNAN:  That's actually what I was

03:05:10  18  going to say.  Interestingly enough, unlike the prior

03:05:13  19  time when I called him, he was very upfront with me.

03:05:18  20  He said:  You know what; I messed up.  I shouldn't have

03:05:23  21  done it.  This is what I did, and this is where I went,

03:05:26  22  and I've really got myself in trouble now.

03:05:28  23          THE COURT:  And he's so upfront with you

03:05:31  24  because we've got it on electronic monitoring, and maybe

03:05:34  25  it finally dawns on him that he's got to come clean

| 03:05:37 | 1 | because we're going to figure out where he was. |
| 03:05:40 | 2 | All of these objections are overruled. |
| 03:05:44 | 3 | Now, that doesn't mean that I'm going to |
| 03:05:47 | 4 | sentence him in the guideline range that I just found. |
| 03:05:51 | 5 | But this gentleman, he obstructed justice.  He is not |
| 03:05:54 | 6 | entitled to acceptance of responsibility.  He has, |
| 03:05:59 | 7 | again, royally messed up. |
| 03:06:03 | 8 | Fifty-one to 63 months is what the advice |
| 03:06:05 | 9 | is. |
| 03:06:05 | 10 | But I've got to decide a sentence that's |
| 03:06:08 | 11 | reasonable, not greater than what it needs to be, as we |
| 03:06:11 | 12 | all know, to accomplish the factors in 18, United States |
| 03:06:15 | 13 | Code, Section 3553. |
| 03:06:17 | 14 | And I think we ought to move on to that, if |
| 03:06:20 | 15 | I've covered, albeit not in the way that you would wish, |
| 03:06:25 | 16 | but if there's anything else that bears on the advice of |
| 03:06:28 | 17 | the guidelines. |
| 03:06:29 | 18 | MS. BRENNAN:  Certainly, Your Honor.  I'm |
| 03:06:31 | 19 | happy to make argument regarding 3553. |
| 03:06:34 | 20 | THE COURT:  Let's hear from Ms. Kocher |
| 03:06:35 | 21 | first, because I cut her off a few minutes ago and said |
| 03:06:40 | 22 | let's do this.  We've done it.  It's finished.  This is |
| 03:06:41 | 23 | what the advice is. |
| 03:06:42 | 24 | You go to what the sentence should be, then |
| 03:06:44 | 25 | I want to hear from you, and I want to hear from your |

03:06:47  1   client.

03:06:47  2          MS. KOCHER:  Thank you, Your Honor.

03:06:48  3          The sentencing memorandum, as you referenced

03:06:51  4   at the beginning of this session, is one of the most

03:06:54  5   thorough memorandums I have seen.

03:06:57  6          THE COURT:  I've never read one that was

03:06:59  7   more thorough.  And this lawyer has so zealously

03:07:03  8   represented her client.

03:07:06  9          MS. KOCHER:  And I think it correctly points

03:07:08  10  out a number of things about the defendant's history and

03:07:13  11  past that -- all of the memo is, of course, appropriate

03:07:17  12  for your consideration.  But I don't, with my words that

03:07:20  13  are yet to come, I do not mean to belittle in any way

03:07:25  14  the service that Mr. Fedak gave to the country, the

03:07:30  15  injuries that he suffered, and the tremendous impact

03:07:33  16  that had both on him personally and on his life.

03:07:38  17          That being said, however, Your Honor,

03:07:42  18  whether the root of where he is now -- or rather,

03:07:51  19  assuming the root of where he is now is a result of a

03:07:54  20  mental illness -- which, by the way, the report only

03:07:57  21  gives an impression.  It actually -- the psychologist

03:08:01  22  report that's in doesn't actually give diagnoses.  She

03:08:04  23  gives clinical impressions.

03:08:06  24          And just on a note, much of what she reports

03:08:09  25  there is based on Mr. Fedak's own representations.  And

03:08:12  1  I hope -- I don't know which way to hope, actually, in

03:08:18  2  regard to the childhood allegations and those types of

03:08:21  3  things.  But what I believe to be true is this is the

03:08:24  4  same individual that I've just gone over all these lies

03:08:27  5  with.  So the psychologist's report is limited by that

03:08:31  6  fact, that what she was relying on was his self-report

03:08:36  7  on that ACE evaluation for those childhood things.

03:08:40  8  Again, not saying that there aren't issues.

