## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF NORTH CAROLINA
### EASTERN DIVISION

_____ )
UNITED STATES OF AMERICA,       )
                                )
            vs.                 )    CASE NO. 4:20-CR-11-51-FL
                                )
                                )
PATRICK J. FEDAK,               )
                                )
            Defendant.          )
_____ )


### THURSDAY, MARCH 10, 2022
### INITIAL APPEARANCE AND DETENTION HEARING
#### HELD IN NEW BERN, NORTH CAROLINA
#### BEFORE THE HONORABLE LOUISE W. FLANAGAN
#### UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:

<u>On Behalf of the Government</u>:

**BARBARA D. KOCHER, Assistant U.S. Attorney**
**U.S. Attorney's Office**
**150 Fayetteville Street, Suite 2100**
**Raleigh, North Carolina  27601**

<u>On Behalf of the Defendant</u>:

**DIANA PEREIRA, Assistant Public Defender**
**Federal Public Defender's Office**
**150 Fayetteville Street, Suite 450**
**Raleigh, North Carolina  27601**

<u>USPO</u>:

**MELISSA LUNSMAN**
**REBECCA RABONE**


### MICHELLE A. McGIRR, RMR, CRR, CRC
#### Official Court Reporter
#### United States District Court
#### Raleigh, North Carolina

1                    I N D E X

2

3    **WITNESS:**

4
              NCIS Special Agent Peter Salomon
5

6    **EXAMINATION:**                                    **PAGE**

7
              Direct Examination by Ms. Kocher          12
8             Cross-Examination by Ms. Pereira          28

9    **WITNESS:**

10

11             Matthew Chambers

12

13   **EXAMINATION:**

14             Direct Examination by Ms. Pereira        31
              Cross-Examination by Ms. Kocher          39
15

16

17

18

19

20                         *   *   *

21

22

23

24

25

```
 1                    (Thursday, March 10, 2022)

 2                   P R O C E E D I N G S

 3

 4       (The defendant, Patrick J. Fedak, escorted into the courtroom

 5                          at 9:27 a.m.)

 6                   (Open Court at 9:38 a.m.)

 7             THE COURT:  Good morning.

 8             The Court has several matters calendared before it this

 9   morning and I'm starting with, quite obviously, the case of United

10   States of America v. Patrick Fedak.

11             And those in attendance with respect to the Panduit

12   matter, well, I don't have a crystal ball.  I don't reasonably

13   believe this criminal session will be protracted.

14             When it's concluded in, I think, a fairly short period of

15   time, the Court will take a 10-minute recess and then start up with

16   the civil matter.

17             So, counsel -- new counsel, Ms. Brennan, welcome.

18             MS. PEREIRA:  Ms. Pereira.

19             THE COURT:  Ms. Pereira.  I'm sorry, yes.  That is Ms.

20   Pereira behind the mask.

21             All right.  So we've got -- are you the -- taking the

22   laboring oar here?

23             MS. PEREIRA:  I was the duty attorney for Wilmington

24   today, your Honor, yes, so I just --

25             THE COURT:  So we just moved you here.
```

```
1              MS. PEREIRA:  Yes, your Honor.
2              THE COURT:  All right.  And Ms. Kocher --
3              MS. KOCHER:  Yes, your Honor.
4              THE COURT:  -- got that one right.
5              MS. KOCHER:  Good morning.
6              THE COURT:  Good morning.
7              I'm beginning to get a little laxer in my COVID
8    prohibitions or procedures and if counsel has been fully vaccinated,
9    and client as well -- and I interpret that to mean your booster
10   shot -- if you wish to remove your mask during this proceeding, you
11   may.  It's completely up to you.
12             I had set aside time next week -- Sean, I think I'd like
13   you to stay here, okay -- for Mr. Fedak's change of plea and a lot
14   has changed since then.  That was to be March 16th.
15             So today you come before me for what is called an initial
16   appearance pursuant to Rule 5 of the Rules of Criminal Procedure.
17   It's the opportunity for the Court to explain to you what you're
18   charged with.
19             And there is also appearing on the docket a motion for
20   detention.  Is that what's in front of me, Ms. Kocher?
21             MS. KOCHER:  Yes, your Honor.
22             THE COURT:  So I wanted to bring you all from Wilmington
23   to New Bern because I think what happens here today reasonably bears
24   on what may or may not happen next week.
25             So the indictment that was returned back in December of
```

1   2020, to which Mr. Fedak entered into a plea agreement recently,

2   agreeing to plead guilty to Count One, with the Government

3   dismissing Count Two.

4           That, I believe, was the bargain you negotiated, correct,

5   counsel?

6           MS. KOCHER:  That is correct, your Honor.

7           THE COURT:  That charged you, Mr. Fedak, with beginning

8   in or about December of 2017 and continuing until December 3rd,

9   2019, in this district and elsewhere, that you did willfully and

10  knowingly embezzle, purloin and steal property of the United States,

11  that is, various articles belonging to the United States Military,

12  with a value in excess of $1,000 with the intent to convert that

13  property to your own use in violation of a law recorded at Title 18

14  of the Code, at 641.

15          And Count Two charged that on or about October 31st of

16  2019, in this district and elsewhere, that you knowingly possessed

17  stolen firearms and they are described in Count Two.  That is five

18  Sig Sauer pistols, P 229R, five Sig Sauer pistols, P 239, and seven

19  Remington shotguns, having been shipped and transported in

20  interstate commerce with reasonable cause and knowing to believe the

21  firearms were stolen in violation of another law recorded at Title

22  18 of the Code.

23          And you were put on a notice that the Government would

24  seek to have you forfeit certain property.

25          And just a matter of days after the plea agreement was

entered into, it appears you're the subject of a criminal complaint
that is, given some detail that I may return to in a moment, with
respect to why you did or didn't do what you're alleged to have
done.

       And out of this though, while today was originally set
aside as a preliminary examination opportunity as well, the
Government's now indicted you and brought that charge into this case
by virtue of a superseding indictment that was filed on March 8th.

       From my cursory review, it looks like Count One and Two
are identical.  It's Count Three that's the focus of my attention
right now.

       And I read to you Count Three as follows:  On or about
February 9th of 2022, in the Eastern District of North Carolina and
elsewhere, that you, Patrick J. Fedak, did corruptly influence,
obstruct and impede and endeavor to influence, obstruct and impede
the due administration of justice by dismantling, separating,
secreting and burying items of evidence in regard to his theft and
possession of stolen government property, to wit, firearms, falling
within the various articles described in Count One and specifically
alleged in Count Two.

       This stating a violation of another law recorded at Title
18 of the Code at Section 1503.

       Now, Government, would you put on the record what the
punishment is that is possible for this defendant if found guilty.

       MS. KOCHER:  If found guilty of Count Three as charged,

1   Mr. Fedak faces not more than ten years imprisonment under that
2   particular statute, 1503.

3           In addition, your Honor, if convicted -- and because that
4   crime was committed while he was on federal pretrial release, under
5   Title 18, United States Code, Section 3147, Mr. Fedak faces up to
6   ten additional years' imprisonment.  And any term under that statute
7   would be served consecutively to any other sentence this Court would
8   impose.

9           There would, in addition, for conviction under 1503, be a
10  fine not to exceed $250,000 or both fine and imprisonment.

11          No more than three years supervised release and up to two
12  additional years of imprisonment should that term ever be revoked.

13          One hundred dollar special assessment and restitution if
14  applicable.

15          THE COURT:  So a very serious matter.  And I want to make
16  sure that you understand what you're charged with and the maximum
17  possible punishment and I want to make sure you understand the
18  rights that you have.

19          The right to plead not guilty, to persist in that plea.
20  The burden is on the shoulders of the Government to prove you guilty
21  beyond a reasonable doubt.

22          As you know, the way the Government would go about
23  proving its case is by calling witnesses to the witness stand and
24  you or your attorney would have the right to ask those people
25  questions.

1          You've also got the right, as you know, to make people

2     come into this courtroom pursuant to subpoena powers to provide

3     testimony in support of your defense.

4          And finally, sir, you've got the right to take the

5     witness stand, but you don't have to.  And it's something important

6     that I want to emphasize in this proceeding.  You have the right to

7     remain silent, but if you do decide to talk, whatever you say may be

8     used against you.

9          In a trial, you don't have to prove anything, as I've

10    just informed you, but you do have the right to take the witness

11    stand, but that's only if you wish.

12         And if you decide not to, in other words, if you decide

13    to exercise that right you've got to remain silent, no suspicion of

14    your guilt, I would tell the jury, is allowed to be drawn from your

15    decision to exercise that right.

16         Now, you've got a right to be represented by an attorney

17    at every point in this proceeding.

18         And the criminal complaint suggests that you buried the

19    guns in the woods because you understood that's what you were

20    supposed to do.  You understood that from your former counsel, who

21    quite appropriately, made a motion to withdraw, which was recently

22    heard in Wilmington before the Magistrate Judge.

23         So does your client understand everything I've explained

24    to him, all his rights and what he's charged with?

25              MS. PEREIRA:  I believe he does, your Honor.

1          THE COURT:  Okay.  Mr. Fedak, do you?

2          THE DEFENDANT:  Yes, ma'am.

3          THE COURT:  Okay.  Do you have any questions of this

4     Court?  You can go through your attorney before you ask them.

5          THE DEFENDANT:  I do not.

6          MS. PEREIRA:  No.

7          THE COURT:  Is there anything further either side wants

8     me to cover in the context of the initial appearance?

9          MS. PEREIRA:  No, thank you, your Honor.

10          THE COURT:  Okay.  So the probation office believes the

11     Court can craft a set of release conditions, despite the allegations

12     here concerning his activity while on pretrial release, that will

13     assure that he will show up for court and not harm others and not

14     interfere with or obstruct justice going forward.