03:08:44  9         What I do believe to be true, Your Honor,

03:08:47  10  even if the root is mental illness or PTSD, that an

03:08:52  11  individual has to hit bottom; that is, come to where

03:08:55  12  they don't want to be anymore.  And to realize, whether

03:08:58  13  it's some type of mental illness that has brought me

03:09:01  14  here, whether it's a drug addiction, Mr. Fedak has been

03:09:06  15  in -- in fact, she, the psychologist, talked about the

03:09:10  16  support he's now receiving from the Veterans

03:09:12  17  Administration and the counseling he's in.  And but for

03:09:16  18  the one virtual group that he would have to attend

03:09:21  19  because it doesn't meet locally, I believe that she

03:09:24  20  totally agreed that the treatment plan he's in and the

03:09:26  21  medication he's on appear to be a very appropriate

03:09:28  22  treatment plan.  She was concerned about interrupting

03:09:30  23  that.

03:09:30  24         Well, Your Honor, that treatment plan has

03:09:32  25  been in place for a good number of months now.  And yet

03:09:35  1   just a few weeks ago he followed the same path; did a
03:09:43  2   wrongdoing, lied about it.  And only when confronted
03:09:46  3   with the fact "you've got a monitoring bracelet on your
03:09:52  4   ankle" did he come forward.
03:09:54  5            For all of those reasons, for the breadth of
03:09:57  6   the conduct here, for the fact that we still have at
03:09:59  7   least 30 guns at a conservative count -- and the agent
03:10:04  8   did testify he believes all 66 guns were received by
03:10:09  9   Fedak.  Many of those, more than 30, are still
03:10:14  10  somewhere.
03:10:15  11           And the agent has gone, even after the
03:10:19  12  debrief, went and was able to track down one more gun.
03:10:24  13  And it's just a constant thing.
03:10:27  14           But I think the guidelines have this one
03:10:28  15  right.
03:10:30  16           I think he needs care, absolutely.  And
03:10:34  17  that can be received, in fact, perhaps even at a better
03:10:40  18  level, within the Bureau of Prisons, who understands
03:10:43  19  this type of conduct, this type of impact on one's
03:10:49  20  living choices, and how things go forward.
03:10:51  21           And, in short, I don't believe that the
03:10:55  22  considerations regarding his history in light of his
03:11:01  23  ongoing conduct provide a basis for mitigation,
03:11:08  24  particularly much below that guideline range that has
03:11:15  25  been determined by the Court.

03:11:19  1          THE COURT:  Okay.

03:11:21  2          MS. BRENNAN:  Thank you, Your Honor.  I will

03:11:24  3   not belabor the numerous points that we made in our

03:11:27  4   sentencing memo.  It was extensive.  But I would like

03:11:30  5   to highlight some things and draw a few connections.

03:11:34  6          We are proposing a non-incarceration

03:11:37  7   sentence today.  We're proposing that.  And probation is

03:11:42  8   punishment if it is meaningfully and thoughtfully

03:11:46  9   constructed.  And we think this is one of those cases

03:11:49  10  that it can be and it should be.

03:11:52  11         One of the biggest benefits that society

03:11:55  12  sees from incarcerating an individual is protecting the

03:11:59  13  public from a dangerous person.  And while there can be

03:12:03  14  rehabilitative aspects of incarceration, we do not

03:12:07  15  incarcerate people to treat them or to rehabilitate

03:12:10  16  them.  We incarcerate solely for punishment, and to

03:12:15  17  separate, and to send a message.

03:12:17  18         Here there is no need for separation from

03:12:19  19  society, nor is incarceration needed for specific or

03:12:23  20  general deterrence, and it's not needed for treatment or

03:12:27  21  punishment here.

03:12:29  22         The sentence we are proposing and submit in

03:12:32  23  the sentencing memo meets all the goals of 3553,

03:12:37  24  properly accounts for the sentencing factors, and is one

03:12:42  25  that this Court should consider sufficient but not

03:12:44  1   greater than necessary.

03:12:46  2          I'd like to talk about first how the

03:12:49  3   sentence we're proposing addresses the goals of

03:12:51  4   sentencing, and then move very briefly into why it's

03:12:54  5   appropriate given his history and characteristics and

03:12:58  6   the nature and circumstances of the offense.