15          What does the Government think?  Do you think I can craft

16     something that would provide those assurances?

17          MS. KOCHER:  The Government does not think that to be the

18     case, your Honor.

19          And with respect to the probation office, first, the case

20     I believe falls within a rebuttable presumption under Title 18,

21     United States Code 3148.  That is to say, this crime is alleged to

22     have been committed while he was on pretrial release.  It involved

23     the obstruction of justice.  And 3148 specifically calls that to a

24     rebuttable presumption.

25          The Government is willing and ready to proceed by proffer

1   in this case if that is of assistance to the Court.

2            THE COURT:  Well, I suppose it really turns on whether

3   defense counsel wants the opportunity to cross-examine anybody that

4   might be here.

5            How would you like to proceed?

6            MS. PEREIRA:  Your Honor, well, first of all, we are

7   prepared to rebut the presumption with a third-party custodian.  So

8   as an initial matter, we do have a witness available for that

9   purpose today.

10           THE COURT:  Okay.

11           MS. PEREIRA:  And then we would prefer any Government

12  witnesses be called and subject to cross-examination.

13           THE COURT:  All right.  I can appreciate that.

14           Well, Ms. Kocher.  Would you like to call your first

15  witness?

16           MS. KOCHER:  Yes, your Honor.

17           The Government calls Naval Criminal Investigative Service

18  Special Agent Peter Salomon.

19           THE COURT:  Okay.  Just so everyone, both in this hearing

20  and going forward in the next, if we're speaking through the masks

21  -- and I'm going to tell the witness, you can take yours off if

22  you're comfortable -- and I think he already is -- stay seated and

23  keep the microphone right in front of you and your voice will be

24  sufficiently amplified even though you're speaking through a

25  barrier.  It's better not to stand up with a mask on and try to

1  project.  I know it goes against the grain, but I want to invite

2  everybody to stay seated and just -- we have learned over time,

3  keeping that microphone directly in front of you is very important.

4         All right.  I interrupted the clerk.  I invite her now to

5  administer the oath.

6         THE CLERK:  If you would please raise your right hand and

7  state your name.

8         THE WITNESS:  Peter Salomon.

9         THE CLERK:  Please spell your name.

10         THE WITNESS:  P-E-T-E-R  S-A-L-O-M-O-N.

11                 **NCIS SPECIAL AGENT PETER SALOMON**

12         having been duly sworn, testified as follows:

13         THE WITNESS:  I do.

14         THE CLERK:  Thank you.

15         MS. KOCHER:  Your Honor, may I approach?

16         THE COURT:  Certainly.

17      (Attorney Kocher providing documents to the deputy clerk)

18         MS. KOCHER:  My apologies.  With the late change in

19  location, I did not have an electronic --

20         THE COURT:  Well, I'm just complimentary to both sides

21  being able to turn your cars around and come here instead.

22         MS. KOCHER:  What I have handed to the Court are

23  Government's Exhibits marked 1 through 6 with some sub pages therein

24  marked additionally.

25  ///

1                    **DIRECT EXAMINATION**

2    BY MS. KOCHER:

3        Q.    Agent Salomon, what do you do for a living?

4        A.    I'm a Special Agent with the Naval Criminal Investigative

5    Service.

6        Q.    And how long have you done that?

7        A.    Since January 2019.

8        Q.    And what is your current assignment, sir?

9        A.    I'm currently assigned to Marine Corps Air Station Cherry

10   Point in North Carolina.

11       Q.    Can you tell the Court who Patrick Fedak is.

12       A.    Patrick Fedak --

13             THE COURT REPORTER:  Could I ask you to please sit closer

14   to the microphone.

15             Thank you.

16       A.    Patrick Fedak is a former Marine, enlisted initially in

17   2001.  Ultimately became a supply officer.  And then from there, we

18   opened an investigation.

19       Q.   (By Ms. Kocher)  All right.  What does a supply officer

20   do?

21       A.    A supply officer is responsible for handling inventory

22   and warehouses, items coming and going pertaining to different

23   squadrons within the Marine Corps.

24       Q.    All right.  And what was the predication for the

25   investigation you mentioned that had been opened?

1       A.      Initially in December of 2019, NCIS received information

2   that there were over $40,000 of what was initially believed to be

3   M16 rifles that were delivered but never put into inventory.

4   Ultimately it was determined that it was not actually M16 rifles, it

5   was M16 rifle sites.

6               However, there are other discrepancies annotated during

7   that initial investigation prompting the rest of the investigation.

8       Q.      All right.  In what manner had those approximately

9   $43,000 of Colt M16 parts requisitioned?  How were they ordered?

10      A.      They were ordered through a website called GSAXcess.

11      Q.      What can you tell us about that?

12      A.      GSAXcess is a website where, if an agency has extra items

13  or goods, they're able to look first within their agency for a user

14  for it.  If they're unable to find one, they can list the items on

15  GSAXcess, which enables other agencies where people or other

16  entities with access to request the items at no cost, with the

17  exception of transfer, shipping costs, to be reutilized for

18  government purposes.

19      Q.      All right.  Do members of the public have access to this

20  web site?

21      A.      No, it's all government tied.

22      Q.      All right.  Did Mr. Fedak have access to this web site?

23      A.      Yes.  Mr. Fedak did have access to this through his role

24  as a supply officer in the Marine Corps.

25      Q.      And did he use that in some legitimate fashion?

1      A.    Yes.  For instance, we know he requested and received

2    work stations on behalf of his squadron.

3      Q.    Now, you mentioned that the investigation had revealed

4    anomalies in regard to some of the property transfers; is that

5    correct?

6      A.    Yes; that's correct.

7      Q.    Let me turn you to what's been marked as Government's

8    Exhibit 1.  Can you tell the Court what this is?

9      A.    So this is a list or partial list of items requested in

10   GSAXcess or approved by Mr. Fedak.  These include weapons such as --

11   different weapons, including handguns and rifles, as well as other

12   items, such as furniture, iPhones, iPads and things of that nature.

13     Q.    All right.  If I can turn your attention to line 23.  Is

14   that, in your review of the list, one of the earliest items that was

15   requisitioned by Mr. Fedak through GSAXcess?

16     A.    Yes.  It was as early as December of 2017.

17     Q.    All right.  And if I can turn you to the third page of

18   Exhibit 1 at line 120.  What is reflected there?

19     A.    Line 120 is a smart phone requisitioned approximately

20   December of 2019.

21     Q.    What types of evidence, other than the GSAXcess in regard

22   to these improper transfers, did the investigation uncover?

23     A.    There's e-mails, phone calls, shipping records,

24   voicemails and other similar items of significance.

25     Q.    All right.  Let me turn you to the second page of

1    Exhibit 1 at line 81.  What transfer is reflected there?

2         A.    This is for a passenger vehicle, which is a Mercedes GLK

3    350.

4         Q.    And turning to Government's Exhibit 2, what is that?

5         A.    This is a screen from GSAXcess showing the listing for

6    that GLK 350 Mercedes.

7         Q.    For the court reporter's purpose, GSAXcess is capital

8    G-S-A-X-c-e-s-s; is that correct?

9         A.    Correct.

10        Q.    All right.  And so this is a screen shot of that website

11   reflecting the offering of that Mercedes?

12        A.    Correct.  Showing that the item location was with DHS ICE

13   in San Diego, California.

14        Q.    Who was offering the Mercedes to any other Government

15   agency?

16        A.    Department of Homeland Security Immigrations and Customs

17   Enforcement through point of contact Reginald Kimbrough [phonetic].

18        Q.    And do you know, sir, how that Mercedes came into the

19   custody of DHS ICE?

20        A.    It was ultimately seized pursuant to one of their

21   investigations from an Antonio Gonzales.

22        Q.    And does this posting on GSAXcess list its anticipated

23   value?

24        A.    Yes.

25        Q.    And what was that?

1      A.    Original value was approximately $38,000.  It says fair

2    market value at the time was approximately -- I believe

3    approximately 13,900.

4             THE COURT REPORTER:  I didn't hear the last part.

5             THE WITNESS:  Approximately 13,900.

6      Q.    (By Ms. Kocher)  Let me turn your attention, please, to

7    the exhibit marked 2a.  What is this document?

8      A.    This document is a transfer order for excess personal

9    property specifically tied to the 2010 Mercedes GLK 350.  Shows here

10   the ordering agency approval individual was a captain in the -- U.S.

11   Marine Captain Patrick Fedak.  Date at 11/22/2019.  And under

12   shipping instructions it said, Captain Patrick Fedak is picking up

13   vehicle on a trailer and driving the vehicle on trailer to Cherry

14   Point, North Carolina.

15     Q.    And that's in Box 8 of Exhibit 2a?

16     A.    Correct.

17     Q.    Did this transfer ultimately occur?

18     A.    Yes, it did.

19     Q.    And is Exhibit 2b a photograph of that Mercedes?

20     A.    Yes.

21     Q.    Can you tell the Court what information you learned

22   during the investigation about the transfer of this Mercedes between

23   DHS ICE and Captain Fedak?

24     A.    Yes.  So ultimately Captain Fedak requested leave from

25   Cherry Point and traveled to San Diego, California, where he met an

```
 1   individual who -- they picked this vehicle up on a trailer.  Per
 2   Immigrations and Customs Enforcement, I believe the individual was
 3   Reginald Kimbrough.  He took a photo of them loading the vehicle and
 4   provided -- the vehicle was driven on to the trailer by them prior
 5   to leaving.
 6        Q.   Do you know where the vehicle was then taken?
 7        A.   Vehicle from there was -- my understanding it was taken
 8   to Arizona prior to being sold.
 9        Q.   When you said that he -- was there anyone else at that
10   exchange or the taking of that vehicle?
11        A.   Yes.  Captain Fedak's father.
12        Q.   And you mentioned that Fedak had taken leave from Cherry
13   Point.  That was personal leave?
14        A.   Correct.
15        Q.   I also noted that in looking at Government's Exhibit 2a,
16   you mentioned that this was personal property.  What did the word
17   "personal" mean to you there?
18        A.   Can you repeat that?
19        Q.   You had referenced this vehicle as personal property and
20   I'm just asking what you meant in the use of the word "personal" at
21   that point.
22        A.   Okay.  At this point, it was DHS property to be turned
23   over to the Marine Corps property.
24        Q.   All right.  Might have been personal property for the
25   purpose of taxes or something to that effect?
```

1      A.    Correct.

2      Q.    Did Agent Kimbrough or others with DHS provide any

3  information about contact conversations, e-mails of any sort,

4  regarding the titling of this vehicle?