03:13:01  7          First, the sentence we're proposing meets

03:13:03  8   the goals of punishment.  It reflects the seriousness of

03:13:06  9   the offense and helps promote respect for the law

03:13:09  10  because probation does curtail one's freedoms.

03:13:13  11         We are proposing that as a part of probation

03:13:15  12  he be given a period of home detention or home

03:13:19  13  confinement.  This Court can impose up to a year of

03:13:23  14  home confinement.  He is already on a bracelet.  We

03:13:27  15  would propose that that continue.

03:13:29  16         We are proposing that he be required to

03:13:31  17  complete, after the home confinement period is done, a

03:13:35  18  period of community service, however many hours this

03:13:38  19  Court deems necessary.  And the Court could direct

03:13:41  20  those to specifically address the concerns that his

03:13:45  21  conduct raise.  It could require him to speak to

03:13:49  22  individuals who are in the military, specifically

03:13:53  23  individuals who are involved in supply chain management

03:13:56  24  in the military.

03:13:57  25         Your Honor, those would be two ways the

03:14:02 1   Court could utilize a probationary punishment to not

03:14:05 2   only rehabilitate, but to generally deter others.

03:14:10 3   Specifically as it goes to deterrence, both general and

03:14:13 4   specific, this prosecution, his military discharge, 22

03:14:20 5   days spent in jail, they have provided deterrence for

03:14:25 6   him to ever commit something like this again.  That also

03:14:32 7   provides general deterrence.

03:14:35 8          The Court received numerous letters from

03:14:37 9   individuals that he was in contact with in the military,

03:14:41 10  people that he had worked with, served under.  And all

03:14:47 11  of those individuals, one, were very complimentary, of

03:14:50 12  course, of his -- of their interactions with him; were

03:14:55 13  shocked at this conduct.  And they all know that he got

03:14:58 14  discharged.  And every one of those individuals has

03:15:01 15  contacts within the military.  And so you can be sure

03:15:05 16  that Mr. Fedak's story doesn't stop in this courtroom.

03:15:10 17  It didn't stop with his UCMJ discharge.  It's filtered

03:15:14 18  out already.

03:15:19 19         And he was so close to retirement, to his 20

03:15:21 20  years where he would have been eligible for full

03:15:24 21  benefits, and he lost a significant amount of that

03:15:27 22  through this prosecution.

03:15:30 23         Additionally, he's lost his ability to vote,

03:15:35 24  at least temporarily; to serve public office; to ever

03:15:38 25  possess a firearm again.  And those are rights that he

03:15:43  1  held prior to entering his plea here and that he held

03:15:46  2  valuable and that members of the military, individuals

03:15:49  3  who we want to deter from committing this type of

03:15:53  4  offense, those are rights and privileges that they hold

03:15:57  5  dear.

03:15:57  6          So, Your Honor, sending him to prison is not

03:16:03  7  necessary to meet the goal of deterrence.

03:16:07  8          Treatment.  It's not necessary for him to go

03:16:11  9  into a BOP facility for treatment.  I would have to

03:16:14  10  disagree with Ms. Kocher's assessment that he can get

03:16:19  11  better care in the Bureau of Prisons.  I would like to

03:16:21  12  think that our veterans and the access that he has out

03:16:28  13  here through his VA benefits are far superior to

03:16:32  14  anything that he would receive in the Bureau of Prisons

03:16:35  15  and are specifically formulated to address individuals

03:16:41  16  with his type of PTSD, combat-related; his traumatic

03:16:48  17  brain injury.  They are doctors that are trained and

03:16:51  18  have worked with hundreds if not thousands of other

03:16:56  19  individuals who have returned from war with those type

03:16:59  20  of injuries.  That is certainly something that the

03:17:02  21  Bureau of Prisons sees, I would think, on a very rare

03:17:09  22  basis.

03:17:10  23          So, Your Honor, I believe he's going to

03:17:12  24  receive much better treatment out in the community.

03:17:16  25  And I believe that Dr. Sapia's assessment that she

03:17:19 1   provided to the Court indicated as much.   And also

03:17:23 2   indicated that, in fact, sending him to prison could

03:17:25 3   have a detrimental effect on his mental health both

03:17:28 4   while in custody and on his ability to regain and

03:17:31 5   reestablish himself once he was out of custody.