5      A.    Yes.

6      Q.    And what were those?

7      A.    We received information from California Department of

8  Motor Vehicles showing that Patrick Fedak filed for a lost title

9  pertaining to this vehicle.

10     Q.    And that is found at Government's Exhibit 2d?

11     A.    Correct.

12     Q.    Why would he need to apply for a lost title?

13     A.    DHS ultimately did not turn over the title to Captain

14  Fedak when he requested it because they provided -- the receiving

15  agency or government entity had to hold the title so it couldn't be

16  something that went to a person.  So in order to use the vehicle or

17  sell the vehicle, you need to have the title associated with it for

18  registration purposes.

19     Q.    Do you know if Mr. Fedak was aware that he could not hold

20  personal title to this vehicle?

21     A.    I believe so based on the application for duplicate

22  title.

23     Q.    No, I'm sorry.  Do you know if Mr. Fedak was aware that

24  he was not eligible to hold personal title for this vehicle?

25     A.    I believe so.

1    Q.    Through his conversations with DHS?

2    A.    Yes.

3    Q.    Can you tell me, sir, the date this application for a

4    duplicate title was signed?  And this, again, is Government's

5    Exhibit 2d.

6    A.    Signed by the notary on March 10th, 2020.  It shows a

7    signature date for -- another party is March 6th, 2020 and Patrick

8    Fedak shows March 10th, 2020, as well.

9    Q.    And I believe you testified that the original

10   investigation began in December of '19.

11   A.    Correct.

12   Q.    Do you know, sir, if by March 10th of 2020 Mr. Fedak

13   would have been aware of the pending investigation?

14   A.    Our understanding is he was notified by his command.

15   Q.    Let me turn your attention right to the center of the

16   page above and below the typewritten section for registered owners.

17   What name is presented there?

18   A.    Antonio Gonzales.

19   Q.    And is that a real person?

20   A.    It is the real person who ICE initially seized the

21   vehicle from.

22   Q.    And how would one find that information if you know?

23   A.    You could do, like, open source checks on vehicle history

24   reports and potentially obtain prior owner vehicle information.

25   Q.    If I can turn you to the third page of Government's

1    Exhibit 2d and direct you to paragraph G, statement of facts.  What
2    is typewritten there on this application for title?

3         A.    This is a statement where Mr. Fedak claims he is
4    currently active duty in the military stationed at Marine Corps Air
5    Station Cherry Point.  Claims he purchased the vehicle without a
6    title in November of 2019.  Stated the vehicle was inoperable; and
7    that he transported the vehicle via trailer; and that he was able to
8    completely repair the vehicle and he was requesting a new title
9    since he was not in California.  And once he received the title, he
10   would retitle the vehicle and register the vehicle to his home of
11   record or duty station.

12        Q.    And Government's Exhibit 2e.

13        A.    2e is a copy of the title that he received ultimately
14   showing the registered owner as Patrick James Fedak and his prior
15   address at 1205 Skipjack Court in New Bern, North Carolina.

16        Q.    Following receipt of this title, do you know what Mr.
17   Fedak did with it, the vehicle?

18        A.    The vehicle was ultimately sold and profits were used to
19   personally benefit Patrick Fedak.

20        Q.    Let me turn your attention then to a second specific
21   example.

22              A number of pistols and firearms were noted there on the
23   list found in Government's Exhibit 1.  Let me turn your attention
24   then to Government's Exhibit 3.  What is that?

25        A.    So this is a transfer order for excess personal property

for 17 firearms from Department of Treasury in Washington D.C.

Q.    And who requested this transfer of firearms?

A.    This was requested by Patrick Fedak.

Q.    Are these actually the firearms mentioned in Count Two of the indictment?

A.    Yes.

Q.    That is, it's five Sig Sauer P229Rs, five Sig Sauer P239s and a number of Remington 870 shotguns; is that correct?

A.    Correct.

Q.    What is a Remington 870, Agent Salomon, if you know?

A.    It's a pump action shotgun.

Q.    Was there anything special about at least two of those Remington 870s?

A.    Yes.  Some of the Remington 870s had a short barrel, which in many states it would be a class three item.

Q.    Which means what?

A.    It means that it would require a special registration with the ATF and then also having an associate tax stamp.

Q.    Do you know how Mr. Fedak received these firearms?

A.    Yes.  A special agent from the Department of Treasury named Special Agent Cloaks drove the items from D.C. to Marine Corps Air Station Cherry Point and hand delivered them to Patrick Fedak.

Q.    And let me turn your attention to Government's Exhibit No. 3a.  What is that?

A.    Special Agent Cloaks had Mr. Fedak sign for every single

firearm by serial number, that he received them; and this is a copy
of that document that Special Agent Cloaks obtained.

Q.    Now, did Special Agent Cloaks know Mr. Fedak prior to the
delivery of these firearms?

A.    He did not know him personally, but they had exchanged
e-mails, phone calls and I believe a few -- there was a prior
shipment.

Q.    And is there any evidence that Mr. Cloaks was able to
affirm Mr. Fedak's identity upon the delivery of those guns?

A.    Yes.  There was both phone calls -- a phone call to Mr.
Fedak as well as Special Agent Cloaks remembered Fedak being on his
name tape on his Marine Corps uniform.

Q.    Did it -- can you say whether or not you're aware that it
ever occurred to Agent Cloaks or strike him as curious that the
Marines would be ordering excess weapons from the Department of
Treasury?

A.    It may have been something he found a little bit unusual,
but ultimately someone with access and approval, he went ahead and
did it and made sure he obtained signed documentation that he turned
over the weapons to the requesting party.

Q.    All right.  So as the Court earlier noted, a plea
agreement was entered into with Mr. Fedak.  Had you anticipated --
I'm sorry, strike that.

By the end of February, Agent Salomon, had you been able
to recover any of the firearms listed in Government's Exhibit 1?

1      A.    Yes.  We recovered four firearms prior to February.

2      Q.    And overall, there's more than 60 firearms that were

3  obtained by Mr. Fedak and listed on Exhibit 1?

4      A.    Correct.

5      Q.    So then let me turn your attention to more recent events.

6            You received a tip regarding some conduct of Mr. Fedak;

7  is that right?

8      A.    Yes.

9      Q.    And what did that tip inform you?

10     A.    The tip informed us that there was possibly weapons

11  pertaining to this investigation buried off of Vandalia Road in

12  Greensboro, North Carolina.

13     Q.    All right.  And as part of then that follow-up, you went

14  to a business located in Greensboro; is that correct?

15     A.    Correct.

16     Q.    And what business was that?

17     A.    DBJ Corporation.

18     Q.    Let me turn you to Government's Exhibit 4.  What is that?

19     A.    This is a screen shot of surveillance footage obtained

20  from DBJ Corporation.  The back corner near the rear trailer, you

21  can see an individual at the back of the truck bed of a silver F150.

22  That person we identified as Patrick Fedak, as well as that being

23  Patrick Fedak's vehicle.

24     Q.    Now, from the entire video, could you tell what Mr. Fedak

25  was doing?

1        A.    He was going in and out of the trailer.  Moving things in
2    and out periodically for approximately an hour.
3        Q.    Let me turn your attention to Government's Exhibit 5a.
4    What is that?
5        A.    Can you repeat the exhibit number?
6        Q.    5a.
7        A.    So this is surveillance footage from DBJ Corporation at
8    the front of the business --
9        Q.    I apologize.  4a.  Yes, that was my bad.
10       A.    NCIS obtained permission to search the trailers at DBJ
11   Corporation.  This is a photo taken outside the trailer that in the
12   previous screen shot saw Mr. Fedak's truck parked next to and him
13   going in and out of.
14       Q.    All right.  And turning to Government's Exhibit 4b.
15       A.    This is photograph taken inside the trailer showing
16   miscellaneous pipe parts, shelves and how the trailer was situated.
17       Q.    And Government's Exhibit 4c.
18       A.    This is a shelf showing a heavy-duty, moving-type blanket
19   as well as some pipe fittings that underneath of which we ultimately
20   discovered two Remington 870 short shotgun barrels, multiple springs
21   and other components in a black Pelican case.
22             THE COURT REPORTER:  What kind of case?
23             THE WITNESS:  A black Pelican case.
24       Q.    (By Ms. Kocher)  And is that, in part, what is reflected
25   in Government's Exhibit 5d?

1      A.    Yes.

2            THE COURT:  4d.

3            MS. KOCHER:  4d.  Yes, your Honor.  Thank you.

4      Q.    (By Ms. Kocher)  I'm sorry, I didn't catch your answer.

5      A.    Yes.

6      Q.    Let me turn you now to 4e.  What is that?

7      A.    So inside the black Pelican case we located various

8  weapon slides, barrels and recoil springs to include two Glock

9  slides that contained serial numbers NGH 206 and GSN 732

10 specifically.

11           THE COURT REPORTER:  Please repeat the serial numbers.

12           THE WITNSS:  NGH 206 and GSN 732.

13     A.    That ultimately were on the list of weapons that had been

14 stolen.