03:17:34 6           Your Honor, as I previously stated, his

03:17:37 7   detention in a prison is not necessary to protect the

03:17:41 8   public.   He's certainly not a danger in the classic

03:17:44 9   sense of the word.   And his discharge from the military

03:17:47 10  removed any danger that he would ever be able to commit

03:17:50 11  this type of offense again.

03:17:52 12          So, Your Honor, we submit that the proposed

03:17:54 13  sentence meets all the goals of sentencing.   And we also

03:17:57 14  submit that it accounts for his history and

03:18:00 15  characteristics, and the nature and circumstances of the

03:18:03 16  offense.   That is where the memo really hits home.   It

03:18:08 17  goes into great detail.

03:18:10 18          But I would just say that I have represented

03:18:12 19  a number of individuals who have been in the military

03:18:17 20  prior to representing the individual in this courtroom.

03:18:21 21  I spent a number of years doing the misdemeanor docket

03:18:24 22  down in Fort Bragg.   I actually did that docket from

03:18:28 23  roughly 2007 to about 2012.   And that was when a lot of

03:18:34 24  service members were coming back with PTSD, TBI.   Of

03:18:41 25  course, the misdemeanor docket focuses mostly on DWIs

03:18:45  1  and that type of stuff, but I had a lot of guys come

03:18:48  2  through who had served overseas and had gotten awards.

03:18:52  3  I never had an individual with the number of service

03:19:02  4  commendations and awards that Mr. Fedak had.

03:19:06  5          And I talked to many individuals that served

03:19:10  6  with my clients.  None had the level of respect that he

03:19:15  7  seemed to have garnered from other individuals that

03:19:18  8  served with him.

03:19:20  9          And he was in combat zones in the time that

03:19:25  10  our country was in one of the most violent conflicts

03:19:30  11  since Vietnam.  He was in Fallujah.  He was getting

03:19:35  12  shot at, bombed, IEDs.  It was traumatic.  And I do

03:19:44  13  think that that bears considering when we are deciding

03:19:50  14  what the appropriate punishment is, particularly when

03:19:55  15  Dr. Sapia's report draws such a strong connection from

03:20:00  16  his service-related injuries to the conduct here and to

03:20:06  17  his errors in judgment.

03:20:12  18          Your Honor, we are asking for a probationary

03:20:15  19  sentence today because it's the right result, given his

03:20:18  20  history and characteristics and the nature of the

03:20:20  21  offense.  We are asking for a probationary sentence and

03:20:24  22  not an active sentence because that is what would be

03:20:27  23  best for his mental health, his treatment, what would be

03:20:32  24  best for his family and his family's financial

03:20:35  25  situation.  We're asking for a probationary sentence not

03:20:39   1   as a pass.  We're asking for it as a punishment for his

03:20:45   2   conduct.  And we're asking the Court to craft that

03:20:47   3   sentence in a way that it has a strong punishment aspect

03:20:52   4   to it, including the home detention, including community

03:20:56   5   service.  And we believe that is the only sentence that

03:21:00   6   is sufficient but not greater than necessary in this

03:21:03   7   case.

03:21:04   8              THE COURT:  Okay.  Thank you.

03:21:10   9              Mr. Fedak, would you like to say anything?

03:21:14   10              THE DEFENDANT:  Yes, Your Honor.

03:21:16   11              Good morning, Your Honor.  First, I'd like

03:21:21   12   to apologize for my actions for this country and also

03:21:26   13   for not fully upholding responsibilities I had while I

03:21:29   14   was in the armed services.

03:21:31   15              I would like to apologize to my family.  I

03:21:34   16   know they're all working.  I asked them; they really

03:21:37   17   wanted to come, but it's a Friday morning, and it's a

03:21:40   18   three-hour drive.  But I really wanted to make sure

03:21:43   19   that they know that I apologize to them for my actions.

03:21:47   20              I take full responsibility for my

03:21:49   21   transactions.  I'm not here to deny that.  At the time

03:21:52   22   my intentions were good, but my conduct fell way short.

03:21:56   23   I was entrusted to insure proper measures were in place,

03:22:01   24   and I completely failed that.  I failed my job as a

03:22:04   25   supply officer, and the armed services, and pretty much

03:22:07 1 this country, ma'am.

03:22:09 2 　　　　　Due to this failure I received an

03:22:12 3 other-than-honorable discharge. I lost my retirement 30

03:22:16 4 days before I was eligible. I was still on postsurgery

03:22:21 5 recovery when this all happened. These consequences

03:22:25 6 greatly affected everything in my life. I was not

03:22:29 7 briefed of my discharge until two days prior, and I was

03:22:33 8 still on bed rest, and I got told I had to come in and

03:22:36 9 check out of the military.