15     Q.    (By Ms. Kocher)  All right.  Turning to Government's

16 Exhibit 5.  What does that reflect?

17     A.    This depicts Mr. Fedak moving something from the bed of

18 his pickup truck to the front passenger seat of a DBJ Corporation

19 vehicle.  Annotated that that is the vehicle that has a black rack

20 on that truck.

21     Q.    And is the date and time stamp to your knowledge correct

22 that's there on Government's Exhibit 5?

23     A.    Yes.

24     Q.    And what does it reflect?

25     A.    It reflected February 9th, 2022, approximately 1:28:04

1   p.m.

2       Q.    And turning to Government's Exhibit 5a, what is that?

3       A.    This is a vehicle GPS data report.  DBJ Corporation keeps

4   GPS data on their vehicles and this is the detailed report for the

5   vehicle with the black rack -- referred to as the black rack truck.

6       Q.    And specifically turning your attention then to the third

7   page of this exhibit, I would note that this summary and these

8   several pages is for the date of February 9th of 2022; is that

9   correct?

10      A.    That's correct.

11      Q.    So turning to page 3, is there -- are there entries of

12  particular relevance for the Court's review?

13      A.    Yes.  We annotated 118 East Vandalia Road in Greensboro,

14  North Carolina, as a location of interest because we identified Mr.

15  Fedak had no reason to be there for his work or work duties.

16      Q.    All right.  And remind the Court, the tip you had

17  received was that he had buried firearms where?

18      A.    Off of Vandalia Road in Greensboro, North Carolina.

19      Q.    Let me turn your attention to Government's Exhibit 7.

20  And before I discuss that particular exhibit, after -- at this point

21  in time, with the GPS data, what step did you next take?

22            THE COURT:  Did you mean 6?

23            MS. KOCHER:  I did, your Honor.

24            THE COURT:  Okay.

25      A.    After receiving the GPS data, we went out to the location

1    to conduct a search on multiple dates.

2         Q.    (By Ms. Kocher)  And what, if anything, did you find?

3         A.    Ultimately I located a spot where I could see mud on top

4    of leaves and also some ground that appeared to have been disturbed.

5              As you can see Exhibit 6, this is post-initial --

6    starting digging.  We utilized a metal detector over the area and

7    got hits followed by starting to dig; and ultimately we uncovered

8    nine lower receivers to weapons as well as some other parts with

9    serial numbers that matched items from the list of stolen weapons.

10        Q.    All right.  And just looking quickly through Government's

11   6a, 6b and 6c, is that what you've just described for the Court?

12        A.    Correct.

13        Q.    And 6c reflects all nine firearms that were recovered

14   there in the dirt on that day; is that correct?

15        A.    Yes.

16        Q.    Those nine then bring the total at that time to 13

17   firearms of more than 60 recovered; is that correct?

18        A.    Of more than 60 that were stolen, yes.

19        Q.    And since Mr. Fedak was arrested, have additional

20   firearms been recovered?

21        A.    Yes.  Another six firearms have been recovered.

22        Q.    So in all, 19 of more than 60 have been recovered; is

23   that correct?

24        A.    Correct.

25        Q.    And at this time, do you have any leads or information to

```
 1   pursue as to those additional missing firearms?

 2        A.   We do have some possible information we're looking into.

 3        Q.   And does that information -- is it as broad as the

 4   remaining more than 40 firearms?

 5        A.   Yes.

 6             MS. KOCHER:  No further questions, your Honor.

 7             THE COURT:  Before I invite the defendant to make

 8   inquiry, let me just make sure I understand from the witness's

 9   testimony the six that were recovered, do the circumstances of their

10   recovery return you back to the woods or any association with the

11   defendant?

12             THE WITNESS:  They were from an individual who knew the

13   defendant.

14             THE COURT:  From an individual who knew the defendant.

15             THE WITNESS:  Yes.

16             MS. KOCHER:  If the identity is known, sir, you can

17   inform the Court.

18             THE WITNESS:  Okay.  Patrick Fedak's father.

19             THE COURT:  Okay.  Questions?

20             MS. PEREIRA:  Thank you, your Honor.

21                        CROSS-EXAMINATION

22   BY MS. PEREIRA:

23        Q.   Good morning, Special Agent.

24        A.   Good morning.

25        Q.   Everything that you testified to about the Mercedes and
```

```
 1    then the listing of the firearms, to include those with the agent

 2    from the Department of Treasury, all relate to Counts One and Two;

 3    is that correct?

 4          A.    Correct.

 5          Q.    And Counts One and Two are those two counts that -- for

 6    which Mr. Fedak was indicted in December of 2020?

 7          A.    Correct.

 8          Q.    Those have not changed or been expanded at all since that

 9    time?

10          A.    No.

11          Q.    So the evidence that you testified to remains static as

12    to Counts One and Two?

13          A.    Pertaining to the vehicle and weapons?

14          Q.    Yes, sir.

15          A.    Yes.

16          Q.    And then the information that you testified to about the

17    tip you received and then the metal detector, those are all weapons

18    that were part of Counts One and Two, correct?

19          A.    Correct.

20          Q.    You were able to determine by serial number that they

21    related to the evidence for Counts One and Two?

22          A.    Yes.

23          Q.    They were not additional weapons expanding the

24    investigation in any way?

25          A.    They were not new weapons from the initial list.
```

1        Q.    Okay.  Thank you.

2              MS. PEREIRA:  May I have a moment, your Honor?

3        (Attorney Pereira conferring with the defendant at counsel table

4                        briefly off the record)

5        Q.    (By Ms. Pereira)  Special Agent, is it your understanding

6   that on this date in early February that that was after Mr. Fedak

7   had entered into a plea agreement and was intending on pleading

8   guilty to Count One?

9        A.    Yes.

10             MS. PEREIRA:  No further questions.

11             THE COURT:  All right.  Thank you.

12             You can step down.  Thank you very much.

13                        (Witness Excused)

14             THE COURT:  Any further evidence from the Government?

15             MS. KOCHER:  No further evidence, your Honor.

16             THE COURT:  All right.  Let's turn our attention to the

17   defendant.  I believe you have someone you would like to suggest as

18   a third-party custodian.

19             MS. PEREIRA:  Yes, your Honor.  Thank you.

20             At this time we'd like to call Mr. Matthew Chambers.

21             THE COURT:  Okay.  And do watch your step when you come

22   on to the red carpet.

23             THE CLERK:  You may come forward and go ahead and have a

24   seat.

25             THE COURT:  Good morning.

```
1                THE WITNESS:  Good morning.
2                THE CLERK:  Once you're seated, if you feel comfortable,
3     you can remove your mask.
4                THE WITNESS:  Thank you.
5                THE CLERK:  Please state and spell your name.
6                THE WITNESS:  Matthew Darrell Chambers.  M-A-T-T-H-E-W
7     D-A-R-R-E-L-L  C-H-A-M-B-E-R-S.
8                          MATTHEW DARRELL CHAMBERS
9                having been duly sworn, testified as follows:
10               THE WITNESS:  I do.
11                          DIRECT EXAMINATION
12    BY MS. PEREIRA:
13          Q.    Good morning, Mr. Chambers.
14          A.    Good morning.
15          Q.    Mr. Chambers, how do you know Mr. Fedak?
16          A.    He brought in a piece of equipment to my shop, ACE
17    Hardware, on West Market Street in Greensboro.  It was a
18    four-wheeler for his kid, he needed it fixed.  That was about a
19    month, month and a half ago I believe.  Fixed it for him.  Called
20    him and we got along.  Both service members.  That's how we met.
21          Q.    What branch did you -- what were your dates of service
22    and branch, please.
23          A.    Started in November 20th, '06.  Got out in '14.
24          Q.    And what city and state do you live in?
25          A.    Greensboro, North Carolina.
```

 1    Q.   And so basically you struck up a friendship with Mr.

 2  Fedak, would that be correct?

 3    A.   We did, yes.

 4         THE COURT:  But you've only been friends for 30 to

 5  45 days?

 6         THE WITNESS:  Correct; yes, ma'am.

 7         THE COURT:  Okay.

 8    Q.   (By Ms. Pereira)  And what is your employment?

 9    A.   I run a d/b/a from one of my dad's businesses that he

10  started 50 years ago.  The ACE Hardware on West Market.  First

11  started out as an experiment, but it is the Valor Active group,

12  Valor Active Outdoor Power Equipment.

13         We do a lot for disabled veterans and disabled civilians.

14  We fund it through fixing power equipment and using the skills we

15  have to reach out and find the people who have fallen through the

16  cracks and see if there's anything we can do for them.  It's a lot

17  but we do a lot.  It's a full-time job.

18    Q.   Through your friendship, I'm sure you and Mr. Fedak

19  talked about his time in the military as well and some of the

20  struggles he's had since.

21    A.   We did.  I'm learning a lot today.

22    Q.   Now, I previously explained to you the responsibilities

23  of a third-party custodian.  Do you understand that if the Judge

24  were to release Mr. Fedak into your custody, it would be your

25  responsibility to do your best to be aware of his compliance with

```
1    the Court's conditions?
2         A.    I do.  And --
3         Q.    Is that something that you're --
4         A.    -- if it pleases the Court, I'd like to actually shed a
5    little light more on that.
6                   THE COURT:  Okay.
7         A.    I have a wide network in Greensboro.  A lot of veterans.
8    Some on the SWAT Team, some investigators in the department.  I've
9    asked their advice.  Even a local Navy Seal, we're close friends.
10   I've informed them everything I know about this case.  And not one
11   of them wanted to be here today, could not.
12        Q.    Now, everything that you know about this case is from
13   public source knowledge; is that correct?
14        A.    Off of what is available on the Internet.  Yes.
15        Q.    But given what you know, you still wish to proceed and be
16   Mr. Fedak's third-party custodian; is that correct?
17        A.    In all candor, I would like to talk to him before making
18   that decision.  (Indicating).
19                   THE COURT:  Because you said you've learned a lot today.
20                   THE WITNESS:  Yes, ma'am.  I still feel that he is
21   tenable.  What he's shown me in work and in character does not fit
22   what I've seen today.  Nothing truly shocks me, but it's
23   interesting.  It's a lot of information to make a decision right
24   this second on.  That's part of valor.  You do embrace that danger
25   with firmness.  That is the definition of it, but that does not mean
```

1    running into a derelict building on fire to save cockroaches.