03:22:37 10 　　　　　I was, like: Okay; what happened?

03:22:39 11 　　　　　And so I had three days to check out of the

03:22:41 12 Marine Corps before my EAS, losing all my benefits, not

03:22:46 13 doing any of my disability rating or financial support.

03:22:52 14 Three days later I was out, and I was a normal civilian

03:22:56 15 with an other-than-honorable discharge.

03:22:59 16 　　　　　That greatly impacted my family and myself,

03:23:02 17 losing that income and support. We had to uproot and

03:23:05 18 move closer to family to have that support and rebuild a

03:23:11 19 life not only for myself and my family, but also our

03:23:14 20 kids.

03:23:15 21 　　　　　Outside of the embarrassment of the

03:23:18 22 other-than-honorable discharge, once you're discharged

03:23:21 23 from the military with an other-than-honorable, you

03:23:25 24 don't get any financial loans or grants that are given

03:23:29 25 to veterans; you have no benefits for the veterans, no

03:23:32  1   medical or mental health.  So I was pretty much on my

03:23:35  2   own for almost a year until my benefits finally got

03:23:38  3   approved based on my enlistment honorable service for 13

03:23:43  4   years.  So because of that I was able to get my

03:23:46  5   veteran's benefits, and I was able to start my mental

03:23:51  6   health re -- what I could do, because I was -- they had

03:23:54  7   me on medication that was wrong, so I know that for a

03:23:56  8   fact, and now I believe I'm on the right treatment.

03:23:59  9          I humbly plea for a non-active sentence as I

03:24:04  10  continue to regain the trust of my family, this Court,

03:24:07  11  and this nation.  And I know I failed my family.  I

03:24:10  12  know I failed this country.  I definitely see the error

03:24:13  13  in my actions, and I understand.  I just respectfully

03:24:18  14  ask for leniency.

03:24:19  15          I have no excuse for the violation over

03:24:23  16  Christmas.  I was with my family.  I thought we were

03:24:27  17  having a great time.  I was planning to stay until the

03:24:30  18  27th.  The 26th my wife is, like: I'm taking them to

03:24:35  19  my sister-in-law's, and they want to spend the night and

03:24:38  20  play with their cousins.  So I was pretty much standing

03:24:41  21  there; I said: All right.  And the only other friend

03:24:43  22  that I have that I can really confide in and talk to,

03:24:46  23  Ms. Pruitt, I went down there and talked to her.  And I

03:24:49  24  regret my actions, and I have no excuse, ma'am.

03:24:53  25          I basically just plea that I can continue

03:24:56  1    with my responsibilities as a father to provide and work

03:25:01  2    for my kids so I can help pay, not only for their school

03:25:04  3    and half their medical bills, but my family depends on

03:25:08  4    that, and I really want to be there for my kids.  So

03:25:12  5    that way, especially my oldest, who has mental health

03:25:16  6    and medical issues, me being there as a support figure,

03:25:21  7    even though I know that I've failed, but I want to

03:25:23  8    rebuild that trust and rebuild that so I can help

03:25:26  9    alleviate some of the stress from my wife and be a part

03:25:29  10   of their family and try to help them go to games.  He's

03:25:34  11   really good at soccer, and he always wants me to play

03:25:37  12   with him.

03:25:39  13          You know, moving forward, if granted a

03:25:41  14   non-active sentence, my plan is to continue to work.   I

03:25:45  15   plan to continue to be a better individual and show this

03:25:48  16   country and this nation that I can be better.  I will

03:25:52  17   be able to provide for my family.  I plan on moving

03:25:55  18   closer to Burlington so I can support my family better,

03:26:00  19   especially with being able to pick up and take my kids

03:26:02  20   to school.  I plan to look for better employment.  I'm

03:26:06  21   going to stay where I am now just because I don't want

03:26:08  22   to -- until I find a better job, which I plan on doing.

03:26:12  23          And I know that having a felony limits my

03:26:14  24   job opportunities, but it won't deter me from trying to

03:26:17  25   find something that will help support my family better

03:26:20  1    than what I'm getting right now.