2            I experienced a lot of fraud, waste and abuse in my time

3    and that's partially what got me out.  I've been a part of units

4    sent there to stand them up, lift them up and those were untenable

5    units.

6        Q.    (By Ms. Pereira)  What you know about Mr. Fedak

7    personally from your time knowing him gives you the confidence to

8    proceed --

9        A.    I'll pick him up and carry him on.  I'll look after him.

10       Q.    And you'll make sure he gets to court appearances?

11       A.    Absolutely.

12       Q.    And if he were to violate any of the conditions that the

13   Judge were to set for him, it would be your responsibility to turn

14   him in.  Is that something you would do?

15       A.    Too easy.

16       Q.    Is that yes?

17       A.    Yes, ma'am.

18       Q.    Okay.  And if the Court were to order electronic

19   monitoring for him, is that something that you would be amenable to?

20       A.    Absolutely.

21            THE COURT:  So, counsel, you're proposing -- and I assume

22   that the witness is agreeing -- that your client would live with

23   him?

24            MS. PEREIRA:  Yes, your Honor.

25            THE WITNESS:  Yes, ma'am.  I have a plan for that if you

```
 1    want to hear it.
 2              THE COURT:  Okay.
 3              THE WITNESS:  So tonight, if he were to be released --
 4    I've spoken with his brother, Brendan Fedak -- we're going to put
 5    him in a hotel.  I'll be there with him for two nights.
 6              I've arranged for West Market Station right up the street
 7    from our work -- because I don't know about transportation, if he
 8    has a license.  Rent -- I'll be there with you.  It's a two bedroom,
 9    two bath on site.  And I do prefer the GPS.  If not, I'll do it
10    myself.
11              THE COURT:  So you would live in a --
12              THE WITNESS:  Apartment, two bedroom.  It is available
13    the 10th, today.
14              THE COURT:  And this disrupts your current living
15    environment?
16              THE WITNESS:  Not at all.
17              THE COURT:  No?
18              THE WITNESS:  Not at all.
19              THE COURT:  Okay.
20              THE WITNESS:  I'm very fortunate.  My dad's a veteran and
21    our family is going through a lot right now.  So the 3602
22    Tattershall address, not going to be -- not okay.  Mom has some
23    health issues that are new so I'm not going to -- not going to put
24    that together.
25              I do stay sometimes above the hardware store.  We have a
```

1   small apartment up there and it does help with on site security.  So

2   that's -- my home of record is 3602 Tattershall, but I stay above

3   the hardware store.

4          Q.    (By Ms. Pereira)  And would Mr. Fedak be able to work

5   with you and would you expect him to do so?

6          A.    I would expect him to do so.

7                THE COURT:  In the hardware business?

8                THE WITNESS:  Yes.  We have a parts shop.  We sell a lot

9   of outdoor power equipment parts, Stihl dealership, S-T-I-H-L.

10  Parts for everything.  We can get anything.  We're an ACE Hardware.

11               And we're going to liquidate in 30 days if I cannot buy

12  it and his skill set is what I need to make it possible with the

13  angel investor.  I've already turned down a lot of money because

14  they were greedy.

15         Q.    (By Ms. Pereira)  And at your home and at your business

16  there are no firearms; is that correct?

17         A.    No, ma'am.

18         Q.    And you do not allow illegal drugs, correct?

19         A.    No, ma'am.  I don't even drink anymore.

20         Q.    That brings me, do you have any type of criminal record

21  yourself?

22         A.    Yes.  Yeah, I had a DUI when I moved back from St. Thomas

23  after the military.  And then the last girl I was dating, there was

24  an issue there.  So there's a 50B, which I willfully did not fight.

25  Any charges involved with that were dismissed.  I just know to stay

1   away from nail technicians and hair dressers and alcohol.  Alcohol
2   does not mix with PTSD.
3       Q.    So you're sober?
4       A.    Absolutely.  Yes, ma'am.
5       Q.    And to the extent that you could, if Mr. Fedak required
6   any services through the VA in Greensboro, would you assist him in
7   helping --
8       A.    Absolutely.  That's already been started just in case.
9       Q.    And so is it your testimony today that you would like --
10  that you are offering to be his third-party custodian understanding
11  the responsibilities and obligations you would have to this Court
12  and doing that for Mr. Fedak?
13      A.    I would prefer to talk to this investigator, this
14  Marine -- thank you for your service -- be for making that choice.
15  But I think that's impossible, so with that -- if that's impossible,
16  the answer is yes, I would --
17          THE COURT:  I don't know if it's impossible.  I haven't
18  really made a call on that.  But what you're saying is you have some
19  questions that you would like to ask the investigator about the
20  defendant before you make a final decision?
21          THE WITNESS:  If it pleases the Court, may I present a
22  couple of them to him or pass the word what the questions are?
23          THE COURT:  Well, I -- I would ask defense counsel, how
24  do you suggest this proceed?
25          MS. PEREIRA:  Well, honestly, your Honor, this is kind of

a first.  And so I think at this point it might be best if we
request a brief recess and allow him to speak off the record and
whatever the agent feels he can offer him.

          And then when we would return from a brief recess, we'd
be able to either persist in putting Mr. Chambers as a third-party
custodian or at that point, if necessary, I would withdraw him.

          THE COURT:  I think that's a very reasonable approach.

          THE WITNESS:  Thank you.

          THE COURT:  Let me ask though before that's decided on,
if the Government would agree to that?

          MS. KOCHER:  To taking a recess and allowing the witness
to ask the agent questions?  With the caveat that -- obviously the
agent will do what he can, but there would be limitations on what
could be shared.

          THE WITNESS:  Understood.  Yes, ma'am.

          THE COURT:  Do you want a conference room available to
you for this purpose?

          MS. KOCHER:  I think that the room across the hall there,
your Honor, would be fine for this purpose.

          THE COURT:  All right.  Well, let's take a 10-minute
recess.  Would that meet the needs?

          THE WITNESS:  Yes, ma'am.

          THE COURT:  Okay.  Ten-minute recess.

                    (Recess commencing at 10:32 a.m.)

     (The defendant, Patrick Fedak, escorted out of the courtroom at

1    10:34 a.m. and returned to the courtroom at 10:38 a.m.)

2    (The witness, Matthew Darrell Chambers, resuming the witness stand

3    at 10:38 a.m.)

4    (Conclusion of recess at 10:48 a.m.)

5    (Open Court at 10:48 a.m.)

6    THE COURT:  So do you continue to offer the witness as

7    your third-party custodian?

8    MS. PEREIRA:  Yes, your Honor.  And I do want to thank

9    the Court for its indulgence.  I would like to continue to present

10   Mr. Chambers as a third-party custodian to the Court.

11   THE COURT:  Okay.

12   MS. PEREIRA:  May I proceed?

13   THE COURT:  Certainly.

14   MS. PEREIRA:  Thank you.

15   Q.   (By Ms. Pereira)  Mr. Chambers, after speaking with the

16   special agent in this case, is it still your desire to serve as a

17   third-party custodian for this Court for Mr. Fedak?

18   A.   Yes, ma'am.

19   Q.   Thank you.

20   MS. PEREIRA:  I have no further questions.

21   THE COURT:  Okay.  Ms. Kocher.

22                    **CROSS-EXAMINATION**

23   BY MS. KOCHER:

24   Q.   Mr. Chambers, what is your main motivation in offering

25   yourself as a third-party custodian for Mr. Fedak?

1        A.    He's alone.  He's abandoned.  Seems as though he's made a

2   mistake, maybe a few.  I've lost four brothers, platoon members, in

3   not exact situations; but it's when men like this are abandoned by

4   family, country, home, that's when he becomes a statistic of 22 a

5   day.  That's number one.

6             Number two, I need him in the store.  I need him in that

7   inventory to get this parts side on line so that I can accomplish a

8   goal to help other veterans.

9             Number three, his character.  From what I've experienced

10  working with him, that was the tipper.

11            THE WITNESS:  Based off what I've discussed with the

12  investigator, not looking so good, bud, but you're still tenable.

13  You're still worthy of defending.

14       A.    I hope that answers your question, ma'am.

15       Q.    (By Ms. Kocher)  It does.  Just more specifically as to

16  the first one, you mentioned the word statistic.  Were you

17  referencing there self harm?

18       A.    I'm referencing the suicides of veterans.  Yes, ma'am.

19       Q.    And is there any specific evidence or information you

20  have that Mr. Fedak is of concern in that regard?

21       A.    He fits abandoned, he fits PTSD.  Excuse me, I don't know

22  if I'm allowed to share that.  I don't know if HIPAA is -- and gut

23  instinct.  I'm an incredible judge of character.  I know when he's

24  lied to me.  I can tell you exactly when.  You don't become a senior

25  scout observer in the United States Army by being a terrible judge

```
 1   of character.
 2        Q.    Thank you, sir.  No further questions.
 3        A.    Yes, ma'am.
 4              MS. KOCHER:  No further questions, your Honor.
 5              THE COURT:  Okay.
 6              MS. PEREIRA:  No follow-up, your Honor.  Thank you.
 7              THE COURT:  Do you have any guns in your home?
 8              THE WITNESS:  No, ma'am.
 9              THE COURT:  All right.  Thank you very much.
10              THE WITNESS:  Yes, ma'am.
11              MS. PEREIRA:  No further questions and no further
12   witnesses.
13              THE COURT:  You're done?  Okay.
14                        (Witness Excused)
15              THE COURT:  So I don't think I need a crystal ball to
16   know that I'm not going to be presiding over a change of plea on
17   March 16th, am I?
18              MS. KOCHER:  It would not be the Government's
19   expectation, your Honor.
20              MS. PEREIRA:  After consultation with Ms. Brennan, I
21   believe that she will require a little bit more time to assess all
22   of the evidence and meet with Mr. Fedak to determine how he would
23   like to proceed with his superseding indictment.
24              THE COURT:  So shall we just take that off the court
25   calendar now for planning purposes so no one has to make a motion to
```

1  continue?