03:26:27  2            THE COURT:  Okay.  Well, it was a big leap

03:26:31  3    of faith on the part of this Court to allow you to be

03:26:34  4    released.  I think there certainly were some surprises

03:26:42  5    along the way.  But I'm sure that time has been

03:26:52  6    valuable to you and your family to have your presence in

03:26:55  7    their lives very directly while these cases wound their

03:27:01  8    way through court and combined.

03:27:08  9            What's missing here from a lot of what I've

03:27:11  10   heard from the defense side particularly is the nature

03:27:16  11   and harm of this offense.

03:27:23  12           Leaving the attempted destruction of the

03:27:28  13   ill-gotten gains to the side, no doubt this course of

03:27:33  14   conduct has resulted in probably, one could say,

03:27:39  15   necessary changes to the way the government disposes of

03:27:44  16   property, and that no doubt has increased the

03:27:50  17   transactional costs of doing that, to make sure the

03:27:57  18   property goes where it's appropriate, not to someone

03:28:02  19   like you.  And so who pays for that?  Well, the

03:28:09  20   taxpayers pay for that.

03:28:12  21           And there certainly is a difficulty in

03:28:16  22   prosecuting these types of cases.  They're probably

03:28:20  23   pretty hard to detect.  And there's been an incredible

03:28:24  24   amount of effort and time into this prosecution.  And

03:28:28  25   you've certainly made it more difficult by your actions.

| | | |
|---|---|---|
| 03:28:38 | 1 | And I wonder about what you did to the |
| 03:28:42 | 2 | command chain.  It sounds from reading the memorandum |
| 03:28:45 | 3 | that you -- again, it's "the motives were good, but the |
| 03:28:51 | 4 | actions were wrong."  Well, that's just a self-serving |
| 03:28:55 | 5 | justification here repeatedly by you of conduct that is |
| 03:29:03 | 6 | illegal, illicit, inappropriate.  And I just wonder |
| 03:29:09 | 7 | about you buying the approval and loyalty of those in |
| 03:29:15 | 8 | the military by getting them things.  I just wonder: |
| 03:29:24 | 9 | At whose expense?  The command chain?  I think this |
| 03:29:30 | 10 | type of conduct, to have somebody within the military |
| 03:29:33 | 11 | doing this, must be very undermining of basically our |
| 03:29:38 | 12 | national defense. |
| 03:29:42 | 13 | So the harm here is significant, and the |
| 03:29:46 | 14 | need to promote respect for the law is immense, and the |
| 03:29:49 | 15 | need to protect the public from people like you is |
| 03:29:53 | 16 | great. |
| 03:29:56 | 17 | Now, that is not to take away from your |
| 03:29:59 | 18 | service, your very honorable service in the military |
| 03:30:06 | 19 | that precedes this.  I want to recognize that. |
| 03:30:16 | 20 | But a noncustodial sentence does not |
| 03:30:19 | 21 | accurately reflect the factors in 18, United States |
| 03:30:26 | 22 | Code, Section 3553.  Basically it would be a broadcast |
| 03:30:33 | 23 | that you can do this, and you can get away with it, to |
| 03:30:39 | 24 | some extent. |
| 03:30:44 | 25 | So all things considered, taking into |

|          |    |
|----------|----|
| 03:30:47 | 1  | consideration the good and the bad of your background |
| 03:30:50 | 2  | and your history, and the other factors, I think the |
| 03:30:57 | 3  | guideline range is too high, and I do come down from it |
| 03:31:05 | 4  | for two reasons:  I come down from it because of the |
| 03:31:10 | 5  | mental health issues, and I come down from it in |
| 03:31:15 | 6  | recognition of your service to this country honorably. |
| 03:31:23 | 7  | But three years is what you're going to |
| 03:31:25 | 8  | serve, 36 months.  That's a sentence that's sufficient |
| 03:31:28 | 9  | but not more than what it needs to be, all things |
| 03:31:31 | 10 | considered. |
| 03:31:33 | 11 | And then you're going to be supervised for |
| 03:31:35 | 12 | three years.  And you know, I tell defendants, one of |
| 03:31:41 | 13 | the things you've got to do is be honest and truthful in |
| 03:31:44 | 14 | all of your dealings with your probation officer.  I |
| 03:31:46 | 15 | tell defendants when I sentence them:  You know, |
| 03:31:49 | 16 | sometimes I see people for supervised release issues on |
| 03:31:53 | 17 | a revocation motion not because of what they did, but |
| 03:31:59 | 18 | because they lied about it.  And you're just the |
| 03:32:02 | 19 | perfect example of that.  If you had been honest and |
| 03:32:06 | 20 | truthful, your going to Raleigh and staying with Ms. |
| 03:32:13 | 21 | Pruitt really might not have been a big deal, or as big |
| 03:32:19 | 22 | a deal as it became when you said:  Oh, I was at home. |
| 03:32:23 | 23 | Remember that when you're being supervised.  Don't do |
| 03:32:27 | 24 | that again.  Be truthful and honest. |
| 03:32:30 | 25 | But let me start with the mandatory |