2          MS. KOCHER:  I would make that oral motion now, your

3  Honor.  Thank you.

4          MS. PEREIRA:  No objection and we would consent to it.

5          THE COURT:  It can always come back on.

6          MS. PEREIRA:  I'll let Ms. Brennan know.

7          THE COURT:  Okay.  Sorry we didn't have her here today,

8  but thank you for being here.

9          Okay.  Would who would like to be heard first in

10  argument?

11          Do you want to go first, Ms. Kocher?

12          MS. KOCHER:  Your Honor, the --

13          THE COURT:  And I know it's -- taking your mask off?

14          MS. KOCHER:  I am eligible for that, yes, your Honor.

15          THE COURT:  All right.

16          MS. KOCHER:  It is certainly, I believe as Ms. Pereira

17  said earlier, a first in a long career of my own.

18          The obstruction in this case is significant particularly

19  given the posture, particularly because it included allegations of

20  wrongdoing by a member of the Bar, the Government believes without

21  cause, but that would be for another day.

22          The obstruction of justice in this case, the hiding of

23  firearms, secreting them, separating them so that they weren't even

24  found in the same location is of significance.  And the evidence

25  that your Honor would consider for the purpose of a detention is

1     very strong in that regard.

2          There are -- and one of the Government's biggest

3     concerns, both as to the third-party custodian's number one concern

4     that he mentioned, and as the prosecutor in the case, are the

5     outstanding 40 firearms.  We don't know where they are, we have some

6     leads as the agent testified that we can pursue, but it is not as if

7     someone has those and we're ready to go pick them up, you know,

8     immediately.  That's of grave concern.

9          The fact that Mr. Fedak has been living a lie throughout

10    the entire process, I would point out -- I don't recall if the

11    motion to revoke pretrial release also pointed out the fact that

12    he's apparently been possessing firearms throughout the pretrial

13    release.  So while it's minor compared to the obstruction, just the

14    flat out, never from the beginning -- even had the plea gone

15    forward -- apparently never from the beginning of his pretrial

16    release did he intend to comply with that particular portion of it,

17    that is, that he not possess firearms.  He's had --

18          THE COURT:  Can you illuminate the circumstances?  I do

19    note under, additional conditions of release, it was imposed there

20    shall be no firearms, destructive devices or other weapons in

21    defendant's residence, including the residence of any third-party

22    custodian.

23          Could you elaborate on the possession of unrelated

24    firearms in violation of that release condition?

25          MS. KOCHER:  I'm not saying unrelated firearms.  I'm just

1    saying that *res ipsa loquitur*, the fact that he buried firearms

2    shows that he had possession of those firearms.

3              THE COURT:  Okay.

4              MS. KOCHER:  So whether the plea had gone forward as

5    scheduled at the end of February or not, he was in contradiction to

6    the terms of his release all along.

7              THE COURT:  Where does the interpretation of the lawyer's

8    advice to put the firearms in the woods come into your argument?

9              MS. KOCHER:  There is more information, your Honor, that

10   was provided giving more details not only to that portion of the

11   obstruction charge, but as to other events as well that accused a

12   number of other persons of wrongdoing who were interviewed by this

13   agent and other agents prior to this point that have no connection

14   to the underlying event thereby casting doubt on all of that which

15   was said in that day.

16             I also personally know the attorney at issue.  Have

17   talked with him at length and nothing coming from that attorney to

18   me -- by the way, there was no violation of any attorney/client

19   privilege.  Knowing the falsehoods that Mr. Fedak has said, for

20   instance, getting a notary on base, once he knows the investigation

21   is underway, to notarize his signature to apply for the lost title

22   for the Mercedes.

23             All of that combined is part of what's in my head to

24   believe that that was not the case, that there was not attorney

25   advice to bury the guns.

1          In fact, specifically, I believe that what Mr. Fedak said

2     was, well, he didn't tell me outright.  He -- you know, basically a

3     wink and a nod type of conversation.  And if I'm going to believe

4     one or the other of those individuals, given the histories of them

5     both, unfortunately that falls to Mr. Fedak.  That's -- it comes to

6     that.

7          That's something I, as a prosecutor, can do that is not

8     perhaps available to yourself in the neutral role you present.

9          I would say in regard to the third-party custodian, your

10    Honor, the honor and intention of that individual are unsurpassed in

11    my experience.  I have no doubt of the good will and good intentions

12    of that individual.  I do not think, however, that it assists at

13    this point in time.  He was living at the time with a family member,

14    with his wife and children, and if with their support -- I have no

15    idea what his day-to-day life was like, but I'm unaware through any

16    reports by probation that there was difficulty prior to his most

17    recent arrest on the obstruction charges.

18         So I am not convinced that introducing even such a fine

19    example of a third-party custodian, particularly someone who's only

20    known the defendant, as your Honor noted, 30 to 45 days, is

21    sufficient both to prevent the risk of flight -- because now he's

22    got, you know, literally another ten year -- on the statutory

23    maximum with an additional ten-year potential consecutive.

24         The risk of flight has grown.  The further obstruction

25    with the 40 outstanding weapons, particularly -- and I think this is

1  a place where the Court can consider the defendant's past history in

2  lying and setting up these transactions, in applying for the title

3  for that vehicle.

4        All of those types of things do go to whether your Honor

5  can trust him now, on a dime literally, to change direction and to

6  change his behavior and now listen to the Court.

7        It is the Government's position that the defendant had

8  the opportunity and literally buried it.  And part of that now is

9  that there are no conditions remaining that the Court can set.

10        I would ask at this time, though, just to follow up on

11  the direct examination, to move into evidence Exhibits 1, 2, 2a

12  through 2e, 3, 3a, 4, 4a through e, 5, 5a, 6 and 6a through c.

13        THE COURT:  Okay.

14        MS. KOCHER:  Thank you, your Honor.

15        THE COURT:  Okay.  Be happy to hear from you now.

16        MS. PEREIRA:  Thank you, your Honor.

17        Your Honor, addressing the Government's concerns about

18  the additional -- perceived additional violation of pretrial release

19  of possessing firearms.  I would note that in the original order

20  setting conditions of release, under subsection paragraph K, not

21  possess a firearm, destructive device or other weapons.  See page 4

22  if this condition applies.  And on page 4 it said, there shall be no

23  firearms, destructive devices or other weapons in defendant's

24  residence, including the residence of any third-party custodian.

25        So I would submit that what we have heard today does not

```
1    amount to that.  And I know it may be somewhat of an academic
2    argument, but I do want to just make sure that we know the universe
3    of what we're discussing as far as any pretrial release.
4              THE COURT:  So you're suggesting the Court used a form
5    that opened up the possibility that he could hold the weapon, but
6    not in his home?
7              MS. PEREIRA:  The way I read paragraph -- page 4 is that
8    there shall be no firearms in his residence.  And we heard no
9    evidence today that there were any firearms in his residence.
10             THE COURT:  Well, that is -- is an interpretation that
11   suggests the Court ought to revisit the form work relied on by the
12   magistrate judge if I'm opening the door to letting every defendant
13   get out of court on release and possess a weapon, but not in his
14   home.
15             MS. KOCHER:  If I might come to the defense, actually
16   your Honor, both the magistrate judge and Ms. Pereira, who was not
17   present at that time -- it does occur to me that at the time of that
18   initial appearance -- and those conditions were agreed upon between
19   the parties -- Mr. Fedak was still a member of the United States
20   Marines --
21             THE COURT:  Oh.
22             MS. KOCHER:  -- and we would have, so that he could
23   continue that job, ordered it that way.
24             THE COURT:  Okay.
25             MS. KOCHER:  So I --
```

1          THE COURT:  Okay.

2          MS. KOCHER:  -- did not recall that until this came up

3     and I apologize.

4          THE COURT:  All right.  That gives me some comfort.

5          MS. PEREIRA:  Your Honor, I would like to note that the

6     order of conditions of release that was signed on December 9th,

7     2020, went -- first of all, did not include a third-party custodian.

8          THE COURT:  Right.

9          MS. PEREIRA:  Did not include electronic monitoring.

10    They were very basic conditions of release.  And Mr. Fedak was being

11    supervised out of the Middle District of North Carolina for

12    approximately 14 months until the events unfolded in February of

13    2022.  So he does have a history of compliance with very minimal

14    conditions of release.

15         And when looking at 18 U.S. Code, Section 3142, it is not

16    the Court's position to start with detention and then work

17    backwards, but to start with unconditional release and then move --

18    only if that is insufficient to ensure the safety of the community

19    and mitigate against any risk of flight, then move step wise

20    systematically through additional conditions.

21         THE COURT:  What do you make of -- you know, I didn't

22    realize this.  Is she correct that there's now a rebuttable

23    presumption?

24         MS. PEREIRA:  So under 314 -- and this is where -- again,

25    the practice of law can be new every day.  If we're here solely for

a detention hearing on the superseding indictment, my position would
be that this is not a presumption case under 3142. If we are here
on a revocation of pretrial release conditions in the former case,
then I think we would fall under 3148.