03:32:32 1 conditions. You can't break any law; you can't possess
03:32:35 2 a weapon; you can't possess drugs.

03:32:37 3 The standard conditions. I've spoken of one
03:32:40 4 of them: Be honest in your dealings with your probation
03:32:43 5 officer. Here's another one that you've played with:
03:32:46 6 Don't go some place, don't live some place, don't move
03:32:50 7 some place where your probation officer doesn't know
03:32:56 8 you're going. Okay.

03:32:59 9 Work full-time. You're motivated to do
03:33:02 10 that. You've done a good job in the hardware store, and
03:33:05 11 I'm sure that was difficult at times. We've had some
03:33:08 12 issues along the way with your relationship with your
03:33:11 13 third-party custodian, and I can certainly say I've
03:33:14 14 worried about that. But you can work hard, and that is
03:33:18 15 to your credit.

03:33:23 16 And then the special conditions for you:
03:33:27 17 Mental health treatment. And I'm going to put on the
03:33:32 18 judgment that's not an option; that's not as directed by
03:33:37 19 the probation office; that's as required by this Court.
03:33:42 20 And then you and your probation officer figure out how
03:33:46 21 to get the best mental health treatment. But clearly
03:33:49 22 that's a priority for you.

03:33:51 23 And supporting your dependents.

03:33:53 24 And then because of the nature and
03:33:57 25 circumstances of what's brought you in this room, you're

03:34:00 1   going to have to agree to warrantless searches of your

03:34:03 2   car, your person, by law enforcement or by the probation

03:34:07 3   office, if there's a reasonable suspicion to think

03:34:10 4   you're breaking the law or violating supervised release

03:34:12 5   conditions, or if it's necessary for your probation

03:34:15 6   officer, as sometimes it is, to search in the regular

03:34:19 7   course of that officer's supervisory responsibilities.

03:34:27 8           I don't think you're a drug user.  I'm

03:34:30 9   going to suspend that testing condition.

03:34:35 10          I know you can't pay a fine.  I'm not going

03:34:37 11  to make you pay a fine.

03:34:39 12          A $100 special assessment.

03:34:41 13          I'm going to dismiss those other counts

03:34:44 14  against you.

03:34:48 15          And I'm going to recommend you to Butner or

03:34:52 16  as close to North Carolina as possible.

03:34:54 17          I'm going to recommend that the Bureau

03:34:56 18  undertake a comprehensive mental health assessment of

03:35:00 19  you when you come into its custody and control.  I'm

03:35:04 20  recommending you for mental health treatment while

03:35:07 21  you're in its custody and control.  And I'm

03:35:12 22  recommending you for further education and vocational

03:35:15 23  training.

03:35:18 24          You can move past this.  You've got to do a

03:35:21 25  lot of deep soul searching with some professional help

03:35:24 1  to do that.  And we all want you to succeed.

03:35:36 2        The order of forfeiture will be entered that

03:35:42 3  the defendant personally obtained at least $586,371.79

03:35:51 4  in proceeds from the offense.

03:35:57 5        Before I impose this finally, from the

03:36:00 6  probation office's side of the room, are there any

03:36:05 7  changes recommended to comply with relevant sentencing

03:36:07 8  law?

03:36:07 9        THE PROBATION OFFICER:  No, Your Honor.

03:36:08 10        THE COURT:  Ms. Kocher?

03:36:09 11        MS. KOCHER:  No, Your Honor.

03:36:10 12        THE COURT:  Counsel?

03:36:10 13        MS. BRENNAN:  Your Honor, the only thing we

03:36:12 14  would ask to add is, while he's in custody, substance

03:36:16 15  abuse treatment due to the prior alcohol addiction.