Regardless, I do believe that our third-party custodian
rebuts the presumption and levels the playing field. So, again,
it's somewhat of an academic argument.

THE COURT: Okay. Interesting.

Well, let me ask everybody -- and I'm throwing into the
pot the probation officer -- so he didn't qualify for
court-appointed counsel originally; is that correct?

MS. PEREIRA: That's my understanding, your Honor.

THE COURT: So the lawyer that we're talking about he was
paying out of his own pocket, right? Is that correct?

MS. KOCHER: That's my understanding.

MS. PEREIRA: It was not a CJA appointed attorney.

THE COURT: So he's in the Middle District of North
Carolina. And is he responsible for paying for his own mental
health treatment? Because I'm reading the write up of our probation
office urging that while he can be released, but he's got to get
medical or psychiatric treatment as directed by the probation
office.

And I'm looking at the Court's order originally of
release and under this section that we've talked a lot about, there
shall be -- okay. Come forward.

1          PROBATION OFFICER LUNSMAN:  Your Honor, I didn't want --
2    since Rebecca is here as the court services -- I'm here representing
3    Lee Meeks, who's the supervising probation officer.
4          THE COURT:  Okay.  Take a seat.  Great.
5          Let me keep on going just to sort of set up this
6    question.  The Magistrate Judge's conditions of release read:
7    Continue participation with current mental health treatment.  All
8    right.  So that suggests that he was getting mental health
9    treatment.
10          PROBATION OFFICER LUNSMAN:  He was eligible for mental
11    health treatment and he had multiple options.  One of those options
12    was out of pocket.  The other option he was presented would have
13    been provided through the U.S. Probation Office with a contract.
14          As my understanding is, he was directed to discuss that
15    with his probation officer in December and there has been no
16    movement on that since that time.
17          THE COURT:  Well, the report that Ms. Perez authored
18    dated March 9th of 2022 says that, Middle District records reflect
19    the defendant allegedly attempted to seek treatment from Military
20    One Source; Guilford Behavioral Health Center; Family Services of
21    Piedmont; and Genesis Mental Health Services in Concord.  However,
22    he was unable to secure an appointment.
23          So that conjures up the picture of someone knocking on
24    the door or making phone calls, making attempts and just not being
25    able to get in.

1    PROBATION OFFICER LUNSMAN:  My understanding, Military
2  One Source would have required him to pay out of pocket.  Those
3  other options were provided to him as alternatives.  One of them he
4  would not have been able to get an appointment until this month.
5  And then the other options, he was directed, you know, contact them,
6  secure an appointment and then no follow-up was done.
7    THE COURT:  But the onus is on -- so the probation
8  officer isn't working its resources to get an appointment and tell
9  him, this is when you go?
10    PROBATION OFFICER LUNSMAN:  Typically, in our district we
11  have one contract provider that we send people to.  People are also
12  allowed to pick their own.  Middle District may do that a little bit
13  differently.  But my understanding is he was directed to set an
14  appointment and had not made one and that's the information that
15  Officer Perez was given.
16    THE COURT:  Well, I would just say I kind of like our way
17  of doing it.
18    All right.  There's clearly some mental health issues
19  here.
20    MS. PEREIRA:  Your Honor, I would draw the Court's
21  attention to the paragraph following what the Court just read from.
22  And without stating it on the record, that there are some medical
23  concerns that Mr. Fedak has, that it is my understanding are not
24  being treated in the custodial setting that he has been in recently.
25  And that is unfortunately, not surprising to me.

1          And I think that would, despite my office's best efforts

2     and the efforts of the United States Marshal Service, I don't

3     believe that those needs would be appropriately met in a detention

4     setting.

5          And so we do think that that would be a factor weighing

6     in favor of his release, to continue seeking and receiving medical

7     and mental health treatment, your Honor.

8          Your Honor, what we heard from the special agent who

9     testified was a lot of evidence pertaining to Counts One and Two and

10    they were not expanded upon; and the reason why I feel that is

11    important for today's purposes is because Counts One and Two were

12    the counts that were against Mr. Fedak in December 2020 when he was

13    released.

14         So all of the evidence that pertains to Counts One and

15    Two existed and the Court found that he could be released on very

16    minimal conditions of supervision.  And so really what we have, as

17    far as a change in circumstance, would be Count Three.

18         And then in regards to Count Three, the evidence that was

19    uncovered relates back to Counts One and Two.  It does not expand

20    upon Counts One and Two.  The serial numbers that were recovered go

21    back to the firearms that were at issue in Counts One and Two.

22    We're not discovering new evidence that would bring in other

23    charges.

24         And so I'm not trying to justify the alleged actions that

25    brought about Count Three, your Honor, but I do believe that when

progressing through the conditions available to the Court in 3142, that there are conditions or combinations of conditions that can be set to appropriately and successfully have Mr. Fedak be on release in this case.  A third-party custodian, electronic monitoring, curfew, reporting to a probation officer, receiving mental health treatment.  And that can be -- understanding the difference in districts, but making sure that the United States Probation Office in the Middle District is ensuring that services are being received, not just sought.

And so we do believe that all of these conditions that are available to the Court are sufficient to address any concerns and we would ask that you deny the Government's motion for detention.

THE COURT:  Okay.  Mr. Chambers was asked at the start by Ms. Kocher, what's your interest in this, and he named three reasons.  And the second one has your client, I think, counting a lot of hardware parts it sounds like.  It's not going to work with Mr. Chambers unless your client is going to help him in the store, it sounds like.

Is that your client's understanding, that he's going to turn into Mr. Chambers' unpaid inventory taker?

Is that a fair -- I mean, is that what you're wanting him to do?

MR. CHAMBERS:  There's pay.

THE COURT:  There's pay.  Okay.

```
 1                MR. CHAMBERS:  Yes, ma'am.

 2                THE COURT:  So all right.

 3                MS. PEREIRA:  Certainly if the Court were to order him to

 4      be on 24/7 house arrest and he couldn't have a job, that would be,

 5      you know -- that would be something that he would comply with if the

 6      Court were to allow him to have a job, then it's great that he has

 7      that opportunity available to him to work with his third-party

 8      custodian.

 9                THE COURT:  Because if he's not a good employee, I don't

10      think this is going to work.  Do you?

11                MR. CHAMBERS:  He's been an incredible employee, your

12      Honor.  The employment I think serves him very much.

13                MS. PEREIRA:  Your Honor, I think based on Mr. Chambers'

14      testimony, I have no doubt that if the third-party supervisee

15      relationship were to disintegrate, that he would notify the

16      probation forthwith.

17                THE COURT:  He leaves me with that confidence that if Mr.

18      Fedak doesn't do what he's supposed to do, that you, Mr. Chambers,

19      would very quickly alert the probation officer.

20                MR. CHAMBERS:  Yes, ma'am.

21                THE COURT:  Okay.  It's a very unusual hearing, isn't it,

22      in so many different ways.

23                All right.  So it was two nights in a hotel and then --

24                MR. CHAMBERS:  Then the apartment on Chestnut Street --

25                THE COURT:  Okay.  Any concerns about Mr. Chambers?
```

```
 1            MS. KOCHER:  About Mr. Chambers.  I'm sorry.
 2            PROBATION OFFICER LUNSMAN:  Your Honor, the biggest
 3   concern that we would have is if you do impose any kind of location
 4   monitoring, not having a residence to set that up is a concern.
 5            Also just -- I guess, just to state it, Officer Meeks
 6   requested that I notify the Court that his recommendation is
 7   detention based on the PS 8 that he filed, which I know is a little
 8   bit unique as well in that it's different from the court services
 9   side, but he filed the motion requesting the warrant after the new
10   indictment.
11            So since I'm here representing him, I just wanted to make
12   sure I notified the Court of that.
13            THE COURT:  Okay.  I hadn't processed that.  So we have
14   dueling recommendations of your office.
15            PROBATION OFFICER LUNSMAN:  A little bit, yes.  I know
16   that's a little bit unique.
17            THE COURT:  Boy.  Yeah.
18            Ms. Kocher, I think you wanted to respond.
19            MS. KOCHER:  Just very briefly, your Honor.
20            Just to clarify to the extent necessary, the Government
21   did not originally move for detention.  The defendant was a captain
22   in the Marines at the time he was indicted.  And with no appreciable
23   criminal history, it is not a case that called for detention.  We
24   didn't argue it then.
25            In fact, as I noted earlier, we came up with that list of
```

conditions for his release and he was released at the time of his
initial appearance.

The nights he spent in the jail, to my knowledge since
the complaint and his arrest in this calendar year, are the only
nights in regard to this case that he has spent in jail.

The nature of an obstruction charge necessarily ties the
conduct back to the existing counts. That is not, in my feeble
mind, any assistance as to detention or not detention. It is by
virtue of an obstruction charge, literally it has to be in regard to
a pending proceeding. And it does happen to be so in regard to
Counts One and Two.

I have two big concerns, your Honor, in regard to a
proposed release. First, as you well know, mental health treatment,
like substance addiction treatment, can be ordered and a person can
be walked into that room and sit there during that process, but the
proposition that mental health treatment will help -- and it
certainly should be an order of any release plan -- but it does not
relieve me of concerns because there has been no -- he's been
directed by probation to seek treatment and given places and it
appears that there is some conflict in what he has reported to the
probation officer about the four, five places that you named off
that he sought treatment from and the probation officer's report
that, no, actually, he tried one, had to pay out of pocket and never
did follow up -- if I understood the probation officer correctly
from counsel table here. And so that one greatly concerns me.