03:36:22 16        THE COURT:  Remind me about the alcohol

03:36:25 17  addiction.

03:36:26 18        MS. BRENNAN:  Your Honor, he had a problem

03:36:27 19  with alcohol up until about 2017.  He quit drinking

03:36:31 20  because it had gotten a little out of hand.

03:36:33 21        THE COURT:  That's right.  He stopped cold

03:36:35 22  turkey because his wife said this is causing problems.

03:36:37 23        MS. BRENNAN:  He did.  And then he used

03:36:40 24  again in February of '22.  So he did, when things sort

03:36:43 25  of hit the fan, he used again.  So if the Court

03:36:48  1  wouldn't mind.  Also that might avail him to additional

03:36:51  2  types of mental health treatment.

03:36:53  3            THE COURT:  And it might take a year off his

03:36:55  4  sentence.  All right.  I'll go ahead and add that, the

03:36:58  5  most intensive treatment program for addiction or

03:37:01  6  dependency.

03:37:04  7            But now that we've brought this up, let me

03:37:06  8  add some supervised release conditions.  You can't

03:37:09  9  drink alcohol.  You can't go to bars.  You can't be

03:37:12  10 around people who are drinking alcohol.  You can't have

03:37:15  11 medicine with alcohol in it unless it's been prescribed

03:37:19  12 by a licensed physician.  You might have an alcohol

03:37:22  13 monitor hooked up to your car.  You're going to be

03:37:25  14 tested for alcohol use.  Testing/treatment as required

03:37:29  15 with any monitoring devices as deemed appropriate.

03:37:33  16            Thank you for reminding me of that.  It

03:37:41  17 probably goes hand in hand with some other things.  So,

03:37:45  18 yes.

03:37:47  19            You can appeal if you think something is

03:37:51  20 really wrong with your conviction or the sentence, but

03:37:53  21 you do need to move quickly.

03:37:57  22            And I would like to note on the record that

03:37:59  23 if I got it wrong with how I ruled on these objections

03:38:07  24 that I would have come -- and really, frankly, did

03:38:11  25 come to the conclusion that 36 months is appropriate

03:38:18  1   with regard to 18, United States Code, Section 3553.

03:38:22  2   The Guidelines were challenged by this case.   The Court

03:38:28  3   was challenged by this case.   But I would have come to

03:38:31  4   the exact same sentence irrespective of the Guidelines.

03:38:36  5           Back to how you can appeal.   You can appeal

03:38:39  6   if you think there's something really wrong with the

03:38:41  7   conviction or the sentence.   You did enter into a plea

03:38:43  8   agreement.   There were benefits in there.   There were

03:38:46  9   waivers in there of your rights to appeal.   These

03:38:48  10  waivers are generally enforceable, but if you think

03:38:52  11  they're not, there's an opportunity to present that

03:38:54  12  theory to the Fourth Circuit; 14 days.

03:39:00  13          If you can't afford the cost of an appeal,

03:39:02  14  you can apply for permission to appeal for free.   And if

03:39:05  15  you request, Ms. Castania will fill out the appeal

03:39:08  16  paperwork for you.   Though I know Ms. Brennan will, and

03:39:11  17  she would acknowledge that she would file a notice of

03:39:13  18  appeal if you told her to.

03:39:15  19          Now, I think your client needs to come into

03:39:18  20  custody, so I'm asking the Marshals to take him now.

03:39:20  21          MS. BRENNAN:   Your Honor, if I may, he drove

03:39:22  22  here.

03:39:25  23          THE COURT:   Well, somebody's going to have

03:39:27  24  to drive it back.

03:39:30  25          All right.   Into custody.

03:39:34    1              And maybe he can give his keys to somebody.
03:39:39    2              MS. BRENNAN:  You wouldn't give him 24 hours
03:39:42    3    to report to get home and get his car back and report to
03:39:48    4    the marshals there?
03:39:49    5              THE COURT:  No.
            6              (Concluded at 2:23 p.m.)
            7                          - - -
            8
            9              C E R T I F I C A T E
           10
           11     I certify that the foregoing is a correct transcript
           12    from the record of proceedings in the above-entitled
           13    matter.
           14
           15    /s/ Tracy L. McGurk_____         ___4/7/2023___
           16    Tracy L. McGurk, RMR, CRR                   Date
           17
           18
           19
           20
           21
           22
           23
           24
           25