1          Finally, your Honor, the other concern I have is there is
2   no ties to Greensboro except, to my understanding, his family from
3   whom he is now estranged.  Mr. Chambers used the word "abandoned."
4   It causes me concern that he will be in proximity to them there in
5   Greensboro; and but for the fantastic organization and Mr. Chambers'
6   presentation today, there is no other tie of which I'm aware to
7   Greensboro.  He moved there to be with his wife and children.
8          So all of that being said, the Government does persist in
9   its request for detention.
10          THE COURT:  Okay.  Have I heard from the defendant fully?
11          MS. PEREIRA:  Just a couple follow ups, your Honor.
12          I think relating back to the Government's most recent
13   concern of the ties to Greensboro and from the thumbnail sketch of
14   Mr. Fedak's family situation that I have learned in the last
15   24 hours, I think there are some struggles and it is an evolving
16   situation.  However, he is a father and that doesn't change.  He has
17   two children there.
18          And what we have is an opportunity for him to have a job,
19   to earn a salary and to be able to provide for his children.  Under
20   electronic monitoring, his whereabouts would be known to the
21   probation office.
22          And furthermore, with a third-party custodian keeping an
23   eye on him, the Court's order would be supervised by Mr. Chambers
24   and we feel that that is sufficient conditions of release to deny
25   the Government's motion.

1          THE COURT:  And, you know, another perhaps unique element

2     to this proceeding is this is a defendant who signed a plea

3     agreement and pleaded guilty to Count One.

4          So the next court event, what, counsel, do you think it

5     should be?  A Rule 17.1 conference just to bring everybody together

6     and figure out where this is going with responsible counsel?  Would

7     that be the next event?

8          MS. KOCHER:  Your Honor, that might actually be a very

9     good thing, yes.  Thank you for suggesting it.

10         THE COURT:  So perhaps you could, in the next couple of

11    days, both sides could look at their calendars and send to the Court

12    a proposal of a couple of alternative dates and times when you could

13    come to New Bern and where it would make sense -- after a chance to

14    sort of digest the fallout here, come to New Bern and we'll figure

15    out where this case is going and get it through the appropriate

16    scheduling order, if necessary, in effect.

17         MS. KOCHER:  Thank you.

18         THE COURT:  Okay.  So we'll sit tight on that with the

19    understanding that, say, by Tuesday of next week, you'll give me

20    some kind of a notice to that effect.  How about that?

21         And I really will be guided by you as to how soon this

22    17.1 conference should be, but I certainly don't want to suggest

23    that I'm not being cognitive of the defendant's right to a speedy

24    trial and the public's right to the same thing.  So I'm going to go

25    ahead and exclude the time between now and next Tuesday.

1          And I'm going to understand that in that notice, both
2    sides will come together and suggest to the Court that the time
3    between that notice and the 17.1 conference should also be excluded.
4    Just thinking ahead.  Okay.

5          And I'm going to let you go.  I'm going to let you go
6    with Mr. Chambers, but I'm going to be watching your performance and
7    I'm going to be seeing you again pretty soon.  And if there are any
8    problems, I'm going to be told of that and I can make the
9    appropriate adjustment as to where you go to bed at night if it's
10   necessary.

11         Now, this is kind of a difficult release order to
12   structure because I'm really not sure what address to tell the clerk
13   to fill in here.  Because it sounds like it's one place for two
14   nights and then another place for the rest of the time.  And, of
15   course, we are going to make sure we know where you are with
16   electronic monitoring and so that's all got to get figured out.

17         And I'm going to let you go to work with Mr. Chambers.
18   And your work schedule is going to need to get figured out.

19         And I'm going to make you start your mental health
20   treatment immediately.  And I'm going to be looking for an update
21   from the probation office as to which of these many places he's
22   going to and when his first appointment is.  And perhaps that'll be
23   helpful to the Middle District to get that set.  Okay.

24         Because you do need mental health treatment.  I don't
25   think anybody would think otherwise.  And I know you don't think

1   otherwise.

2           So over the Government's objection, the Court will let

3   you go.  But let's go back and see what other conditions need to be

4   added to this that weren't already in the original order.

5           I assume the probation office has his passport.

6           PROBATION OFFICER LUNSMAN:  Yes.  We've collected that,

7   your Honor.

8           THE COURT:  So you're not going to be getting any new

9   passport, but that's already a condition.  It looks like -- no, it

10  may not already -- it's already a condition, yes.

11          And, Mr. Chambers, you're going to let the probation

12  officer know immediately and so we need to get that address -- that

13  contact information to Mr. Chambers.

14          It's not you, right.  It's your --

15          PROBATION OFFICER LUNSMAN:  That's right, but I'll meet

16  with him after.

17          I would like to request since we are imposing electronic

18  monitoring, may we have 24 hours to get that installed so the Middle

19  District can figure out where he is and meet with him?

20          THE COURT:  And if you need 48 because the hotel -- it's

21  not going to work if you're going to a hotel for two days, you can

22  take 48.

23          PROBATION OFFICER LUNSMAN:  Do you have a preference on

24  RF or GPS monitoring?  What you would like us to do?

25          THE COURT:  You educate me on that.

1          PROBATION OFFICER LUNSMAN:  I think RF monitoring is most

2    appropriate as far as affordability and it monitors his coming and

3    going.

4          Would you prefer he be on a curfew, home detention or

5    home incarceration?  I assumed curfew or home detention because

6    you're going to allow him to work.

7          THE COURT:  Yeah.  I assume once they get settled, he's

8    walking up the street to the hardware store and counting parts.

9          Do you have a schedule for that?

10          MR. CHAMBERS:  Yes, ma'am.  0730 --  7 a.m. to 5:30 p.m.

11    Monday through Friday.  Some Saturdays off, but generally 8 until

12    3 p.m.  I don't expect anyone to work on a Sundays but myself.

13          So Saturday and a lot of time off -- that will leave for

14    mental health and any appointments that -- as you see fit.

15          THE COURT:  Right.  He'll need to meet with his lawyer.

16          But if you're not meeting with your lawyer, going to

17    church or the synagog or seeing your mental health professional, or

18    going to the doctor, or going to work, then you need to be at your

19    home unless the probation officer lets you out.  Do you understand

20    that?

21          So you've just heard your new work hours.  I don't know

22    what your salary is.  That might be really going beyond the bounds

23    of what I'm supposed to cover here; but if you're not going to work

24    those hours, I think you ought to let me know.

25          MS. PEREIRA:  Your Honor, I think that the home detention

provision allows for -- if he's not at work, then he must be at home

other than for education, religious services, medical, substance

abuse, mental health treatment, attorney visits, court appearances.

I think that all kind of gets --

THE COURT:  Are you okay with that?

PROBATION OFFICER LUNSMAN:  Yes.  Home detention seems

most appropriate in this case.

THE COURT:  Okay.  Can I task our probation officer with

suggesting to the Court the proposed order setting conditions of

release?  And Ms. Castania just handed me a form and I'll hand it

back to her for her to give it to you and that -- and you can meet

with Mr. Chambers, figure out the address information, and I'll be

in the next hearing and you can bring it back to me and I'll sign

it.

But this will be a chance, too, for Ms. Kocher to make

sure that, without waiving her right to complain about this

decision, if there's something missing and you think it needs to be

in there, I certainly would like to know it.

MS. KOCHER:  Yes.

THE COURT:  Okay.  So I suppose I'm going to be putting

you back in the custody of the Marshal Service until I get this

order inked, but I'm prepared to act on it as soon as it's proposed,

along with terms and conditions outlined and discussed here.

And I'll look forward to hearing about your progress

under release at that 17.1 conference, which is an opportunity for

```
 1    the Court and the parties to come together and consider matters that
 2    bear on the fair, just and expeditious resolution of this case that
 3    now includes this new count.  So unless there's anything else for me
 4    to consider.
 5              Thank you for the patience of the civil parties.
 6              I will take my 10-minute recess and come back.  And
 7    again, I can be interrupted with this order.
 8              Anything further, Ms. Kocher?
 9              MS. KOCHER:  No, your Honor.
10              THE COURT:  And for the defendant?
11              MS. PEREIRA:  No, your Honor.  Thank you.
12              THE COURT:  Well, thank you all.  We'll be in recess.
13                   (Hearing adjourning at 11:29 a.m.)
14    (Whereupon the Court heard other matters and returned to the Initial
15              Appearance and Detention matter at 11:56 a.m.)
16              THE COURT:  Could I just interrupt you right there just
17    for a second?
18              Would you come forward.
19              If you want to take a break.
20      (Probation Officer Lunsman approaching the Bench with documents)
21              THE COURT:  I had promised to send Mr. Fedak to
22    Greensboro to start counting.
23              Has Ms. Kocher reviewed this?
24              PROBATION OFFICER LUNSMAN:  Yes.
25              THE COURT:  Okay.  All right.  Before you leave the room
```

 1   just make sure you've got what you need.  Just take a second.  And I

 2   think I've signed it in the right place.

 3          PROBATION OFFICER LUNSMAN:  (Reviewing document).  Yes,

 4   it looks great.

 5          THE COURT:  All right.  Good luck.  Thank you for your

 6   help.

 7

 8

 9          (Conclusion of proceedings at 11:57 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    UNITED STATES DISTRICT COURT

2               WESTERN DISTRICT OF NORTH CAROLINA

3

4                 CERTIFICATE OF OFFICIAL REPORTER

5

6              I, Michelle A. McGirr, RMR, CRR, CRC, Federal

7    Official Court Reporter, in and for the United States District Court

8    for the Western District of North Carolina, do hereby certify that

9    pursuant to Section 753, Title 28, United States Code, that the

10   foregoing is a true and accurate transcript of my stenographically

11   reported proceedings held in the above-entitled matter and that the

12   transcript page format is in conformance with the regulations of the

13   Judicial Conference of the United States.

14

15   Dated this 12th day of April, 2023

16

17                              /s/  Michelle A. McGirr
                                MICHELLE A. McGIRR
18                              RMR, CRR, CRC
                                U.S. Official Court Reporter
19

20

21

22

23

24

25
```